NJM:RMP/ADR
F. #2023R00939

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

                                          Docket No. 25-CR-88 (HG)

MANSURI MANUCHEKHRI,
    also known as "Mansuri Manchekhri"
    and "Manysher,"

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Robert M. Pollack
Andrew D. Reich
Assistant United States Attorneys
(Of Counsel)

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ iv

PRELIMINARY STATEMENT .......................................................................1

FACTUAL BACKGROUND ...........................................................................3

    I.      Background on ISIS and ISIS-K ............................................................3

    II.     Offense Conduct ....................................................................................6

          A.     Payments to ISIS Associates Overseas ...................................... 6

          B.     Firearms Training and Unlawful Possession ........................... 11

          C.     Immigration Fraud Scheme ...................................................... 13

    III.    The Defendant's Arrest and Post-Arrest Statements .............................15

ARGUMENT ................................................................................................17

    I.      Section 922(g)(5)(A) Is Not Unconstitutional ......................................17

          A.     Introduction ............................................................................ 17

          B.     The Defendant Is Not Among "the People"
                Protected by the Second Amendment ...................................... 19

           C.     Section 922(g)(5)(A) Is Consistent with the
                Nation's Historical Tradition of Firearms
                Regulation .............................................................................. 27

                1.     Nonmembers of the Political Community
                        Historically Have Been Restricted from
                        Bearing Arms ............................................................. 28

                  2.     Section 922(g)(5)(A) Is Analogous to
                        Founding-Era Firearms Restrictions ........................... 29

    II.     Count One Properly Alleges a Material Support Conspiracy ................33

          A.     Applicable Law ....................................................................... 33

           B.     Analysis ................................................................................. 34

III.    The Defendant Is Not Entitled to a Bill of Particulars ............................... 39

    A.    Applicable Law ................................................................................... 39

    B.    The Material Support Conspiracy ....................................................... 41

    C.    The Firearms Conspiracy ................................................................... 42

IV.    Count Four Should Not Be Severed ............................................................. 43

    A.    Applicable Law ................................................................................... 43

    B.    Analysis .............................................................................................. 46

V.    The Defendant's iCloud Account Was Lawfully Searched .......................... 48

    A.    Applicable Law ................................................................................... 48

        1.    Probable Cause ......................................................................... 49

        2.    Particularity and Breadth ......................................................... 50

    B.    Analysis .............................................................................................. 52

        1.    The Warrant Was Issued Upon Probable Cause
            with Sufficient Nexus to the Specified iCloud
            Accounts ................................................................................... 52

        2.    The Warrant Was Sufficiently Particularized
            and Not Overbroad ................................................................... 54

        3.    The Warrant Did Not Rely and No Evidence
            Was Seized in Reliance Upon Any False
            Statement .................................................................................. 58

        4.    The Warrant Was Relied Upon in Good Faith ......................... 61

VI.    The Defendant Validly Waived his *Miranda* Rights .................................. 62

    A.    Applicable Law ................................................................................... 63

    B.    *Miranda* Warnings Were Sufficiently Given, and
        the Defendant's Waiver Was Knowing and
        Voluntary ............................................................................................ 64

    C.    The Defendant Did Not Invoke the Right to Remain
        Silent .................................................................................................. 69

       D.     The Court Should Deny the Defendant's Request for a Hearing ............................................................................. 70

  VII.    There Is No Basis to Dismiss Count Five ............................................................. 71

CONCLUSION ............................................................................................................ 74

# TABLE OF AUTHORITIES

Page

## CASES

*Berghuis v. Thompkins*,
    560 U.S. 370 (2010)..................................................................................63

*Cabell v. Chavez-Salido*,
    454 U.S. 432 (1982)..................................................................................21

*Carpenter v. United States*,
    585 U.S. 296 (2018)............................................................................51, 52

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...........................................................................passim

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022)..............................................................................26

*Drummond v. Robinson Twp.*,
    9 F.4th 217 (3d Cir. 2021).........................................................................32

*Franks v. Delaware*,
    438 U.S. 154 (1978)..................................................................................58

*Hamling v. United States*,
    418 U.S. 87 (1974)....................................................................................33

*Hampton v. Mow Sun Wong*,
    426 U.S. 88 (1976)....................................................................................32

*Herring v. United States*,
    555 U.S. 135 (2009)..................................................................................61

*Illinois v. Gates*,
    462 U.S. 213 (1983)......................................................................49, 54, 57

*Illinois v. Krull*,
    480 U.S. 340 (1987)..................................................................................62

*Mathews v. Diaz*,
    426 U.S. 67 (1976)....................................................................................32

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010).................................................................18, 19, 25, 29

*Medina-Cantu v. United States,*
    145 S. Ct. 1318 (2025)................................................................................................ 17

*Missouri v. Seibert,*
    542 U.S. 600 (2004)................................................................................................... 68

*Moran v. Burbine,*
    475 U.S. 412 (1986)................................................................................................... 63

*New York State Rifle & Pistol Association v. Bruen,*
    597 U.S. 1 (2022)................................................................................................ passim

*North Carolina v. Butler,*
    441 U.S. 369 (1979)....................................................................................... 64, 65, 69

*Perez v. United States,*
    142 S. Ct. 1133 (2022)............................................................................................... 20

*Plyler v. Doe,*
    457 U.S. 202 (1982)............................................................................................ 23, 24

*Rhode Island v. Innis,*
    446 U.S. 291 (1980)................................................................................................... 67

*Rivera v. United States,*
    928 F.2d 592 (2d Cir. 1991) ...................................................................................... 50

*Russell v. United States,*
    369 U.S. 749 (1962)................................................................................................... 36

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206, 210 (1953)........................................................................................... 32

*Texas v. Brown,*
    460 U.S. 730 (1983)................................................................................................... 49

*United States v. Addonizio,*
    451 F.2d 49 (3d Cir. 1971) ........................................................................................ 41

*United States v. Adekanbi,*
    675 F.3d 178 (2d Cir. 2012) ...................................................................................... 72

*United States v. Ahmed,*
    12-CR-661 (S-1) (E.D.N.Y.) (SLT).......................................................................... 36

*United States v. Albunio,*
    No. 91-CR-0403, 1992 WL 281037 (E.D.N.Y. Sept. 9, 1992) ................................. 40

v

*United States v. Alfonso,*
   143 F.3d 772 (2d Cir. 1998) ................................................................. 33, 34, 37

*United States v. Aliperti,*
   867 F. Supp. 142 (E.D.N.Y. 1994) ............................................................ 34, 40

*United States v. Alsahahhi,*
   No. 21-CR-371 (BMC), 2022 WL 2239624 (E.D.N.Y. June 22, 2022) ................... 38

*United States v. Amato,*
   15 F.3d 230 (2d Cir. 1994) .................................................................... 45, 47

*United States v. Aparo,*
   221 F. Supp. 2d 359 (E.D.N.Y. 2002) ........................................................... 66

*United States v. Asainov,*
   19-CR-402 (E.D.N.Y.) (NGG) ................................................................... 36

*United States v. Augustine,*
   No. 18-CR-393 (SJ) (RML), 2020 WL 9199944 (E.D.N.Y. 2020) ....................... 41

*United States v. Augustine,*
   No. 18-CR-393 (SJ) (RML), 2021 WL 1381060 (E.D.N.Y. 2021) ....................... 41

*United States v. Awan,*
   459 F. Supp. 2d 167 (E.D.N.Y. 2006) ........................................................... 36

*United States v. Awan,*
   No. 06-CR-154, 2006 WL 3207858 (E.D.N.Y. Nov. 6, 2006) .............................. 37

*United States v. Awan,*
   384 F. App'x 9 (2d Cir. 2010) ................................................................... 36

*United States v. Balde,*
   No. 20 Cr. 281 (KPF) (S.D.N.Y. Sept. 6, 2022) ............................................... 22

*United States v. Barret,*
   824 F. Supp. 2d 419 (E.D.N.Y. 2011) ........................................................ 40, 43

*United States v. Barrios,*
   210 F.3d 355, 2000 WL 419940 (2d Cir. 2000) ................................................ 71

*United States v. Belloisi,*
   No. 20-CR-219 (DLI), 2023 WL 2709879 (E.D.N.Y. Mar. 30, 2023) .............. 51, 55

*United States v. Blakney,*
   941 F.2d 114 (2d Cir. 1991) ...................................................................... 45

*United States v. Bortnovsky*,
 820 F.2d 572 (2d Cir. 1987) ....................................................... 40

*United States v. Brown*,
 347 F. Supp. 2d 920 (D. Or. 2004) ............................................ 68

*United States v. Carbajal-Flores*,
 143 F.4th 877 (7th Cir. 2025) .............................................. 17, 29

*United States v. Carbajal-Flores,*
 No. 25-CR-469, 2025 WL 3260220 (U.S. Nov. 24, 2025)...................... 17

*United States v. Carpio-Leon*,
 701 F.3d 974 (4th Cir. 2012) ......................................... 22, 31, 32

*United States v. Chao Xian Yao*,
 No. 05-CR-1114 (SAS), 2006 WL 1227771 (S.D.N.Y. May 3, 2006) ............ 64, 65

*United States v. Chen*,
 378 F.3d 151 (2d Cir. 2004) ....................................................... 39

*United States v. Chudhary*,
 20-CR-135 (E.D.N.Y.) (CBA) ................................................... 36

*United States v. Cioffi*,
 668 F. Supp. 2d 385 (E.D.N.Y. 2009) ......................................... 50

*United States v. Citron*,
 783 F.2d 307 (2d Cir. 1986) ....................................................... 34

*United States v. Clark*,
 638 F.3d 89 (2d Cir. 2011) .................................................. 50, 62

*United States v. Dawkins*,
 No. 17-CR-684 (ER), 2019 WL 2464924 (S.D.N.Y. May 23, 2019).......... 56

*United States v. Duque-Ramirez*,
 No. 24-CR-6257, 2025 WL 3637480 (10th Cir. Dec. 16, 2025)............... 17

*United States v. Escobar-Temal*,
 No. 24-CR-5668, 2025 WL 3632831 (6th Cir. Dec. 15, 2025)............... 17

*United States v. Feyrer*,
 333 F.3d 110 (2d Cir. 2003) .............................................. 45, 47

*United States v. Flores*,
 663 F.3d 1022 (8th Cir. 2011) ............................................ 22, 27

*United States v. Fortenberry,*
   919 F.2d 923 (5th Cir. 1990) ................................................................. 44

*United States v. GAF Corp.,*
   928 F.2d 1253 (2d Cir. 1991) ................................................................ 39

*United States v. Ganias,*
   824 F.3d 199 (2d. 2016) ........................................................................ 57

*United States v. Gaskin,*
   364 F.3d 438 (2d Cir. 2004) ................................................................. 49

*United States v. Gonzalez,*
   719 F. Supp. 2d 167 (D. Mass. 2010) ............................................. 68, 69

*United States v. Gotti,*
   784 F. Supp. 1017 (E.D.N.Y. 1992) ..................................................... 40

*United States v. Harun,*
   232 F. Supp. 3d 282 (E.D.N.Y. 2017) .................................................. 71

*United States v. Hashmi,*
   No. 06-CR-442, 2009 WL 4042841 (S.D.N.Y. Nov. 18, 2009) ...................... 37, 42

*United States v. Huitron-Guizar,*
   678 F.3d 1164 (10th Cir. 2012) ........................................................ 22, 31

*United States v. Ianniello,*
   621 F. Supp. 1455 (S.D.N.Y. 1985) ..................................................... 40

*United States v. Imam,*
   10-CR-19 (S-4) (E.D.N.Y.) (RJD) ........................................................ 36

*United States v. Jacobson,*
   4 F. Supp. 3d 515 (E.D.N.Y. 2014) ................................................. 51, 55

*United States v. Jimenez,*
   895 F.3d 228 (2d Cir. 2018) ................................................................. 22

*United States v. Jimenez-Shilon,*
   34 F.4th 1042 (11th Cir. 2022) ................................................... passim

*United States v. Kaziu,*
   09-CR-660 (S-1) (E.D.N.Y.) (JG) ........................................................ 36

*United States v. Kemp,*
   No. 21-CR-1684, 2023 WL 405763 (2d Cir. Jan. 26, 2023) .................... 43, 44

*United States v. Larranga Lopez*,
   No. 05-CR-655 (SLT), 2006 WL 1307963 (E.D.N.Y. May 11, 2006) ................................... 66

*United States v. Laurent*,
   861 F. Supp. 2d 71 (E.D.N.Y. 2011) ....................................................................... 38

*United States v. Lauria*,
   70 F.4th 106 (2d Cir. 2023) ........................................................................ 57, 58

*United States v. Leon*,
   468 U.S. 897 (1984) .................................................................................. 61, 62

*United States v. Levy*,
   2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) ......................................................... 51, 55

*United States v. Lustyik*,
   57 F. Supp. 3d 213 (S.D.N.Y. 2014) ............................................................... 51, 55

*United States v. Maneti*,
   781 F. Supp. 169 (W.D.N.Y. 1991) ..................................................................... 40

*United States v. Matthews*,
   No. 03-CR-1214 (ERK) (MDG), 2006 WL 8447011 (E.D.N.Y. Mar. 6, 2006) ..................... 65

*United States v. Matthews,*
   No. 03-CR-1214 (ERK) (MDG), 2006 WL 8447012 (E.D.N.Y. May 30, 2006) ..................... 65

*United States v. McDuffie*,
   No. 01-CR-808 (NRB), 2002 WL 654136 (S.D.N.Y. Apr. 18, 2002) .................................. 65

*United States v. McGrath*,
   558 F.2d 1102 (2d Cir. 1977) ........................................................................... 43

*United States v. Medina-Cantu*,
   113 F.4th 537 (5th Cir. 2024) ........................................................................... 17

*United States v. Messalas*,
   Case No. 17-CR-339 (RRM), 2020 WL 4003604 (E.D.N.Y. Jul. 14, 2020) ................... 51, 55

*United States v. Meza-Rodriguez*,
   798 F.3d 664 (7th Cir. 2015) ........................................................................ 23, 30

*United States v. Mottley*,
   130 F. App'x 508 (2d Cir. 2005) ........................................................................ 71

*United States v. Munoz-De La O*,
   No. 20-CR-134, 2022 WL 508892 (E.D. Wash. Feb. 18, 2022) ............................................. 30

*United States v. Murillo-Lopez,*
   151 F.4th 584 (4th Cir. 2025) ........................................................................ 17, 27

*United States v. Murphy,*
   16 F. Supp. 2d 397 (S.D.N.Y. 1998) ...................................................................... 65

*United States v. Osadzinski,*
   2021 WL 3209671 (N.D. Ill. 2021) ....................................................................... 42

*United States v. Page,*
   657 F.3d 126 (2d Cir. 2011) ........................................................... 44, 45, 46, 47

*United States v. Perez,*
   6 F.4th 448 (2d Cir. 2021) ..................................................................... passim

*United States v. Perryman,*
   No. 12-CR-0213 (ADS), 2013 WL 4039374 (E.D.N.Y. Aug. 7, 2013) ................................ 71

*United States v. Pierce,*
   No. 06-CR-42 (DLI), 2007 WL 1175071 (E.D.N.Y. Apr. 19, 2007) .................................. 71

*United States v. Plugh,*
   648 F.3d 118 (2d Cir. 2011) ........................................................... 63, 69, 70

*United States v. Portillo-Munoz,*
   643 F.3d 437 (5th Cir. 2011) ........................................................ 21, 22, 24, 27

*United States v. Potamitis,*
   739 F.2d 784 (2d Cir. 1984) ............................................................... 47, 73

*United States v. Pugh,*
   No. 15-CR-116 (NGG), 2015 WL 9450598 (E.D.N.Y. Dec. 21, 2015) ................................ 42

*United States v. Purcell,*
   967 F.3d 159 (2d Cir. 2020) ............................................................... 50, 55

*United States v. Rahimi,*
   602 U.S. 680 (2024) .......................................................................... 27

*United States v. Richardson,*
   837 F. Supp. 570 (S.D.N.Y. 1993) ............................................................. 66

*United States v. Riley,*
   906 F.2d 841 (2d Cir. 1990) ........................................................... 51, 55, 56

*United States v. Rivera,*
   546 F.3d 245 (2d Cir. 2008) ........................................................... 44, 45, 46, 47

x

*United States v. Ruiz,*
   894 F.2d 501 (2d Cir. 1990) ............................................................ 44

*United States v. Salameh,*
   152 F.3d 88 (2d Cir. 1998) ......................................................... 45, 50

*United States v. Saleh,*
   15-CR-393 (E.D.N.Y.) (FB) ............................................................ 36

*United States v. Sampson,*
   385 F.3d 183 (2d Cir. 2004) ....................................................... 44, 47

*United States v. Sampson,*
   898 F.3d 270 (2d Cir. 2018) ....................................................... 34, 38

*United States v. Sattar,*
   314 F. Supp. 2d 279 (S.D.N.Y. 2004) ............................................. 40

*United States v. Scully,*
   108 F. Supp. 3d 59 (E.D.N.Y. 2015) .............................................. 56

*United States v. Silva,*
   146 F.4th 183 (2d Cir. 2025) .......................................................... 54

*United States v. Simpkins,*
   No. 96-CR-750 (EHN), 1996 WL 629567 (E.D.N.Y. Oct. 16, 1996) .................... 66

*United States v. Singh,*
   390 F.3d 168 (2d Cir. 2004) ............................................................ 49

*United States v. Singh,*
   979 F.3d 697 (9th Cir. 2020) .......................................................... 23

*United States v. Singh,*
   No. 12-CR-121 (DLI), 2012 WL 2501032 (E.D.N.Y. June 27, 2012) .................... 66

*United States v. Singh,*
   141 S. Ct. 2671 (2021) .................................................................. 23

*United States v. Sitladeen,*
   64 F.4th 978 (8th Cir. 2023) ...................................................... 17, 27

*United States v. Smith,*
   9 F.3d 1007 (2d Cir. 1993) .............................................................. 50

*United States v. Spencer,*
   995 F.2d 10 (2d Cir. 1993) .............................................................. 64

*United States v. Spinelli*,
  352 F.3d 48 (2d Cir. 2003) ............................................................... 45

*United States v. Stavroulakis*,
  952 F.2d 686 (2d Cir. 1992) ............................................................. 33

*United States v. Stringer*,
  730 F.3d 120 (2d Cir. 2013) ............................................................. 33

*United States v. Torres*,
  901 F.2d 205 (2d Cir. 1990) ............................................................. 39

*United States v. Torres*,
  911 F.3d 1253 (9th Cir. 2019) .......................................................... 22

*United States v. Travisano*,
  724 F.2d 341 (2d Cir. 1983) ............................................................. 50

*United States v. Turoff*,
  853 F.2d 1037 (2d Cir. 1988) ........................................................... 44

*United States v. Ulbricht*,
  858 F.3d 71 (2d Cir. 2017) ............................................................... 51

*United States v. Urso*,
  369 F. Supp. 2d 254 (E.D.N.Y. 2005) ............................................. 40

*United States v. Walia*,
  No. 14-CR-213 (MKB), 2014 WL 2533848 (E.D.N.Y. June 5, 2014) .................................. 71

*United States v. Walsh*,
  194 F.3d 37 (2d Cir. 1999) ......................................................... 34, 40

*United States v. Werner*,
  620 F.2d 922 (2d Cir. 1980) ............................................. 44, 45, 46, 47

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003) ............................................................... 46

*United States v. Yousef*,
  750 F.3d 254 (2d Cir. 2014) ............................................................. 46

*Untied States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ......................................................................... 22

*Zafiro v. United States*,
  506 U.S. 534 (1993) ......................................................................... 45

*Zherka v. Bondi*,
   140 F.4th 68 (2d Cir. 2025) ............................................................................... 20, 31, 32

## STATUTES

18 U.S.C. § 2339A ................................................................................................ 35

18 U.S.C. § 2339B ................................................................................................ 34

18 U.S.C. § 922(g)(5)(A) ................................................................................... passim

## RULES

Fedeal Rule of Criminal Procedure 14(a) ............................................................ 44

Federal Rule of Criminal Procedure 12(b)(3) ...................................................... 38

Federal Rule of Criminal Procedure 7(c) ........................................................ 33, 39

Federal Rule of Criminal Procedure 8(a) ............................................................ 44

## OTHER AUTHORITIES

A. Amar, The Bill of Rights: Creation and Reconstruction 187 (1998) ................. 19, 25

Bernard Schwartz, The Bill of Rights: A Documentary History 681 (1971) .............. 29

J. Story, 3038 Commentaries on the Constitution of the United States § 1890 (1833) .......... 25, 29

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early
   America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139 (2007) ....... 28

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun
   Control*, 73 FORDHAM L. REV. 487 (2004) ............................................................ 28

*Tajik Islamic State network fundraises in Russia* (Jun. 13, 2022), https://eurasianet.org/tajik-
   islamic-state-network-fundraises-in-russia .......................................................... 9

U.S. Citizenship and Immigration Services, Early American Immigration Policies,
   https://www.uscis.gov/about-us/our-history/overview-of-ins-history/early-american-
   immigration-policies (July 30, 2020) ................................................................ 30

PRELIMINARY STATEMENT

The defendant Mansuri Manuchekhri is charged in a five-count indictment with: (1) conspiring to provide material support to the Islamic State of Iraq and al-Sham ("ISIS") and the Islamic State–Khorasan Province ("ISIS-K"), in violation of 18 U.S.C. § 2339B(a)(1); (2) conspiring to possess firearms and ammunition while unlawfully in the United States, in violation of 18 U.S.C. § 371; (3) possessing firearms and ammunition while unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5)(A); (4) immigration fraud, in violation of 18 U.S.C. § 1546(a); and (5) making false statements to federal agents, in violation of 18 U.S.C. § 1001(a)(2).  *See* ECF No. 8 (Indictment).  The defendant facilitated approximately $70,000 in payments to ISIS-affiliated individuals in Türkiye and Syria, including to at least one individual who was later arrested by Turkish authorities for alleged involvement in a January 2024 terrorist attack on a church in Istanbul for which ISIS-K publicly claimed responsibility.  The defendant also frequently trained on firearms and sent videos of himself firing assault rifles to an ISIS affiliate in Türkiye, and he defrauded immigration authorities in an effort to illegally obtain status in the United States.  The defendant subsequently lied about his crimes to federal law enforcement officers.  *See* ECF No. 1 (Complaint).

The government respectfully submits this memorandum of law in opposition to (i) the defendant's motion to dismiss Counts Two and Three of the Indictment as unconstitutional under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), ECF No. 33 ("Bruen Motion"); (ii) the defendant's motion to dismiss Count One of the Indictment, to provide a bill of particulars and to sever Count Four of the Indictment, ECF No. 34 ("MTD"); and (iii) the defendant's motion to suppress evidence from his iCloud, to suppress his post-arrest statements

and to dismiss Count Five of the Indictment, ECF No. 35 ("MTS") (collectively, the "defendant's motions").

As described herein, the defendant's motions misrepresent both the facts and the law and should be denied in their entirety. *First*, Section 922(g)(5)(A) is constitutional and Courts of Appeals around the country have unanimously upheld its constitutionality post-*Bruen*. *Second*, Count One more than satisfies the necessary pleading requirements under long established law. *Third*, the defendant is not entitled to a bill of particulars as the Indictment, Complaint and voluminous discovery in this matter sufficiently describe the nature of the charged conduct and the government's allegations. *Fourth*, Count Four should not be severed because the immigration conduct charged in that count is the same conduct that gives rise to the false statements and the unlawful firearm possession by an alien counts. *Fifth*, the defendant identifies no valid basis on which to suppress evidence obtained through a judicially authorized search warrant based on ample probable cause and tailored to obtain relevant evidence. *Sixth*, the defendant executed a valid waiver of his *Miranda* rights in multiple languages and there is no evidence that he was unable to understand his rights or that he ever asserted his right to remain silent. *Seventh*, there is no basis to dismiss Count Five because there was nothing improper about the interview during which the defendant made multiple materially false statements to federal agents.

FACTUAL BACKGROUND

   The government expects to establish the following facts at trial through witness and expert testimony, financial records, electronic communications and other digital, documentary and photographic evidence, and the defendant's own admissions to law enforcement and third parties.[1]

## I.   Background on ISIS and ISIS-K

   ISIS is a designated foreign terrorist organization that has claimed credit for numerous terrorist activities as part of its broader goal of forming an Islamic state or "caliphate" in Iraq, Syria and beyond.[2] At various times over the past several years, ISIS has controlled territory in Syria, Iraq and Libya, and maintained presences in other countries as well, such as Yemen, Afghanistan, and elsewhere. ISIS routinely carries out killings and deliberate targeting of civilians; mass executions; persecution of individuals and communities on the basis of their

---

  [1]  The factual allegations in the defendant's memoranda in support of his motions represent a selective and misleading (and sometimes simply mistaken) recitation of the record in this case. Because this submission is intended to address the instant motions, it does not set forth all of the facts and evidence that the government will seek to introduce at trial, or correct every misstatement in the defendant's brief. Where the content of statements, written communications or documents are described herein, they are done so in pertinent part and in sum and substance, unless otherwise indicated. The defendant's communications with co-conspirators were principally in Tajik and/or Russian, and direct quotations contained herein are therefore translations into English made by qualified linguists, presented in draft form and subject to revision.

  [2]  On or about October 15, 2004, the U.S. Secretary of State ("Secretary") designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist ("SDGT") under Section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary amended the designation of AQI to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the Islamic State of Iraq and al-Sham ("ISIS") and other aliases to the FTO listing. On September 21, 2015, the Secretary added the following aliases to the FTO and SDGT listings: Islamic State, ISIL, and ISIS. On March 22, 2019, the Secretary added additional aliases to the FTO and SDGT listings. To date, ISIS remains a designated FTO.

religion, nationality, or ethnicity; kidnapping of civilians; forced displacement of Shia Muslim communities and minorities; killing and maiming of children; rape; and other forms of sexual violence. ISIS has recruited thousands of foreign fighters—*i.e.*, non-Syrians and non-Iraqis—from around the globe to assist with its efforts to expand its caliphate in Iraq and Syria. ISIS has also leveraged technology—including the internet, social media, and encrypted communications platforms—to spread its violent extremist ideology and for the purposes of inciting adherents to commit terrorist acts. Tens of thousands of extremists have traveled to the Middle East to join ISIS.

ISIS has also claimed credit for numerous terrorist activities, including attacks against Americans in the United States and against Westerners abroad. For example, ISIS supporters have claimed responsibility for, among others, the following attacks in the United States: the May 2015 shooting in Garland, Texas at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California at the Inland Regional Center; the June 2016 shooting in Orlando, Florida at the Pulse nightclub; the October 2017 West Side Highway truck attack in Manhattan; the December 2017 attempted bombing of the 42nd Street-Port Authority Bus Terminal in Manhattan; and the January 2025 truck attack in New Orleans. ISIS supporters have continued to publicly express their desire to target and attack the United States and other Western nations. On March 28, 2024, ISIS released a message calling for lone-wolf attacks in, among other places, the United States.

ISIS and its supporters have also claimed responsibility for violent attacks across Europe, South Asia and Oceania, including: the November 2015 shootings and suicide bombings in Paris, France at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 attack upon the Holey Artisan Bakery in Dhaka, Bangladesh in which more than 25 people

were killed, including at least one United States citizen; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; the August 2017 van attack in Barcelona, Spain; an August 2018 suicide bombing in Kabul, Afghanistan; the April 2019 Easter Sunday bombings in Sri Lanka that killed or wounded more than 700 people; the August 2021 suicide bombing attack at the Kabul airport that killed more than 170 people, including thirteen members of the United States military; the September 2021 stabbing attack in New Zealand; the November 2021 shooting and suicide bombing attack at a military hospital in Kabul that killed 25 people; the March 2022 shooting and suicide bombing attack at a mosque in Peshawar, Pakistan, that killed or wounded more than 250 people; and the September 2022 suicide bombing attack at the embassy of the Russian Federation in Kabul, in which approximately ten people were killed. Most recently, in December 2025, two gunmen determined to have been motivated by ISIS murdered fifteen people (including a ten-year-old child), and injured several dozen others, during a Hanukkah celebration at Bondi Beach in Sydney, Australia.

ISIS-K is a regional branch of ISIS in South and Central Asia.[3] ISIS-K has similarly claimed responsibility for violent and deadly attacks. For example, on March 22, 2024, ISIS-K claimed responsibility for the terrorist attack at the Crocus City Hall concert venue in Moscow, Russia that killed over 130 people and injured hundreds more. It was the deadliest terrorist attack in Europe since 2004. ISIS and ISIS-K also claimed responsibility for the January

---

[3]     On or about January 14, 2016, the Secretary designated ISIL Khorasan as an FTO under Section 219 of the INA and on or about January 21, 2016, as an SDGT under section 1(b) of Executive Order 13224. The Secretary has also listed additional aliases for ISIL Khorasan, including The Islamic State of Iraq and ash-Sham–Khorasan Province, Islamic State's Khorasan Province, Islamic State Khurasan, and ISIS-K. To date, ISIS-K remains a designated FTO.

28, 2024 shooting during Sunday Mass at the Santa Maria Church in Istanbul (the "Istanbul Church Attack"), which killed one person and injured another, and publicly asserted on the Telegram social media and messaging platform that the attack was part of the call to kill Christians and Jews everywhere.

II.    Offense Conduct

    A.    Payments to ISIS Associates Overseas

As alleged in the Complaint, the defendant traveled to the United States from Tajikistan in June 2016 on a non-immigrant tourist visa and remained in the country after his visa expired in December 2016. Compl. ¶ 3. While here, the defendant expressed his support for ISIS to others by praising past ISIS attacks in the United States (including the October 2017 West Side Highway attack referenced above), *id.* ¶ 6, and by collecting jihadist propaganda videos promoting violence and martyrdom. For example, one video found in the defendant's iCloud account featured a Hamas spokesman and ended with the message, "It is indeed a jihad of victory or martyrdom." *Id.* ¶ 8. Another video apparently produced by an ISIS media apparatus featured a lecture by an ISIS leader depicted against a background of battlefield footage and images of dead and wounded fighters. *Id.* The defendant also sent an associate a video entitled "Central Asia: The Call of ISIS," which discussed a Tajik military commander who defected to ISIS in 2015 and encouraged others to do the same. *Id.* ¶ 9. A close relative of the defendant's told law enforcement agents that, on one occasion, the defendant proclaimed that "if you kill non-Muslims in the war, you will be rewarded with going to heaven" and that he wanted to get revenge on the "pigs."

The defendant communicated frequently with an individual in Istanbul, Türkiye, who is referred to in the Complaint as "CC-1." CC-1 sent the defendant religious messages, often in the form of links to videos on an Instagram account containing extremist Islamic videos in Tajik

or Russian, or subtitled in Tajik or Russian.  For example, on or about September 20, 2022, CC-1 sent the defendant an audio file of an ISIS nasheed, which is a form of vocal music used by ISIS to distribute propaganda.  The nasheed, which contained indications that it was produced by ISIS's Turkish media outlet, stated in part, "They have tied my hands and thrown me in prison.  The day of revenge is near and we will be glorious against the infidels.  To break the chains, we will chant Allahu Akbar."  *Id.* ¶ 12.

From approximately December 2021 through June 2023, while residing in Brooklyn, the defendant facilitated payments to ISIS-affiliated individuals in Türkiye and Syria. *Id.* ¶¶ 13-26.  On numerous occasions during that timeframe, the defendant and CC-1 discussed the defendant's transmission of money to CC-1, and his collection of money from other "brothers" to be submitted to CC-1.  The defendant regularly sent money to CC-1 through a third party, referred to in the Complaint as "Individual-2," and also put Individual-2 in direct contact with CC-1 to facilitate these money transfers.  *Id.* ¶ 13.  The defendant's use of Individual-2 as an intermediary to send money to CC-1 began on or about December 25, 2021, when the defendant asked CC-1, "Dear brother, can I give them this WhatsApp number?"  CC-1 replied, "Give him this WhatsApp."  That same day, the defendant sent several text messages in succession to Individual-2, the first with a name provided by CC-1, then the phone number for CC-1, then "$2,000," and finally the message, "Brother, [this is] the WhatsApp number for that brother in Türkiye."  On December 28, 2021, Individual-2 texted the defendant an image of a Western Union receipt that displayed an alias of CC-1 as the named recipient.  *Id.* ¶ 14.

Subsequent messages indicated that this money was received.  Specifically, on January 18, 2022, CC-1 sent the defendant a photograph of several stacks of Syrian currency.  Next to the money was a hand-written sign bearing the date "05.01.22," and another hand-written sign

that read, in Russian, "Relief is near, $2,000," and in Arabic, "May God reward you."  CC-1 also sent a photo of a woman and a girl seated on the floor wearing burqas, with Syrian currency spread out in front of them, and a hand-written sign that read in Russian, "Relief is near," and in Arabic, "May God reward you."  CC-1 further sent the defendant a screenshot of text messages in Russian from another person, which read, "24 = were distributed to families," "24 to sisters and 69 to children," and "$50 for the boy who is in jail."  *Id.* ¶¶ 16-17.

CC-1 also sent an audio recording to the defendant in which he stated, "Brother, this is not photoshop.  Just to track down the money.  In regard to the money, it was distributed to 24 families and they will receive Syrian currency.  For example, for the deceased, their wives receive 30,000 and their children 20,000, depending how many children they have.  Praise be upon God; the money has been distributed very well.  The money has helped the widows and their children.  Just to let you know that this is only half of the money."  By using the phrase "the deceased," CC-1 was referencing battlefield deaths of ISIS members.  Indeed, there is a regular practice of soliciting financial support from ISIS sympathizers for the families of slain ISIS fighters.  Additionally, the government will demonstrate that the reference to another "half" of the money not going to these family members was a reference to a portion going to other individuals about whom CC-1 was more circumspect to discuss on the telephone: specifically, ISIS fighters.  *Id.* ¶ 18.[4]

_____

[4]    During the fighting to recapture territory that was previously controlled by ISIS, thousands of people, including ISIS members and their families, were displaced into Al-Hol and Al-Roj detention camps in northern Syria, near the border with Iraq.  These camps were nominally controlled by the Syrian Democratic Forces, and the people in them have received international humanitarian aid, but it has been widely reported that the camps are in substantial part *de facto* governed by ISIS.  *Id.* ¶ 19.  It has also been publicly reported that ISIS networks, including Tajik-speaking ISIS-K networks, use online and social media platforms to encourage ISIS supporters to transfer money through surreptitious means to support ISIS militants and their families in the camps, and that they send photographs like those described above to support these fundraising

The communications between CC-1 and the defendant reflect numerous other transactions of similar character.  In each, the defendant informs CC-1 that he is sending money and directs Individual-2 to send money, and financial records show that the money was sent.  The messages also reflect that the defendant was raising money from others to send to CC-1.  For instance, on January 18, 2022, shortly after receiving the above-described photographs from CC-1, the defendant sent CC-1 a voice message stating that he had "collected the money that was designated for Madrasa."  In another sent on April 16, 2022, CC-1 said that he "has a list of 125 individuals who are supposed to pay their alms," and that "each individual should pay $4 as alms and the money will be sent once collected."  The defendant responded that he would "count everything" and try to send "by early next week."  In another message sent on May 12, 2022, the defendant told CC-1 that he sent $2,100, of which "$1,000 was collected as alms" and the rest of which was collected by the defendant "and other brothers."  *Id.* ¶ 22.

After the defendant's message that he sent $2,100, CC-1 responded by asking if he could "put some [of the money] aside for the brothers," some of whom "are traveling" and send the rest for "the sisters."  The defendant responded that he approved and added that he was going "to talk to other brothers and once they collect some money," they would send more.  The distinction drawn between money designated for "the brothers who are traveling" and "the sisters" reflected a distinction between ISIS or ISIS-K members who were outside of the detention camps

---

efforts.  *Id.* ¶ 20.  For instance, one article published in June 2022 about fundraising over an ISIS-K–affiliated Telegram channel included images with several overlapping elements of the photographs that CC-1 sent to the defendant, including a hand-written sign and message, the display of Syrian currency on the floor, and even the style of tent wall visible in the background. *See Tajik Islamic State network fundraises in Russia* (Jun. 13, 2022), https://eurasianet.org/tajik-islamic-state-network-fundraises-in-russia.

and family members who were inside of them.  The exchange thus demonstrates that the defendant understood he was sending money to both groups.  *Id.* ¶ 23.

In a message sent on February 24, 2023, CC-1 complained to the defendant about "some brothers who promised to send [him] money" who were "now trying to find excuses or not fulfilling their obligation."  He asked the defendant if he had "gathered the money."  The defendant answered, "Yes brother, I talked to a few brothers and they told me that they can help."  On April 7, 2023, the defendant sent a message to CC-1 that he had just sent $2,300, of which $1,000 was "alms from a brother," $500 was "alms from" a specifically named "brother," and "$300 alms" from another unspecified "brother."  CC-1 responded, asking, "Brother, should I use this money where you told me, can you let me know?  Also, I was wondering if you collected alms for the month of Ramadan.  You remember as I told you that each brother can pay $3 alms for the month of Ramadan."  The defendant answered, "Brother, wherever you want to spend the money it is up to you.  If you can spend $1,000 for the brothers and the rest for the sisters, that would be good.  In regard to alms for the month of Ramadan, not yet.  I will talk to the brothers and let you know." *Id.* ¶¶ 24-25.

Based on the defendant's communications with CC-1 and Individual-2, together with Individual-2's communications and financial records, the government has calculated that between approximately December 2021 and June 2023 the defendant sent or caused to be sent (through Individual-2) approximately $70,000 to CC-1 and to others, including to another individual in Istanbul referred to in the Complaint as "CC-2."  Individual-2's text messages with CC-2 coordinating money transfers that the defendant directed include an image of CC-2's Turkish identity card that indicates that CC-2 is a Tajik national residing in Türkiye, and also an image of

a receipt with CC-2's name indicating receipt of a money transfer in Türkiye in April 2023.  *Id.* ¶ 26.

In February 2024, CC-2 was arrested by Turkish authorities for terrorism offenses in connection with the January 28, 2024 Istanbul Church Attack, described above, for which ISIS and ISIS-K publicly claimed responsibility.  According to public reporting, CC-2's vehicle, or a vehicle known to have been used by CC-2, was used in the attack.  *Id.* ¶ 28.  CC-1 was similarly arrested by Turkish authorities in the summer of 2023 for affiliation with ISIS-K.  As such, his communications with the defendant, as reflected in the defendant's iCloud account, ended in June of that year.  *Id.* ¶ 27.

B.    Firearms Training and Unlawful Possession

Within the same time period as the money transfers, the defendant also possessed and used firearms, and made frequent visits to shooting ranges, even though he was prohibited from doing so as an alien unlawfully in the United States (as described below, the defendant twice fraudulently applied for lawful permanent residence status, but that status has never been granted to him).  *Id.* ¶ 29.  Photographs and videos in the defendant's iCloud account show him possessing and using firearms at the shooting ranges, which he sometimes visited with other foreign nationals with whom he lived in Brooklyn.  *Id.* ¶ 30.  For example, an invoice from a shooting range in New Jersey reflects that on February 27, 2022, the defendant and a naturalized Tajik native he lived with rented a rifle port, an AK-47, and a Smith & Wesson M&P 15 tactical rifle, and purchased ammunition and other gear.  *Id.* ¶ 32-33.

Additional photographs and communications in the defendant's iCloud account indicate that he may have been seeking to illegally purchase a firearm, *id.* ¶ 31, and may have acquired one.  Specifically, on February 8, 2024, a Russian national with whom the defendant

lived and with whom he had visited shooting ranges (and who has since been deported) sent the defendant a screenshot of a separate text message exchange (without further context) about the potential purchase of a gun. In that screenshot, a third party sent several photographs of a Glock 22 handgun and a text message in Russian stating that the gun or one like it could be purchased for $1,000, which the sender noted in parentheses was a substantial cost markup because it would come "without documents, checks, and other things." *Id.* On August 19, 2024, another individual sent the defendant a video displaying a Ruger handgun, holster, and a Ziploc bag filled with ammunition, stating that it cost $250 to buy. The next day, the defendant sent a photograph of what appears to be the same gun and Ziploc bag of ammunition to the Russian national described above. Several days later, on August 24, 2025, the defendant sent that Russian national a video recorded from inside a moving vehicle, which shows the outstretched arm of the person recording the video (seemingly the defendant) firing a handgun out the window toward the side of the highway. (The visual content of the video and metadata recorded by the phone establish the location where this video was made, and other evidence corroborates that the defendant was in that vicinity in the same timeframe and thus that he was not merely sharing a found video.)

The defendant's interest and access to firearms and firearms training was directly related to his support for ISIS's violent agenda. In February 2022, the defendant sent CC-1 a recording of himself firing an assault rifle at the shooting range in New Jersey with the message, "Thank God, I am ready, brother." *Id.* ¶ 33. In June 2022, the defendant sent CC-1 another video of himself firing an assault rifle with the message, "Brother, I go for training at least once or twice a week." *Id.* ¶ 34.

These communications are consistent with others found on the defendant's phone in which he relayed his desire to travel overseas to join jihadist causes. For example, in November

2023, the defendant messaged a Türkiye-based individual, "I've been waiting for 5 years, I didn't get married after the divorce, it didn't work out.  I thought that if I went to jihad, maybe my family would stop me." // "Brother, for Allah's sake, if there is a way, please tell me.  I want to go there." In another instance, the defendant wrote to a separate individual, "Sheikh, is it possible to go to Palestine to fight with Hamas, will it be jihad?  For Allah's sake, I ask you to answer, and how to go there?"  After receiving a response with instructions for sending cryptocurrency, the defendant responded, "Sheikh, for the sake of Allah, tell me, is it possible to get to Palestine . . . I really want to go there, please, if there is a way, send me there."

      C.    <u>Immigration Fraud Scheme</u>

      In March 2017, the defendant paid an American citizen to enter into a sham marriage with him so that he could obtain legal status in the United States.  *Id.* ¶¶ 35-38.  However, he failed to provide supporting documentation that the government requested of him, and his petition to become lawful permanent resident was never granted.  *Id.*  The defendant thereafter falsely claimed to be a victim of domestic violence in order to obtain legal status and was similarly unsuccessful.  *Id.*

      Specifically, in March 2017, the defendant married a woman, referred to in the Complaint as "Individual-3," who is a United States citizen.  Individual-3 was born in the Bronx, lives in the Bronx, and has never lived with the defendant in Brooklyn or anywhere else.  The defendant and Individual-3 together filed a petition for the defendant to become a lawful permanent resident as Individual-3's spouse.  Immigration authorities requested additional supporting evidence that the defendant never provided.  That original petition was later abandoned in March 2021 when the defendant sought divorce from Individual-3 and filed a petition to become a lawful

permanent resident pursuant to the Violence Against Women Act, and claimed to have been abused by Indiviudal-3 and an unknown male associate of Individual-3's. *Id.* at ¶ 36.

Both of the defendant's petitions were fraudulent. Indeed, the defendant submitted as support to his applications purported copies of utility bills addressed to his name and Indiviudal-3's name at an address in Brooklyn, which were in fact altered. The actual bills, provided by the utility company, do not include Individual-3's name, and the utility company confirmed that Individual-3's name has never been listed at that address. *Id.* at ¶ 37. Additionally, the defendant's iCloud account contained text messages between the defendant and Individual-3 showing that the defendant paid Individual-3 to marry him and that Individual-3 continually demanded more money and threatened to report the defendant to immigration authorities. *Id.* ¶ 38. For example, Individual-3 made statements such as, "I'm helping you out to get ya papers the least you can do is help me out when I need it," and, "You want papers but don't wanna pay the right price another girl would've got you for more . . . Ima just speak to immigration my sister is married the same way I am she knows the system she's helping me."[5] *Id.* ¶¶ 39-41.

Additionally, the defendant's iCloud account contained text messages with an individual identified in the Complaint as "Individual-4" whom he met through work as a mover and with whom he discussed his sham marriage. On September 6, 2019, Individual-4 asked whether the defendant's friends also found American wives to get green cards, and the defendant said that they did not. Individual-4 asked how the defendant found his American wife, and the defendant said he thought he had already relayed the story. Individual-4 responded, "u didn't tell

---

[5]     Communications between the defendant and Individual-3 were made in English and are reproduced here verbatim, with any errors in the original unaltered.

me the details u just said u got married for green card and that she left."[6]  The defendant responded,
"Yes."  Individual-4 asked, "Why didn't u actually marry her did you not like her[?]"  The
defendant answered, "No, I don't like her because she drinks a lot and she is a dancer somewhere
dancing honestly I don't know, we met twice this affection for the wedding the second time I gave
her money."  The defendant added that his sham wife "has an unofficial husband."  The following
day, Individual-4 asked, "These women don't marry more than once right or else the government
will know they do it for the money," and the defendant responded, "Yes they do for the money."
Individual-4 responded, "No I meant they can't do it more than once? / Bctheyll get caught / It's
illegal."  The defendant answered, "Yes you right."  *Id.* ¶¶ 43-45.

III.    The Defendant's Arrest and Post-Arrest Statements

            Early on the morning of February 26, 2025, agents from the Federal Bureau of
Investigation ("FBI") went to the defendant's home in Brooklyn to execute an arrest warrant issued
on the Complaint.  Subsequent analysis of the defendant's cellphone pursuant to a search warrant
revealed that in the moments after FBI agents began knocking on his door and calling his phone,
the defendant deleted the Telegram encrypted messaging application (its contents have not been
recovered).  The defendant thereafter emerged from his home and was arrested.

            Later that morning, the defendant waived his *Miranda* rights and agreed to sit for a
consensual interview with FBI agents.  When confronted with the WhatsApp communications he
had with CC-1, the defendant identified CC-1 by name and repeatedly and unequivocally denied
ever having sent him any money, directly or through any intermediary.  When confronted with
contents of those communications that suggested that the defendant had sent money, the defendant

------

        [6]        Communications between the defendant and Individual-4 were made in English and
are reproduced here verbatim, with any errors in the original unaltered.

15

admitted that CC-1 asked the defendant to send him money, but said he recognized (unprompted by the FBI interviewers) that he "cannot do this because it's [a] crime." When asked why he thought it would be a crime to send money to CC-1, the defendant said that CC-1 might "do something," that there is "a lot of stuff going on in the world," and that CC-1 might "send money to, like, to do something bad," possibly including a "terrorist group."

The defendant also admitted to agents from the FBI that he had married Individual-3 and claimed that it was a genuine marriage, but he misremembered her first name (he gave a name that rhymed with her actual name) and could not remember her surname. When confronted with the altered utility bills that he submitted to immigration authorities, he claimed that they were not altered and that he submitted them just as he received them from the utility company.

On March 11, 2025, a grand jury sitting in the Eastern District of New York returned the Indictment described above, charging the defendant with federal crimes for his material support of ISIS and firearms possession, his immigration fraud scheme and his false statements to federal agents. *See* ECF No. 8. The government has since made a number of discovery productions to the defendant. *See* ECF Nos. 12, 15, 17, 19, 22, 23, 24, and 28.

ARGUMENT

For the reasons set forth below, each of the defendant's pretrial motions lacks merit and should be denied.

I.    Section 922(g)(5)(A) Is Not Unconstitutional

The defendant first moves to dismiss Counts Two and Three of the Indictment on the grounds that Title 18, United States Code, Section 922(g)(5) violates his Second Amendment right to keep and bear arms in light of the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). *See* Bruen Motion. For the reasons set forth below, the Court should follow the unanimous consensus across circuits upholding Section 922(g)(5) post-*Bruen* and deny the motion. *See, e.g.*, *United States v. Murillo-Lopez*, 151 F.4th 584 (4th Cir. 2025); *United States v. Medina-Cantu*, 113 F.4th 537 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1318 (2025); *United States v. Escobar-Temal*, No. 24-CR-5668, 2025 WL 3632831 (6th Cir. Dec. 15, 2025); *United States v. Carbajal-Flores*, 143 F.4th 877 (7th Cir. 2025), *cert. denied*, No. 25-CR-469, 2025 WL 3260220 (U.S. Nov. 24, 2025); *United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023); *United States v. Duque-Ramirez*, No. 24-CR-6257, 2025 WL 3637480 (10th Cir. Dec. 16, 2025).

A.    Introduction

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to possess arms for self-defense. *Id*. at 635. The Court cautioned, however, that the right to keep and bear arms "is not unlimited" and that the right remains subject to "lawful regulatory measures."

17

*Id.* at 626, 627 n.26.   Section 922(g)(5)(A) constitutes one such lawful regulatory measure. Pursuant to Section 922(g)(5)(A), "[i]t shall be unlawful for any person . . . who, being an alien . . . is illegally or unlawfully in the United States" to ship, transport, possess, or receive any firearm or ammunition in or affecting interstate or foreign commerce.   The defendant does not appear to dispute (and there can be no reasonable dispute) that he is unlawfully present in the United States. He argues, however, that following *Bruen*, Section 922(g)(5) is unconstitutional.   The defendant's argument fails for two reasons.

 *First*, as an alien without status in the United States, the defendant is not part of "the people" to whom the Second Amendment applies.   The Second Amendment provides only for "the right of *the people* to keep and bear Arms."   U.S. Const. amend. II (emphasis added).   The Supreme Court, including in *Bruen*, has repeatedly framed the scope of this right as protecting the rights of "citizens" who are "law-abiding"; the defendant is neither.   *See, e.g.*, *Heller*, 554 U.S. at 635 (holding that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home"); *McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010) (describing *Heller* as holding that "citizens must be permitted 'to use [handguns] for the core lawful purpose of self-defense'" (quoting *Heller*, 554 U.S. at 630) (alteration in *McDonald*)); *Bruen*, 597 U.S. at 71 (characterizing the right as belonging to "law-abiding citizens").   The historical understanding of the Second Amendment, which did not extend the right to bear arms to those outside of the political community, is consistent with this understanding of "the people" as limited to citizens.   The scope of the Second Amendment's text is thus itself sufficient to deny the defendant's motion.

 *Second*, and regardless, the restriction set forth in Section 922(g)(5)(A) is consistent with and similar to relevant historical practice around firearms regulation.   Nonmembers of the

political community have historically been denied the right to firearms possession by colonial and Founding-era legislatures.  And while laws explicitly barring aliens without status in the United States from firearm possession are more recent, that is because illegal immigration is itself a comparatively more recent development.  The Court should therefore follow *Bruen*'s instruction by looking to analogous (and not strictly identical) historical restrictions upon those deemed nonmembers of the political community, and it will conclude that Section 922(g)(5)(A) is consistent with such restrictions.

      B.      <u>The Defendant Is Not Among "the People" Protected by the Second Amendment</u>

      In *Heller*, the Supreme Court determined that "the Second Amendment right is exercised individually and belongs to all *Americans*."  554 U.S. at 581 (emphasis added).  The rest of the Court's opinion likewise reflects the understanding that the right to keep and bear arms belongs to "citizens" who are "law-abiding."  *See id*. at 595 ("right of citizens"); *id*. at 603 ("an individual citizen's right"); *id*. at 608 (right "enjoyed by the citizen"); *id*. at 613 ("citizens ha[ve] a right to carry arms"); *id*. at 625 ("weapons not typically possessed by law-abiding citizens" and "possession of firearms by law-abiding citizens"); *id*. at 635 ("law-abiding, responsible citizens").

      Subsequent Supreme Court cases have similarly identified the right as belonging to law-abiding citizens.  *See, e.g.*, *McDonald*, 561 U.S. at 767-68 ("Thus, we concluded, citizens must be permitted 'to use [handguns] for the core purpose of lawful self-defense.'") (quoting *Heller*, 554 U.S. at 630) (alteration in *McDonald*); *id*. at 775 ("one of the 'core purposes of the Civil Rights Act of 1866 and of the Fourteenth Amendment was to redress the grievances' of freedmen who had been stripped of their arms and to 'affirm the full and equal right of every citizen to self-defense'") (quoting A. Amar, The Bill of Rights: Creation and Reconstruction 187, 264-65 (1998)); *Bruen*, 597 U.S. at 8-9 ("In [*Heller*] and [*McDonald*] we recognized that the

Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."); *id*. at 9 ("ordinary, law-abiding citizens"); *id*. at 29 (framing appropriate historical analogies as comparing "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id*. at 31-32 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."); *id*. at 60 ("law-abiding citizens"); *id*. at 71 ("law-abiding citizens"). Aliens without status in the United States are not citizens. In addition, they have, by definition, "show[n] a willingness to defy our law" by entering or remaining in the United States illegally; thus, they are not law-abiding citizens protected by the Second Amendment. *United States v. Perez*, 6 F.4th 448, 456 (2d Cir. 2021) (rejecting Second Amendment challenge to Section 922(g)(5)(A)), *cert. denied*, 142 S. Ct. 1133 (2022).[7]

Most recently, in a case that now squarely forecloses a convicted felon's Second Amendment challenges with respect to Section 922(g)(1), the Second Circuit reiterated that *Heller* "defined the 'people' broadly to include 'all Americans.'" *Zherka v. Bondi*, 140 F.4th 68, 76 (2d Cir. 2025) (quoting *Heller*, 554 U.S. at 581) (emphasis added). The Second Circuit relied on the fact that Zherka, as a United States citizen, was a member of the "political community," which necessarily implies that aliens without status and illegally in the United States are not included within "the people" for purposes of the Second Amendment. *Zherka*, 140 F.4th at 77 ("The government does not assert that Zherka is not an American nor that he does not, as a felon who has completed his sentence, belong to the political community.").

---

[7]    Notably, the Supreme Court denied Perez's petition for certiorari, even though he expressly asked the Court to hold his petition pending the decision in *Bruen*. Thus, the Court declined the opportunity to vacate and remand for further consideration in light of *Bruen*.

The defendant attempts to avoid the Supreme Court's repeated emphasis that the Second Amendment right belongs to law-abiding citizens—a category from which he is doubly excluded—by pointing to language in *Heller* stating that "the people" "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." Bruen Motion at 4. But this passage cannot bear the weight the defendant places on it. In the sentence immediately preceding that passage, as the defendant himself acknowledges, the Supreme Court explained that "the term ['the people'] unambiguously refers to all members of the *political community*." *Id.* (citing *Heller*, 554 U.S. at 580 (emphasis added). The "political community" does not include aliens without status in the United States. "That illegal aliens remain outside the political community is reflected throughout the Constitution and federal law. Illegal aliens may not hold federal elective office, U.S. Const. art. I, § 2, cl. 2; *id.* art. I § 3, cl. 3; *id.* art. II, § 1, cl. 5, are barred from voting in federal elections, 18 U.S.C. § 611(a), may not serve on federal juries, 28 U.S.C. § 1865(b)(1), and are subject to removal from the United States at any time, 8 U.S.C. § 1227(a)." *Perez*, 6 F.4th at 463 (Menashi, J., concurring in the judgment); *see also Cabell v. Chavez-Salido*, 454 U.S. 432, 438-40 (1982) (observing that "citizenship . . . determin[es] membership in the political community" and that "[a]liens are by definition . . . outside of this community"). Thus, "[i]llegal aliens are not 'law-abiding, responsible citizens' or . . . 'members of the political community'—that is, 'the people'— who may invoke the Second Amendment." *Perez*, 6 F.4th at 463 (Menashi, J., concurring in the judgment) (quoting *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011), and *Heller*, 554 U.S. at 580).

The Second Circuit has not yet definitively resolved this question. *See Perez*, 6 F.4th at 453 (declining to decide whether undocumented immigrants have a constitutional right to

bear arms, and upholding Section 922(g)(5)(A) on other grounds);[8] *see also United States v. Balde*, No. 20 Cr. 281 (KPF) (S.D.N.Y. Sept. 6, 2022), Dkt. 151 at 18 (citing *Perez*, 6 F.4th 448) ("This court recognizes, as it must, that neither the majority's discussion of Mr. Perez's inclusion, or not, in the national community, nor Judge Menashi's concurrence is binding on this Court post *Bruen*. But each opinion builds on Supreme Court precedent that is binding on the Court, and that appears not to have been modified or abrogated by *Bruen*."); *United States v. Torres*, 911 F.3d 1253, 1258-61 (9th Cir. 2019) (similar); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1167-70 (10th Cir. 2012) (similar). But a clear majority of Courts of Appeals to answer the question have determined that undocumented immigrants are not among "the people" or "political community" to whom the Second Amendment applies, or otherwise are not protected by the Second Amendment. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1043-47 (11th Cir. 2022) (concluding, based on Second Amendment's "text and history," that illegal aliens "do not enjoy the right to keep and bear arms"); *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) (discussing *Heller* and *Untied States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), and the historical record at length, and concluding "that illegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection"); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (holding that "the protections of the Second Amendment do not extend to aliens illegally present in this country"); *Portillo-Munoz*, 643 F.3d at 442 ("Whatever else the

---

[8]    To be sure, the Second Circuit subsequently read the *Heller* passage discussed above to mean that "presumably at least some non-citizens are covered by the Second Amendment." *United States v. Jimenez*, 895 F.3d 228, 233 n.1 (2d Cir. 2018). But as Judge Menashi has noted, this language from *Jimenez* is quintessential dicta: "[*Jimenez*] had nothing to do with the application of the Second Amendment to non-citizens, and the opinion contains no holding addressing that issue." *Perez*, 6 F.4th at 462 n.3 (Menashi, J., concurring in the judgment). The Second Circuit declined to reach the question in *Perez*.

term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States."); *see also United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) (rejecting challenge to Section 922(g)(5)(B) and noting that "those unlawfully present . . . are neither citizens nor members of the political community"), *cert denied*, 141 S. Ct. 2671 (2021); *but see United States v. Meza-Rodriguez*, 798 F.3d 664, 669-72 (7th Cir. 2015) (concluding that the defendant was among "the people" but upholding § 922(g)(5)(A) on other grounds). And Judge Menashi, concurring in *Perez*, stated that he "would join those circuits that have held that illegal aliens are not among 'the people' to whom the right to keep and bear arms under the Second Amendment belongs." 6 F.4th at 461 (Menashi, J., concurring in the judgment). *Bruen* did nothing to cast doubt on the decisions that have held that the Second Amendment does not extend to undocumented immigrants.

The defendant argues that the term "the people" in the Second Amendment must be consistent with its use elsewhere in the Bill of Rights, relying on *Verdugo-Urquidez* and *Plyler v. Doe*, 457 U.S. 202 (1982). His reliance on those decisions is misplaced. In *Verdugo-Urquidez*, the Supreme Court held that the Fourth Amendment—which protects "[t]he right of the people" against unreasonable search and seizure, U.S. Const. amend. IV—does not apply to "the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country." 494 U.S. at 261. The Court expressly declined to decide whether "the Fourth Amendment applie[s] to illegal aliens in the United States." *Id*. at 272. Even assuming that the term "the people" bears the same meaning in the Second and Fourth Amendments, then, *Verdugo-Urquidez* would not establish that the term encompasses noncitizens who are unlawfully present in the United States. While the Second Circuit has recognized undocumented immigrants' First and Fourth Amendment rights in some circumstances, the conclusion that the Second Amendment

does not apply to noncitizens who are present in the country unlawfully rests not simply on the Second Amendment's reference to "the people," but also on the historical understanding of the scope of the right the Second Amendment codified.  *See infra*; *Portillo-Munoz*, 643 F.3d at 440-41 (recognizing that "[t]he purposes of the Second and the Fourth Amendment are different" and thus "the use of 'the people' in both" amendments need not "cover exactly the same groups of people").

In *Plyler*, meanwhile, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment—which provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws"—protects noncitizens who are present in the United States illegally.  457 U.S. at 214-16.  But that decision involved the meaning of the term "any person" in the Fourteenth Amendment, not the meaning of the distinct term "the people" in the Second Amendment, or the distinct history of the right to keep and bear arms.  *Id*. at 214; *see also Jimenez-Shilon*, 34 F.4th at 1045 (distinguishing *Plyler* on this basis).  *Verdugo-Urquidez* and *Plyler* thus do not suggest that noncitizens who are unlawfully present in the United States are protected by the Second Amendment.  And, as discussed below, even if they were, Section 922(g)(5)(A) would be a permissible regulation of the right to keep and bear arms.

Moreover, the historical record supports the conclusion that the Second Amendment was understood to extend the right to bear arms to citizens at the time of its ratification.  Under the English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," the right to keep and bear arms was expressly limited to "Subjects."  *Heller*, 554 U.S. at 593 (quoting Bill of Rights 1689, 1 W. & M., ch. 2, § 7, Eng. Stat. at Large 441); *see id*. ("By the time of the founding, the right to keep and bear arms had become fundamental for English subjects.") (emphasis added).  And in colonial America, "[a]lien men"

did not have "the right to bear arms" because that and other rights "were rights of members of the polity." *Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (quoting Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (1998)); *accord Jimenez-Shilon*, 34 F.4th at 1047-48.

Accordingly, colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the political community, and "[s]tate constitutions in the early republic continued a similar practice by restricting the right to keep and bear arms to citizens." *Perez*, 6 F.4th at 463 & n.6 (Menashi, J., concurring in the judgment) (collecting Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania constitutions); *accord Jimenez-Shilon*, 34 F.4th at 1049. The Bill of Rights codified this understanding of the right to bear arms as being connected with membership in and preservation of the political community. *See McDonald*, 561 U.S. at 769-70 ("The right of *the citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist triumph over them.") (quoting 3 J. Story, 3038 Commentaries on the Constitution of the United States § 1890, p. 746 (1833)) (emphasis added).

In response to this lengthy historical record, the defendant cites a state law that provided that certain "free white aliens" were eligible for militia duty and three state laws that, he asserts, effectively did the same thing by not expressly exempting them from militia service. Bruen Motion at 11-12. As an initial matter, it is not surprising that a state law would not explicitly exclude noncitizens from militia duty, given that "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service." *Heller*, 554 U.S. at 628 (emphasis added). But even accepting the defendant's premise that a handful of

states included noncitizens within the obligation of militia service, and that by doing so those states did not prohibit them from bearing arms, it remains the case that other states excluded noncitizens from the right to bear arms. *See Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (explaining that "alien men . . . typically could not vote, hold public office, or serve on juries and did not have the right to bear arms because these were rights of members of the polity" and that "non-citizens . . . were neither expected, nor usually allowed, to participate in the militia") (quotation marks omitted); *Jimenez-Shilon*, 34 F.4th at 1047-48 (describing history of "disarmament of groups associated with foreign elements," including "on the ground of alienage") (quotation marks omitted). And there is no suggestion that any states were viewed at the time as lacking the authority to exclude noncitizens from the right to bear arms. *See Bruen*, 597 U.S. at 30 (where there were "no disputes regarding the lawfulness of [certain] prohibitions," one "can assume it settled" that those prohibitions are "consistent with the Second Amendment"); *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022) (noting that the fact that several states did not prohibit a given practice "does not mean that anyone thought the States lacked the authority to do so").

Moreover, the absence of laws explicitly excluding a group of noncitizens from a right that noncitizens already were understood not to possess is hardly surprising. *See Perez*, 6 F.4th at 462 n.4 (Menashi, J., concurring in the judgment) ("[A]rms bearing and suffrage were intimately linked two hundred years ago and have remained so."). Furthermore, as discussed below, while immigration is hardly a new phenomenon, *illegal* immigration is essentially a phenomenon that began in the late 19th century; accordingly, laws prohibiting undocumented immigrants from bearing arms that arose soon after the existence of undocumented immigrants suggest that the Second Amendment does not extend to such persons. *See United States v.*

*Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023) (holding challenge foreclosed by *Flores*, 663 F.3d at 1023 which adopted *Portillo-Munoz*, 643 F.3d at 442); *see also Murillo-Lopez*, 151 F.4th at 591 ("This Court has already rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(5), concluding undocumented non-citizens 'do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection.'").

Section 922(g)(5)(A) disarms noncitizens who are unlawfully present in the United States. Such persons, by definition, are not "law-abiding, responsible citizens" protected by the Second Amendment. *Heller*, 554 U.S. at 635.

C.    Section 922(g)(5)(A) Is Consistent with the Nation's Historical Tradition of Firearms Regulation

Assuming the Second Amendment applies at all, it permits limitations on the right to keep and bear arms that are "fairly supported by . . . historical tradition." *Heller*, 554 U.S. at 627; *see, e.g.*, *id*. at 626-27 & n.26 (emphasizing that "nothing in [the Court's] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and stating that these "presumptively lawful regulatory measures" were identified "only as examples" and not as an "exhaustive" list). The Supreme Court confirmed in *Bruen* that, even where the Second Amendment applies, the government may justify a challenged restriction by showing "that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19; *see also United States v. Rahimi*, 602 U.S. 680, 692 (2024). The Court has affirmed not only that firearms regulations that are direct progeny of those at the relevant historical period are permissible, but also that courts may "determine[e] whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by determining "whether the two regulations are relevantly similar." *Bruen*, 597 U.S. at 29 (internal quotation marks omitted); *see also Rahimi*, 602 U.S. at 681. In conducting that

inquiry, courts should examine "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. (Of course, this language in *Bruen* makes it clear that the Court need not reach the stage of examining historical analogies to Section 922(g)(5)(A) because that law imposes no burden on a law-abiding citizen's right to armed self-defense.)

1.    Nonmembers of the Political Community Historically Have Been Restricted from Bearing Arms

As discussed above, there is abundant precedent before, during, and after the American Revolution for disarming nonmembers of the political community. For instance, Massachusetts and Virginia forbade the arming of Native Americans. *See Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment); *Jimenez-Shilon*, 34 F.4th at 1047. Consistent with the English understanding of the connection between fealty to the Church of England and membership in the English political community, Virginia prohibited Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 157 (2007). During the American Revolution, colonial governments disarmed persons who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506 (2004); *see id.* at 506 nn.128-29 (collecting statutes); *see generally* Churchill at 159 ("[T]he new state governments . . . framed their police power to disarm around a test of allegiance."). During the ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion," while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable citizens" the right to keep arms. Bernard Schwartz, The Bill of Rights: A Documentary

28

History 681, 761 (1971); *see Heller*, 554 U.S. at 604 (considering ratification conventions' proposals). As the Seventh Circuit observed in *Carbajal-Flores*, "governments have consistently conditioned the right to bear arms on one's allegiance to the sovereign. Allegiance serves as a mark of trustworthiness. And it shows one's willingness to accede to the term of social order in exchange for the full benefits of citizenship. Aliens as a matter of their status, have not yet affirmed their allegiance to the sovereign. That has uniformly served as the basis for disarming them. It serves as the basis for § 922(g)(5)(A)'s prohibition too." 143 F.4th at 887-88 (internal citation omitted).

The Bill of Rights codified this understanding of the right to bear arms as being connected to citizenship and to membership in and preservation of the political community. *See McDonald*, 561 U.S. at 769-70 ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them.") (quoting Story at 746). Section 922(g)(5)(A) fits squarely within this historical tradition, and certainly does not "burden a *law-abiding citizen's* right to armed self-defense" in a manner inconsistent with historical precedent. *Bruen*, 597 U.S. at 29 (emphasis added).

2.    Section 922(g)(5)(A) Is Analogous to Founding-Era Firearms Restrictions

The defendant argues that these historical precedents are not close enough analogies because alien disarmament is a novelty in the 20th century and there are no direct comparators to Section 922(g)(5)(A). Bruen Motion at 10-11 (citing *Bruen*, 597 U.S. at 26-27) ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant

29

evidence that the challenged regulation is inconsistent with the Second Amendment.").  But the defendant focuses on the wrong question.  Section 922(g)(5)(A) does not prohibit firearm possession by all immigrants, but rather prohibits aliens "*illegally or unlawfully* in the United States" from shipping, transporting, possessing, or receiving any firearm or ammunition in or affecting interstate or foreign commerce.  18 U.S.C. § 922(g)(5)(A) (emphasis added).  The relevant phenomenon of illegal immigration is one of more recent provenance than the Second Amendment.

"The federal government first forayed into the realm of immigration legislation during the 1870s.  One decade later, the 1882 Chinese Exclusion Act prohibited Chinese laborers from entering the United States for ten years."  *United States v. Munoz-De La O*, No. 20-CR-134, 2022 WL 508892, at *1 (E.D. Wash. Feb. 18, 2022); *see also* U.S. Citizenship and Immigration Services, Early American Immigration Policies, https://www.uscis.gov/about-us/our-history/overview-of-ins-history/early-american-immigration-policies (July 30, 2020) ("Americans encouraged relatively free and open immigration during the 18th and early 19th centuries, and rarely questioned that policy until the late 1800s.").  In the context of a country that initially drew no connection between the manner of an immigrant's arrival and lawbreaking, there was no need to explicitly restrict any immigrant's possession of firearms (even if, as discussed above, the common understanding was that noncitizens had no affirmative right to bear arms).  After the problem of illegal immigration emerged, by contrast, "Congress ha[d] every right to conclude that those who show a willingness to defy our law are candidates for further misfeasance or at least a group that ought not be armed when authorities seek them."  *Perez*, 6 F.4th at 456 (quotation marks and alteration omitted); *see also Meza-Rodriguez*, 798 F.3d at 673 (recognizing that "unauthorized noncitizens" are more "difficult to track" and "have an interest in eluding law enforcement");

*Huitron-Guizar*, 678 F.3d at 1170 ("Congress may have concluded that illegal aliens, already in probable present violation of the law, simply do not receive the full panoply of constitutional rights enjoyed by law-abiding citizens.  Or that such individuals, largely outside the formal system of registration, employment, and identification, are harder to trace and more likely to assume a false identity."); *Carpio-Leon*, 701 F.3d at 982-83 (similar).

In *Bruen*, the Supreme Court recognized that courts should be mindful of changing societal conditions in evaluating how closely a challenged regulation must conform to historical precedent.  "While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Bruen*, 597 U.S. at 27.

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check.  On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted.  On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id*. at 2133; *see also Zherka*, 140 F.4th at 80-81 ("There are no historical twins for Section 922(g)(1) from the colonial era.  The absence in the historical record of a dead ringer for felon-in-possession laws does not, however, support that Section 922(g)(1) is unconstitutional as applied to Zherka; rather, it is largely attributable to how the English and early Americans punished felons.").

Illegal immigration is an issue that substantially postdates the Second Amendment.  Accordingly, the government need not identify "a dead ringer for historical precursors," but rather must identify only "a well-established and representative historical analogue."  *Id*.  The

31

government has done precisely that here, pointing to laws barring Native Americans, Catholics, and Loyalists from bearing arms. While some of these classifications—such as those based on race or religion—are abhorrent and of course "would be unconstitutional today" under other constitutional provisions, *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.8 (3d Cir. 2021) (quotation marks omitted), they nevertheless show that the right to bear arms was understood to be subject to the government's limitation of that right to those within the political community. *See Zherka*, 140 F.4th at 93 ("The test that *Bruen* requires us to apply uses history as its guide, not policy concerns. Our task here is solely to follow the history.").

Today, by virtue of laws prohibiting immigration outside of authorized channels and criminalizing the violation of those laws, Congress has clearly expressed its understanding that undocumented immigrants are not entitled to the full panoply of rights afforded to U.S. citizens, including the right to bear arms under the Second Amendment. *See Carpio-Leon*, 701 F.3d at 982 ("[W]hen Congress regulates illegal aliens by prohibiting them from possessing firearms, it is functioning in a special area of law committed largely to the political branches, and on which we owe Congress special deference.") (citations omitted).[9]

The Court should find that the defendant is not among "the people" to whom the Second Amendment guarantees the right to bear arms. And even if he were, Section

---

[9]     The Supreme Court has held that "the responsibility for regulating the relationship between the United States and our alien visitors"—determinations about which noncitizens should be allowed to enter and remain in the United States and the terms and conditions imposed upon such noncitizens while they are here—is "committed to the political branches" of government. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). In exercising that power, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Id*. at 80. And because Congress's "power over aliens is of a political character," its exercise of that power is "subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976); *see Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (holding that congressional power over noncitizens is "largely immune from judicial control").

922(g)(5)(A)'s prohibition on the possession of firearms by undocumented immigrants is consistent with and analogous to this nation's historical practice of denying the right to possess firearms by those deemed outside the political community.  Accordingly, the Court should deny the defendant's motion to dismiss Counts Two and Three of the Indictment.

II.    Count One Properly Alleges a Material Support Conspiracy

The defendant next moves to dismiss Count One of the Indictment, which charges the defendant with conspiring to provide material support to ISIS and ISIS-K.  *See* MTD at 10-17.  But Count One appropriately alleges the essential elements of such a conspiracy.  As such, the defendant's motion is without merit and should be denied.

A.    Applicable Law

It is well established that an indictment need not include all the government's factual evidence, and that an indictment that tracks the language of a statute and states the time and place of the alleged crime is sufficient to survive a motion to dismiss for failure to state an offense.  Under Federal Rule of Criminal Procedure 7(c), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  An indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (internal quotation marks omitted); *see United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (same); *Hamling v. United States*, 418 U.S. 87, 117 (1974).  Where an indictment does so, it is sufficiently specific to withstand a motion to dismiss.  *See United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) ("When the charges in an indictment have stated the elements of the offense and provided even minimal protection against double jeopardy, this court has 'repeatedly refused, in the absence of any showing of prejudice, to dismiss . . . charges for lack

33

of specificity.'") (internal citations omitted); *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (affirming conviction on appeal where defendant argued that the district court erred in failing to dismiss the indictment pretrial); *United States v. Citron*, 783 F.2d 307, 314 (2d Cir. 1986); *United States v. Aliperti*, 867 F. Supp. 142, 144 (E.D.N.Y. 1994).

Moreover, challenges that invite the Court to "look beyond the face of the indictment" and draw "inferences as to the proof that would be introduced by the government at trial" are premature and not appropriately addressed in a Rule 12(b) pretrial motion to dismiss. *Alfonso*, 143 F.3d at 776-77; *see also United States v. Sampson*, 898 F.3d 270, 283-84 (2d Cir. 2018) ("[W]e simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be.") (internal citations omitted).

B.    <u>Analysis</u>

The defendant makes two arguments in support of his motion. *First*, he asserts that Count One should be dismissed because it "does not limit the types of material support that the government alleges Mr. Manuchekhri conspired to provide." MTD at 14. This is both factually incorrect and fails as a matter of law.

Section 2339B states, in relevant part:

Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be [punished] . . . . To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization [], that the organization has engaged or engages in terrorist activity [], or that the organization has engaged or engages in terrorism [] . . . .

[T]he term "material support or resources" has the same meaning given that term in section 2339A . . . .

18 U.S.C. §§ 2339B(a)(1); 2339B(g)(4).

34

Section 2339A states, in relevant part:

> [T]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1).

Consistent with the requirements repeatedly endorsed by the Second Circuit, Count One of the Indictment tracks the language of the statute and provides the approximate time and place of the charged crime. Count One further identifies the particular categories of material support the defendant is alleged to have provided from the several categories listed in the statutory definition. Specifically, Count One alleges, in relevant part:

> In or about and between December 2021 and June 2023 . . . within the Eastern District of New York and elsewhere, the defendant . . . together with others, did knowingly and intentionally conspire to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), including services, personnel including himself and others, and property including currency and monetary instruments, to one or more foreign terrorist organizations, to wit: the Islamic State ("ISIS") and the Islamic State-Khorasan Province ("ISIS-K"), which at all relevant times were designated by the Secretary of State as foreign terrorist organizations pursuant to Section 219 of the Immigration and Nationality Act, knowing that ISIS and ISIS-K were designated foreign terrorist organizations and that ISIS and ISIS-K had engaged in and were engaging in terrorist activity and terrorism . . . .

Indictment ¶ 1.

In addition to tracking the statute, Count One thus alleges that the defendant's material support included "services, personnel including himself and others, and property including currency and monetary instruments." *Id.* This is sufficiently specific to provide the

required notice to the defendant.  Indeed, this is precisely how Section 2339B charges are routinely pled in this district and elsewhere.  *See, e.g.*, *United States v. Chudhary*, 20-CR-135 (E.D.N.Y.) (CBA) (alleged material support included "services and personnel, including himself"); *United States v. Asainov*, 19-CR-402 (E.D.N.Y.) (NGG) (alleged material support included "property, services and personnel, including himself and others"); *United States v. Saleh*, 15-CR-393 (E.D.N.Y.) (FB) (alleged material support included "services and personnel, including themselves"); *United States v. Ahmed*, 12-CR-661 (S-1) (E.D.N.Y.) (SLT) (alleged material support included "services, currency, weapons and personnel, including themselves"); *United States v. Imam*, 10-CR-19 (S-4) (E.D.N.Y.) (RJD) (alleged material support included "currency, lodging, training, expert advice and assistance, safehouses, communications equipment, explosives, personnel and transportation"); *United States v. Kaziu*, 09-CR-660 (S-1) (E.D.N.Y.) (JG) (alleged material support included "property, tangible and intangible, and services, including personnel, including himself").

The sole case cited by the defendant in support of his argument is *United States v. Awan*, 459 F. Supp. 2d 167 (E.D.N.Y. 2006), *aff'd*, 384 F. App'x 9 (2d Cir. 2010).  But *Awan* is of no help to him.  In that case, the indictment charged a violation of Section 2339A (material support of terrorism) but did not list *any* categories of material support the defendant was alleged to have committed.  As the district court observed, "the indictment uses the generic expression 'material support,' as defined in 18 U.S.C. § 2339A(b), without specifying which of a variety of activities, any one of which would be criminal, that the defendant must defend against or which the grand jury considered."  *Awan*, 459 F. Supp. 2d at 175 (citing *Russell v. United States*, 369 U.S. 749, 764-65 (1962)).  However, once the indictment in that case was superseded to identify categories of support set forth in the statute, as the Indictment here does, it was held sufficient.

36

*See United States v. Awan*, No. 06-CR-154, 2006 WL 3207858 at *3 (E.D.N.Y. Nov. 6, 2006) (superseding indictment identified "currency, monetary instruments, financial services and personnel"); *see also United States v. Hashmi*, No. 06-CR-442, 2009 WL 4042841, at *4 (S.D.N.Y. Nov. 18, 2009) (observing same about *Awan* and concluding that "[t]he [i]ndictment here goes beyond simply tracking statutory language and provides the sort of particularity Hashmi argues that *Awan* requires").

Of course, the allegations set forth in the charging instruments in this case do substantially more than what is required by law. In particular, the 21-page Complaint provides considerable detail describing the particular allegations against the defendant, as set forth above. Among other things, the Complaint describes the various types of material support provided by the defendant, including his facilitation of approximately $70,000 in payments to ISIS-affiliated individuals in Türkiye and Syria, as well as the defendant's frequent firearms training to "ready" himself to fight for ISIS (and additional communications by the defendant, produced in discovery and described above, demonstrate his desire to travel abroad to fight for jihadist causes).[10] Nevertheless, because Count One of the Indictment satisfies the Second Circuit's requirement that an indictment "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," *Alfonso*, 143 F.3d at 776, Count One is adequately pled.

*Second*, the defendant asserts, in direct contradiction to his first argument, that Count One must be dismissed because it charges him with providing material support specifically and exclusively by making donations to Syrian detention camps, which is lawful and does not violate Section 2339B. MTD at 14-16. The defendant is again wrong on both the facts and the

---

[10]    The defendant's assertion that he is left to "guess" about the allegations against him is thus particularly curious. MTD at 14.

law.  To begin with, the government alleges multiple theories of material support, none of which includes making donations to Syrian detention camps through non-profit charities like "Save the Children, Syrian Arab Red Crescent, Doctors Without Borders, USAID, WHO [or] Human Rights Watch," as the defendant describes.  MTD at 7.  Instead, as described above, the government's financial support theory alleges that the defendant facilitated payments to ISIS-affiliated individuals in Türkiye, some of which he understood would be shared with ISIS-associated families in detention camps, and some of which he understood would be provided to ISIS fighters. The alleged conspiracy also includes additional theories of material support relating to the defendant's firearms training, which is separate from his financial support.

The defendant asserts that the evidence referenced in the Complaint is insufficient to demonstrate the government's theory.  MTD at 16.  But such a factual dispute is appropriately resolved at trial, not in a motion to dismiss an indictment.  Under Federal Rule of Criminal Procedure 12(b)(3), a defense that an indictment fails to state an offense may be raised by a pretrial motion only "if the basis for the motion is then reasonably available and *the motion can be determined without a trial on the merits*" (emphasis added).  Where the motion cannot be determined without reference to the evidence that would be presented at trial, it must be denied as premature.  A technically sufficient indictment "is not subject to dismissal on the basis of factual questions, the resolution of which must await trial."  *United States v. Laurent*, 861 F. Supp. 2d 71, 110 (E.D.N.Y. 2011); *see Sampson*, 898 F.3d at 279 ("[T]he civil summary judgment mechanism does not exist in federal criminal procedure . . . ."); *United States v. Alsahahhi*, No. 21-CR-371 (BMC), 2022 WL 2239624, at *4-6 (E.D.N.Y. June 22, 2022) (rejecting defendants' pretrial motion to dismiss and observing that "many of defendants' arguments here are inappropriately

premised on the sufficiency of the Government's evidence, and not on statutory interpretation . . . the Government is entitled to make its case at trial . . . .").  So too, here.

Each of the four cases cited by the defendant in support of his argument is a *post-trial* appellate decision evaluating (and then *affirming*) a jury conviction for material support charges based on the evidence at trial.  MTD at 16-17.  As such, those cases do not support the defendant's argument and instead demonstrate why his motion is premature at this stage and should be denied.  The defendant will have ample opportunity to challenge the government's proof both during and after trial.

III.    The Defendant Is Not Entitled to a Bill of Particulars

Next, the defendant demands a bill of particulars with respect to the allegations in Counts One and Two of the Indictment.  *See* MTD at 17-21.  This motion similarly has no merit and should be denied.  The Indictment specifies the nature of the charged acts, and the detailed 21-page Complaint and substantial discovery in this case provide further specifics of the government's allegations.

A.    Applicable Law

Under the Federal Rules of Criminal Procedure, an indictment need only set forth a "plain, concise, and definite written statement of the essential facts constituting the offense." Fed. R. Crim. P. 7(c).  Additional details, in the form of a bill of particulars, are not appropriate unless the indictment is too vague to inform the defendant of the nature of the charges so as to allow the preparation of a defense, avoid unfair surprise, and preclude double jeopardy.  *See United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004); *United States v. GAF Corp.*, 928 F.2d 1253, 1260 (2d Cir. 1991); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990).  If the information sought by a defendant is provided in the indictment or through some other means, a bill of

39

particulars is not warranted.  *See United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *United States v. Urso*, 369 F. Supp. 2d 254, 271 (E.D.N.Y. 2005).

"[T]he burden is on the defendant to show that non-disclosure of the requested particulars will lead to prejudicial surprise at trial or will adversely affect his rights."  *United States v. Maneti*, 781 F. Supp. 169, 186 (W.D.N.Y. 1991).  The ultimate test of the appropriateness of a bill of particulars is whether the information is necessary, not whether it is helpful, to the defendant.  *See Aliperti*, 867 F. Supp. at 148; *see also United States v. Gotti*, 784 F. Supp. 1017, 1019 (E.D.N.Y. 1992) (bill of particulars is necessary only if "directed to curing defects in an indictment; that is [only if it] clarifies the charges against the defendant") (emphasis in original).

It is improper for a defendant to use Rule 7(f) as a mechanism to limit the government's evidence, or to flush out the prosecution's theories in advance of trial.  *See Urso*, 369 F. Supp. 2d at 272; *United States v. Barret*, 824 F. Supp. 2d 419, 439 (E.D.N.Y. 2011) ("[T]he court is mindful that it cannot compel the government to disclose, through a bill of particulars, the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories.") (quotations and citations omitted); *United States v. Sattar*, 314 F. Supp. 2d 279, 318 (S.D.N.Y. 2004); *United States v. Ianniello*, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985) ("To require most of the further disclosure the defendants seek would do little more than restrict the government's proof at trial, which is not the purpose of a bill of particulars."); *United States v. Albunio*, No. 91-CR-0403, 1992 WL 281037, at *2 (E.D.N.Y. Sept. 9, 1992) ("The defendant's right to know the crime with which he is charged must be distinguished from his right to know the evidentiary details by which proof of his culpability will be established.").

B.     The Material Support Conspiracy

The defendant first demands a bill of particulars with respect to Count One, claiming that the Indictment "fails to apprise [him] of what types of material support and resources he is charged with conspiring to provide."  MTD at 18-19.  But the defendant simultaneously concedes that the Complaint "provides additional details" as to that charge, MTD at 2, which he describes and analyzes over more than seven full pages in his motion.  *See* MTD at 2-8.  Indeed, as described above, the 21-page Complaint details the defendant's alleged conduct at length, including his facilitation of some $70,000 in payments to CC-1 and CC-2 through Individual-2, and his frequent firearms training to "ready" himself to fight for ISIS, about which he provided updates to CC-1.[11]

In reality, through the motion for a bill of particulars, the defendant inappropriately seeks to compel the government to "weave the information in its command into the warp of a fully integrated trial theory for the benefit of the defendant[] . . . ."  *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971).  The defendant's multiple requests for "what facts the government intends to rely on" to prove its case at trial, MTD at 21, constitute exactly the type of mining for "evidentiary details" that courts have warned against.  Courts in this district have routinely declined to order a bill of particulars in similar circumstances.  *See United States v. Augustine*, No. 18-CR-393 (SJ) (RML), 2020 WL 9199944, at *13 (E.D.N.Y. Sept. 8, 2020), *report and recommendation adopted*, No. 18-CR-393 (SJ) (RML), 2021 WL 1381060 (E.D.N.Y. Apr. 13, 2021) (denying request for bill of particulars in material support case based on disclosures already made to defendant); *United States v. Pugh*, No. 15-CR-116 (NGG), 2015 WL 9450598, at *28

---

[11]     The government has also made voluminous discovery productions in this case that provide additional details about the allegations.  *See* ECF Nos. 12, 15, 17, 19, 22, 23, 24, and 28.

(E.D.N.Y. Dec. 21, 2015) (same and collecting cases) ("[A]n indictment need not say more, with regard to the provision of material support, than that the defendant provided an FTO with material support in the form of personnel."); *Hashmi*, 2009 WL 4042841, at *12 (denying request for bill of particulars on material support charge "[f]or the same reasons that the vagueness challenge is denied."); *United States v. Osadzinski*, 2021 WL 3209671, at *7 (N.D. Ill. 2021) (rejecting, in a material support case, a request for a bill of particulars because the government provided factual detail in a criminal complaint, produced "extensive discovery," and included sufficient detail in a response brief). Tellingly, the defendant cites no cases in support of his request, *see* MTD at 18-19, and the Court should deny it.[12]

C.    The Firearms Conspiracy

The defendant next demands a bill of particulars with respect to Count Two. The defendant asserts that "[t]he indictment similarly doesn't provide sufficient information about" this count. MTD at 19. Once again, the defendant's assertion is belied by the Indictment and Complaint, which describe the alleged conduct in detail. Count Two of the Indictment identifies multiple overt acts consisting of visits to shooting ranges with others; each visit is identified by its precise date and location. The Complaint, meanwhile, explicitly describes the defendant's visits to shooting ranges with individuals with whom he lived in Brooklyn, and the communications he received from one of those individuals about buying a firearm "without documents, checks and

---

[12]    Importantly, much of the information demanded by the defendant is already in his possession. For example, he demands to know "[w]hether the government is proceeding solely on a provision of currency or other monetary instruments theory of material support," MTD at 21; the Indictment and Complaint make clear that it is not, and the government has explicitly said so to defense counsel. The defendant similarly demands to know "[w]hen and to whom the government is alleging [he] illegally sent money," *id.*; the Indictment and Complaint, supported by discovery containing financial records and the defendant's own communications, are quite specific on this as well, as detailed above.

other things." *See* Complaint ¶¶ 30-31.  Thus, once again, the defendant has ample information to present a defense with respect to this count, and his request is improper.  *See Barret*, 824 F. Supp. 2d at 439.  As with his first request for a bill of particulars, the defendant cites no cases to support his demand and poses questions to which he already has the answers.[13]  His request is without merit and should be denied.

## IV.     Count Four Should Not Be Severed

Next, the defendant's motion to sever Count Four of the Indictment misses the point and should be denied.  *See* MTD at 22-25.  The immigration fraud conduct charged in Count Four directly relates to (and, indeed, gives rise to) the charges in the Indictment for possessing a firearm without status (which, in turn, relate directly to the material support charge) and for making false statements to federal agents.  Joinder of these counts is proper because they are of a similar character, bear a logical connection, and will rely on the same evidence.  Moreover, the defendant will not be unfairly prejudiced by facing them in a single trial.

### A.     Applicable Law

Rule 8 of the Federal Rules of Criminal Procedure outlines a "liberal standard for joinder." *United States v. McGrath*, 558 F.2d 1102, 1106 (2d Cir. 1977).  Under Rule 8(a), "counts may be joined in the same indictment when they 'are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.'" *United States v. Kemp*, No. 21-CR-1684, 2023 WL 405763, at *6 (2d Cir. Jan. 26, 2023)

---

[13]     For example, the defendant asserts that "[s]hooting ranges . . . are generally completely appropriate places to possess and shoot guns" and demands to know "[w]hat the government alleges is the illegal agreement underlying the conspiracy to possess guns at shooting ranges."  MTD at 20-21.  As the Indictment explicitly states, the government alleges that the defendant agreed with others "to possess . . . firearms and ammunition," "knowing that he was an alien illegally and unlawfully in the United States," which is illegal.  Indictment ¶ 2.

(quoting Fed. R. Crim. P. 8(a)). "Each of these tests for when offenses may be tried together reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused." *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988). Moreover, "[j]oinder is proper where the same evidence may be used to prove each count, or if the counts have a sufficient logical connection." *Kemp*, 2023 WL 405763, at *6 (quoting *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011); *see also United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980) (joinder does not require "too precise an identity between the character of the offenses").

"'Similar' charges include those that are 'somewhat alike,' or those 'having a general likeness' to each other." *United States v. Rivera*, 546 F.3d 245, 253 (2d Cir. 2008) (quoting *Werner*, 620 F.2d at 926); *see also United States v. Fortenberry*, 919 F.2d 923, 925 (5th Cir. 1990) (affirming joinder of counts charging transportation of an undeclared weapon on a commercial airliner and possession of an unregistered firearm, as both were "weapons violation[s]" and thus of the "'same or similar character'"); *Rivera*, 546 F.3d at 248, 253-54 (affirming joinder of five counts charging illicit sex offenses and child pornography offenses, relating to four victims, because, among other things, they shared a "general likeness" and "some of the same exhibits were used to prove" three of the counts); *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990) (affirming joinder of false statement and perjury charges as of a similar character because, among other things, they both involved "substantial alleged dishonesty").

Notwithstanding proper joinder under Rule 8(a), a court may nonetheless sever charges pursuant to Rule 14 if joinder "appears to prejudice a defendant." Fed. R. Crim. P. 14(a). "[T]he defendant must show not simply some prejudice, but *substantial* prejudice," *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (internal quotation marks and citation omitted), which means "prejudice so great as to deny [the defendant] a fair trial," *United States v. Salameh*,

152 F.3d 88, 115 (2d Cir. 1998) (internal quotation marks and citation omitted).  The defendant's

burden is "heavy."  *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994).  A "generalized claim

of prejudice" based on the alleged "cumulative effect of evidence relating to distinct offenses"

fails to satisfy the defendant's heavy burden, *Rivera*, 546 F.3d at 254 (internal quotation marks

and citation omitted), "since this type of 'prejudice' will exist in any Rule 8(a) case," *Werner*, 620

F.2d at 929.

       Indeed, "less drastic measures than severance, such as limiting instructions, often

will suffice to cure any risk of prejudice and permit joinder."  *Page*, 657 F.3d at 129 (alteration

adopted, internal quotation marks and citation omitted); *see United States v. Feyrer*, 333 F.3d 110,

114 (2d Cir. 2003) (noting that even "where the risk of prejudice is high . . . . less drastic

measures—such as limiting instructions—often suffice as an alternative to granting a Rule 14

severance motion").  Jurors are presumed to follow such instructions.  *Zafiro v. United States*, 506

U.S. 534, 540 (1993).

       A decision to grant or deny severance under Rule 14 is "committed to the sound

discretion of the trial judge," *United States v. Spinelli*, 352 F.3d 48, 54 (2d Cir. 2003) (internal

quotation marks and citation omitted), and "will not be overturned unless the defendant

demonstrates that the failure to sever caused him substantial prejudice in the form of a miscarriage

of justice," *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991) (internal quotation marks

and citation omitted).  As the Second Circuit has observed, "a district court order denying a Rule

14 motion is considered 'virtually unreviewable' and will be overturned 'only if a defendant can

show prejudice so severe that his conviction constituted a miscarriage of justice and that the denial

of his motion constituted an abuse of discretion.'"  *United States v. Yousef*, 327 F.3d 56, 150 (2d

Cir. 2003) (citations omitted), *overruled on other grounds as stated in United States v. Yousef*, 750 F.3d 254, 261 (2d Cir. 2014).

B.    <u>Analysis</u>

The defendant falls far short of demonstrating either that joinder is improper or that he will suffer substantial prejudice from Count Four's inclusion. Not only would two separate trials needlessly expend significant judicial resources, but much (if not all) of the evidence underlying Count Four's immigration fraud conduct would be presented at trial for the remaining charges because it is directly relevant to the firearms offenses, which are premised on the defendant's immigration status, and to the false statement offense, which requires the government to demonstrate that the defendant lied about committing the conduct charged in Count Four.

*First*, joinder here satisfies Rule 8(a)'s liberal standard because the immigration fraud is of a similar character and bears a logical connection to the alien-in-possession charges (they both arise out of the defendant's immigration status) and the false statement charge (they both arise out of making false statements to federal authorities; indeed one involves lying about the other). *See Werner*, 620 F.2d at 926; *Rivera*, 546 F.3d at 253; *Page*, 657 F.3d at 129. Moreover, much of the same evidence will be used to prove all four of those counts. *See Page*, 657 F.3d at 129 (joinder proper where "same evidence may be used to prove each count"). In particular, the two alien-in-possession charges (Counts Two and Three) will rely on the same evidence of the defendant's immigration history and lack of status as Count Four, and the false statements charge (Count Five) necessarily depends on the same evidence as Count Four because several of the false statements are about the very conduct charged in Count Four. "The law in this circuit clearly supports the joinder of underlying substantive crimes with perjury counts where, as

here, the false declarations concern the substantive offenses." *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984) (citing cases).[14]

*Second*, the defendant has not carried his "heavy" burden under Rule 14 of demonstrating he would suffer "substantial prejudice" by joinder here. *Sampson*, 385 F.3d at 190; *Amato*, 15 F.3d at 237. Instead, he offers only a "generalized claim of prejudice" based on the alleged "cumulative effect of evidence relating to distinct offenses." *Rivera*, 546 F.3d at 254; *Werner*, 620 F.2d at 929. That is because joinder here does not create any additional prejudice, let alone substantial prejudice.

An immigration fraud scheme premised on a sham marriage is significantly less inflammatory than allegations that the defendant was materially supporting ISIS, a violent terrorist organization, and training on deadly firearms. Nor does the defendant explain how material support and firearms conduct that post-dates the immigration fraud could be used as propensity evidence to prove the earlier immigration fraud. Moreover, given that in any trial of Counts Two and Three the jury will necessarily learn of the defendant's immigration history and applications for status, and given that in any trial of Count Five the jury will necessarily learn of the immigration fraud scheme about which the defendant lied to federal agents, the incremental prejudice of including Count Four in the same trial is virtually nonexistent. Any concerns of prejudice can be addressed by a limiting instruction to the jury to consider each charge separately, and to consider as to each only the evidence relevant to the respective charge. *See Page*, 657 F.3d at 129; *Feyrer*, 333 F.3d at 114. The defendant appears to acknowledge the unavoidable connection between

---

[14]    Evidence of the defendant's immigration history will also be introduced at trial in connection with the material support offense, including as background and crucial context for his relationship with Individual-2, CC-1 and others. For that reason, joinder would still be proper even if the only two offenses charged were Counts One and Four.

Counts Four and Five but does not address the reality that any trial including Count Five would feature the very evidence he seeks to exclude.  Instead, he simply presumes that Count Five will be dismissed, which, as explained below, is an equally meritless and improper request.

Thus, this request too should be denied.

## V.    The Defendant's iCloud Account Was Lawfully Searched

Next, in his suppression motion, the defendant argues that evidence obtained from his Apple iCloud accounts pursuant to judicially authorized search warrant should be suppressed because, he says, the accounts were not "sufficiently connected" to the probable cause described in the warrant, the warrant was overbroad, and the "bulk" of probable cause "was based on" statements of Individual-2 (whom the defendant calls Individual-1, following the convention of the first warrant rather than a subsequent warrant and the Complaint), which the government has since "disavowed."  All of the defendant's arguments are erroneous and should be rejected.  The warrant established probable cause that evidence of specified crimes would be found within the iCloud accounts; it was particularized, properly describing the offenses at issue, the accounts to be searched, and the items to be seized, and not overbroad, with the categories of items to be seized corresponding to the probable cause established in the affidavit.  Moreover, even if there were some deficiency in the warrant (there is not), the warrant was sought and executed in good faith— precluding suppression as a remedy.

### A.    Applicable Law

The so-called Warrants Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend.

48

IV. This provision creates interrelated yet conceptually distinct requirements for search warrants and search warrant applications: probable cause and particularity.

    1.   <u>Probable Cause</u>

"[P]robable cause is a flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983), and the Fourth Amendment requires "[o]nly the probability, and not a prima facie showing, of criminal activity" to meet it, *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (citations omitted). In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. In assessing the sufficiency of a warrant application, the training and experience of law enforcement agents bear significantly on probable cause determinations. *Id.* at 232. Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances and their training and experience may all support a probable cause finding. *Id.* at 231-32; *see also United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004) ("[C]ourts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not."). Moreover, a showing of nexus between the alleged criminal activities and the place to be searched "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004).

    In reviewing a magistrate court's probable cause determination, the reviewing court's duty "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238-39 (internal quotation marks and modifications omitted). "[A] court reviewing a challenged warrant— whether at the district or appellate level—

49

must accord considerable deference to the probable cause determination of the issuing magistrate." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (internal quotation marks omitted). Indeed, the reviewing court must "resolve any doubt about the existence of probable cause in favor of upholding the warrant," *Salameh*, 152 F.3d at 113, and "the magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993). Under this deferential standard, a defendant "who argues that a warrant was issued on less than probable cause faces a heavy burden." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).

   2. <u>Particularity and Breadth</u>

   "To satisfy the Fourth Amendment's particularity requirement, a warrant must meet three criteria: (1) it must identify the specific offense for which the police have established probable cause; (2) it must describe the place to be searched; and (3) it must specify the items to be seized by their relation to designated crimes." *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020) (internal quotation marks omitted). "The level of specificity required by the Warrants Clause depends on many factors." *United States v. Cioffi*, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009). "The nature of the crime, for example, may require a broad search," and "[t]he type of evidence sought is also relevant; in particular, courts have recognized that documentary evidence may be difficult to describe ex ante with the same particularity as a murder weapon or stolen property." *Id.*

   Nor does particularity "mean the officers must be left with no discretion whatsoever." *United States v. Messalas*, Case No. 17-CR-339 (RRM), 2020 WL 4003604, at *5

(E.D.N.Y. Jul. 14, 2020). "Rather, the warrant must be sufficiently specific to permit the rational exercise of judgment in selecting what items to seize," and "courts in this Circuit have routinely upheld warrants that define the items to be seized by reference to particular offenses and the use of an illustrative list." *Id.* (citations omitted); *see also, e.g.*, *United States v. Belloisi*, No. 20-CR-219 (DLI), 2023 WL 2709879, at *8 (E.D.N.Y. Mar. 30, 2023) (finding warrant sufficiently particular because it identified specific offenses for which probable cause was established and included attachment listing categories of items to be seized by relation to specified crimes); *United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) (authorizing seizure of "evidence, fruits and instrumentalities" of particular crimes, and "enumerat[ing] ten illustrative categories of items"); *United States v. Riley*, 906 F.2d 841, 843 (2d Cir. 1990) (authorizing seizure of "bank records, brokerage house records, business records . . . and other items that constitute evidence" of a conspiracy to distribute cocaine); *United States v. Lustyik*, 57 F. Supp. 3d 213, 227–28 (S.D.N.Y. 2014) (authorizing seizure of "evidence, fruits, or instrumentalities" of specific crimes, and setting "forth an illustrative list of items to be seized"); *United States v. Levy*, 2013 WL 664712, at *9 (S.D.N.Y. Feb. 25, 2013) ("By specifically identifying the statutes and conduct that gave rise to the search and seizure, the Search Warrant sufficiently identified the suspected crimes for which there was probable cause, and which the materials to be seized evidenced.").

"Search warrants covering digital data may contain some ambiguity so long as law enforcement agents have done the best that could reasonably be expected under the circumstances." *United States v. Ulbricht*, 858 F.3d 71, 100 (2d Cir. 2017), *abrogated on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018) (internal quotation marks and modification omitted). Although closely related, breadth and particularity are conceptually distinct: "A warrant may be broad, in that it authorizes the government to search an identified

51

location or object for a wide range of potentially relevant material, without violating the particularity requirement. For example, a warrant may allow the government to search a suspected drug dealer's entire home where there is probable cause to believe that evidence relevant to that activity may be found anywhere in the residence." *Id.* at 102; *see also id.* at 100 ("[A] search warrant does not necessarily lack particularity simply because it is broad.").

    B.    <u>Analysis</u>

        1.    <u>The Warrant Was Issued Upon Probable Cause with Sufficient Nexus to the Specified iCloud Accounts</u>

The defendant does not appear to challenge the sufficiency of the warrant affidavit to establish probable cause to believe that the specified crimes had been committed—and for good reason, since the probable cause was ample and obvious. Rather, the defendant asserts that the facts articulated in the affidavit lacks sufficient nexus to his iCloud accounts. In other words, he asserts that warrant affidavit fails to establish probable cause to believe that evidence of the specified crimes would be found in the particular location where the warrant authorized a search. The defendant is mistaken.

The defendant's argument is premised upon his conclusory assertion that the warrant affidavit connects the specified crimes to his iCloud accounts only through a boilerplate invocation of the agent's training and experience. MTS at 26-30. And he cites numerous district court cases (without engaging seriously with the facts of any of them, or of this case) for the uncontroversial proposition that such boilerplate and "blanket generalizations about the widespread use of cellphones" is not enough, standing alone, to establish probable cause. *Id.* 26-28. But his foundational premise is simply wrong. The affidavit contains much more than an empty invocation of "training and experience."

Specifically, the warrant affidavit establishes that the defendant, in Brooklyn, directed Individual-2 (called Individual-1 in the warrant affidavit) to send money to individuals in Türkiye who were later arrested for terrorism offenses and affiliation with ISIS-K, MTS Ex. A ¶¶ 14-15; gave Individual-2 contact information for those individuals in Türkiye to coordinate the money transfers (presumably the same contact information the defendant used himself to coordinate with them from New York), *id.* ¶ 13; at least sometimes communicated with Individual-2 by phone at particular numbers and a particular WhatsApp account, *id.* ¶¶ 12, 21; at least sometimes communicated with Individual-1 (the close family member identified as Individual-2 in the warrant affidavit) from a particular phone number, *id.* ¶¶ 16, 21; made comments that gave Individual-1 concern that the defendant may commit acts of violence, including praising jihad, *id.* ¶¶ 16-18; entered a sham marriage with a woman he never lived with (and thus likely coordinated with electronically), *id.* ¶¶ 18, 20; and that Apple records showed that the specific iCloud accounts at issue existed and contained data associated with the particular phone numbers the defendant used with Indiviudal-1 and Individual-2, *id.* ¶ 22.  The training and experience of the agent (together with information published by Apple) was relied upon principally to establish the kinds of information typically preserved in iCloud accounts, including that iClouds could contain records of communications and text messages and other categories of electronic data that could constitute evidence of the crimes discussed above.

The facts in the warrant affidavit establish an exceedingly high probability that the defendant affirmatively used particular phone numbers to facilitate the specified crimes (certainly in communications with Individual-1 and Individual-2 and very likely with co-conspirators in Türkiye and his sham wife), and that the specified iCloud accounts would contain evidence of that use.  The Second Circuit recently held in *United States v. Silva* that it is not necessary to show that

a defendant used a cellphone in furtherance of crime to establish probable cause for a search warrant, since a mere showing of "fair probability" that evidence will be found is sufficient; but that allegations that *do* tend to show that the phone was used in furtherance of criminal conduct alone "suffice to establish probable cause."  146 F.4th 183, 190 (2d Cir. 2025).  That holding controls the outcome here.  And the defendant's effort to distinguish *Silva*, MTS at 29-30, is unpersuasive.  In particular, the bare assertion that the crimes at issue here are not ones "that logically required regular communication among participants," MTS at 29, misses the mark, because a theoretical assessment of the extent of communication required to establish the elements of the offenses in the abstract is immaterial.  The facts in the warrant affidavit show that *in this case* the defendant in fact *did* communicate by telephone in furtherance of the crimes with at least two people, and very likely with others.  That is enough to put this case squarely within the binding holding of *Silva*.

        In sum, the facts articulated in the warrant affidavit not only established probable cause to believe that the specified crimes had been committed (which the defendant does not challenge), but were also sufficient to allow the magistrate judge "to make a practical, common-sense decision" that there was "a fair probability that" evidence of those crimes would be found in the specified iCloud accounts.  *Gates*, 462 U.S. at 238.  In other words, the warrant was issued upon probable cause with sufficient nexus to the defendant's iCloud accounts.

### 2.    The Warrant Was Sufficiently Particularized and Not Overbroad

        The defendant does not appear to dispute—and there can be no reasonable dispute—that the warrant satisfies the particularity requirements enumerated in *Purcell*, as described above: it plainly identifies the particular criminal offenses at issue, describes the place

to be searched, and specifies the items to be seized by relation to the specified crimes. *Cf. Purcell*, 967 F.3d at 178.

Specifically, Attachments A and B to the warrant are incorporated by reference on its face. MTS Ex. A, MM_000361. Attachment B, Section II states that the warrant authorizes a search for evidence, fruits, and/or instrumentalities of violations of certain specified offenses. This satisfies the first *Purcell* requirement. Attachment A states that the "place" to be searched is information associated with specified Apple IDs stored at premises controlled by Apple, and Attachment B, Section I specifies the particular information associated with those Apple IDs to be disclosed by Apple and searched. This, too, is sufficient particularity as to the location to be searched, satisfying the second *Purcell* requirement, and no greater particularity with respect to (virtual) "locations" within the account is required by the Fourth Amendment.

Finally, the warrant satisfies the third requirement enumerated in *Purcell* because it specifies the items to be seized "by reference to particular offenses and the use of an illustrative list." *Messalas*, 2020 WL 4003604, at *5. Specifically, Attachment B, Section II follows precisely the formula described in *Messalas* by authorizing the search for and the seizure of records that "constitute[] evidence and/or instrumentalities of violations of" a specified list of offenses and includes an illustrative list of ten categories of records that may relate to those offenses. This is "sufficiently specific to permit the rational exercise of judgment in selecting what items to seize," and is a type of search warrant that "courts in this Circuit have routinely upheld." *Id.*; *see also, e.g.*, *Belloisi*, 2023 WL 2709879, at *8; *Jacobson*, 4 F. Supp. 3d at 524; *Riley*, 906 F.2d at 843; *Lustyik*, 57 F. Supp. 3d at 227-28; *Levy*, 2013 WL 664712, at *9.

The defendant nevertheless complains that the search warrant was "overbroad and non-particular," MTS at 30, because it authorized (he says) the "seizure" of multiple accounts and

the entirety of the data in the accounts.   Here the defendant simply confuses what the warrant required Apple to produce and what it authorized the government to seize.   The warrant did not authorize the government to seize (and the government did not seize) the entire accounts, any more than the premises search warrant that the government executed on the day of the defendant's arrest authorized the government to seize the entire house he lived in.   Rather, the warrant required Apple to produce broad categories of information associated with the accounts, described in Attachment B, Section I—in which, as discussed above, there was probable cause to believe evidence of specified crimes may be found—so that they could be searched, and it only authorized the government to seize particular evidence of those crimes, described in Attachment B, Section II.

In the context of electronic evidence, it is reasonable under the Fourth Amendment for a warrant to authorize agents to obtain all data on a device or in an account, so that agents can then search for and seize specified evidence within that account.   This "two-step" process, by which the service provider produces to the government the full account or a broadly defined set of information associated with the account, and the government then searches for and seizes evidence falling within specific categories identified in the warrant, is routinely upheld in this Circuit.   *See, e.g.*, *United States v. Scully*, 108 F. Supp. 3d 59, 89-95 (E.D.N.Y. 2015) (rejecting a challenge to search warrants that allowed seizure of entire contents of email accounts in order to review and identify which emails were evidence of specified crimes); *United States v. Dawkins*, No. 17-CR-684 (ER), 2019 WL 2464924, at *7 (S.D.N.Y. May 23, 2019) (rejecting a challenge to search warrants that "allowed law enforcement agents to review the full contents of the [seized] phones instead of specific places" because the warrants "described the target crimes, identified the phones as the items to be searched, and specified the types of data that would be seized from the phones"); *cf. Riley*, 906 F.2d at 844–45 (2d Cir. 1990) ("It is true that a warrant authorizing seizure of records

56

of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category. But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'").

Here, the warrant appropriately authorized the government to *obtain* (but not seize) a broad set of information contained in the defendant's iCloud accounts where there was "a fair probability that" evidence would be found, *Gates*, 462 U.S. at 238, and authorized the government to search for and seize evidence within it. The government produced the entirety of the accounts as received from Apple to the defendant (pursuant to Federal Rule of Criminal Procedure 16(a)(1)(D)(iii)) because they belong to him, and separately produced (pursuant to Rule 16(a)(1)(D)(i) and (ii)) the subset of the account contents that the government seized as evidence and may use at trial. But the scope of the data that the government *searched* was determined, as discussed above, by the probable cause; and the data the government *seized*, as authorized by the warrant, was only the data that constitutes evidence or instrumentalities of the specified crimes.[15]

The only binding authority the defendant cites supposedly to the contrary, *United States v. Lauria*, 70 F.4th 106 (2d Cir. 2023), is wholly inapposite. In that case, the Second Circuit ruled that a corrected warrant affidavit failed to establish probable cause to obtain several months'

---

[15]    The government routinely segregates data seized during the execution of a search warrant from the full data set from which it was seized and maintains custody of the latter (without re-accessing the non-seized data) solely for the purpose of overcoming an authenticity challenge of seized evidence at trial. The Second Circuit acknowledged the legitimacy of this approach in *United States v. Ganias*, 824 F.3d 199, 216-18 (2d. 2016) (en banc) (accepting the government's legitimate interest and even need to maintain physical custody of full electronic devices or forensic images that it can no longer lawfully search "to preserve, authenticate, and effectively present at trial the evidence" that was "lawfully obtained" from them, since "[t]he weight of digital evidence admitted at trial . . . may be undermined by challenges to its integrity—challenges which proper preservation might have otherwise avoided").

of an individual's cell-site location data because the affidavit did not link him to any crimes *at all* but only established that he was Facebook "friends" with a person who was linked to robberies being investigated and was in communication with him "shortly before" one of the robberies. *Id.* at 129. In reaching that holding, the court specifically cautioned that, in other cases (like this one), "probable cause as to a person's criminal conduct can sometimes inform probable cause to search a place used or frequented by that person or to obtain records for electronic devices linked to that person." *Id.* at 130 n.14. Here, unlike in *Lauria* and as discussed above, there was abundant probable cause connected specifically to the defendant, and specifically establishing a probability that evidence of his crimes would be found in the particular accounts to be searched.

In short, because the warrant met all three *Purcell* requirements, and the scope of the search was determined by the probable cause, the warrant satisfied the Fourth Amendment's particularity requirement and was not overbroad.

3. The Warrant Did Not Rely and No Evidence Was Seized in Reliance Upon Any False Statement

Next the defendant argues that evidence should be suppressed or the court should order an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), because "the bulk" of the probable cause in the affidavit was supposedly based on information provided by Individual-2 and "his assertions that the government has since disavowed." MTS at 33. The defendant's characterization of Individual-2's apparent error and the government's view of it is overblown, and the defendant's conclusory assertion of the warrant's reliance on that information is wholly mistaken.[16]

---

[16]    As noted above, the defense brief follows the convention of the first warrant affidavit in calling this person Individual-1, whereas in a subsequent warrant, the Complaint, and this brief he is called Individual-2. It is regrettable—and, frankly, mystifying—that defense counsel would seemingly accuse the government of bad faith by saying that this change "seemed

The essential facts stated in the warrant affidavit, as relevant to Individual-2 and the charged offenses, are those already summarized above: the defendant directed Individual-2 to transmit money to certain persons in Türkiye and gave Individual-2 contact information for them, Individual-2 did as the defendant directed him to do, and at least two of the recipients of that money were subsequently arrested in connection with the Istanbul Church Attack and affiliation with ISIS-K. Probable cause was supported by statements of Individual-1, a close family member of the defendant, who reported that the defendant had praised jihad and martyrdom and might commit acts of violence. None of these facts rely solely upon Individual-2's statements: as noted in the warrant affidavit, the agent also reviewed the contents of Individual-2's cellphones and records obtained directly from third parties about Individual-2's communications and financial transactions, all of which corroborate these facts. MTS Ex. A, ¶¶ 7, 9, 14.

Additional facts in the first warrant affidavit, which are not relevant *to the charged offenses*—but which are disclosed in footnotes in a second warrant affidavit and the complaint— are that Individual-2 claimed to be a victim of an international extortion scheme directed by people in his (and the defendant's) native Tajikistan, and that he believed the defendant was involved in this scheme. This belief explained, or at least appeared to contribute to, Individual-2's willingness to transmit money to strangers overseas on the defendant's behalf and at his direction. Records

---

design to obscure that it was the same person." MTS at 33. Obscure it from whom? Surely not from anyone who reads both affidavits, as the detailed factual allegations make clear that the persons listed by different pseudonyms in these disparate affidavits are the same. Nor from anyone who reads only the later warrant or Complaint, as both contain a footnote disclosing the very issue that gives rise to the defendant's argument. *See* MTS Ex. B, ¶ 16 n.5 (MM_000377); Compl. ¶ 13 n.6 (ECF No. 1). The actual explanation for the change is rather straightforward: the first third-party to be introduced in an affidavit is typically introduced as Individual-1, and which person is introduced first sometimes changes in later affidavits if facts are presented in a different order when the investigation is more fully developed.

and communications corroborated that Individual-2 *was* the victim of an extortionate scheme, as he described.  *See* Compl. ¶ 13 n.6 (ECF No. 1).  At the time of the first warrant, his belief that the defendant was involved appeared credible (although of course uncertain), and it supported probable cause to search the defendant's iCloud accounts for evidence of crime that is not among the charged offenses.  When the iCloud search warrant was executed, however, although abundant evidence of *charged* offenses was identified and seized, no evidence was identified to support Individual-2's belief that the defendant was involved in or aware of the extortion.  The government concluded that there was no longer probable cause to support the assertion that the defendant was involved in that scheme and accordingly did not seek evidence of it in subsequent warrants (although disclosing Individual-2's apparently erroneous belief), nor was the defendant charged in connection with it.

To be clear, the government has not "disavowed" the information that Individual-2 was the victim of an extortionate scheme, nor has it "decided that information was wrong."  MTS at 33.  That information was corroborated, and, to the best of the government's knowledge, it remains credible.  The government has only concluded—and disclosed everywhere Individual-2's credibility could conceivably be at issue—that it now appears Individual-2 was likely mistaken in his belief that the defendant was involved in that scheme and has likely conflated the defendant's conduct with the conduct of others for whom he has transferred money internationally.  This conclusion has little bearing on Individual-2's broader credibility.

Critically, moreover, none of the facts supporting probable cause that the defendant directed the transmission of money to persons affiliated with ISIS-K in Türkiye depends solely on Individual-2's statements: text communications in his cellphones and financial records corroborate (and are in fact independently sufficient to establish) that.  The only thing that Individual-2 appears

to have been mistaken about is the defendant's involvement in the extortion scheme, and no evidence was obtained in reliance upon that mistake.

Accordingly, and in sum, the probable cause of the *charged offenses* in the affidavit did not rely upon any false statement or mistaken information, and the only mistaken information included in the affidavit was in support of probable cause of an *uncharged offense* of which no evidence was obtained (and which was therefore not pursued or charged). Individual-2's apparent error therefore does not support suppression or a *Franks* hearing.

### 4.    The Warrant Was Relied Upon in Good Faith

Finally, even if the warrant were defective in some respect (and it is not), the evidence obtained through its execution should not be suppressed because law enforcement agents relied upon the warrant in objectively reasonable good faith.

A Fourth Amendment violation "does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). To the contrary, the Supreme Court has described the exclusionary rule as its "last resort," not its "first impulse." *Id.* That is because it "is designed to deter police misconduct" and not "to punish the errors of judges and magistrates." *United States v. Leon*, 468 U.S. 897, 916 (1984). Thus, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. In other words, even if a warrant is facially defective or unsupported by probable cause, evidence obtained pursuant to it should not be suppressed if law enforcement officers acted in "objectively reasonable reliance on [the] subsequently invalidated search warrant"—what is known as the "good faith" rule. *Leon*, 468 U.S. at 922. Although the government has the burden of showing the objective reasonableness of the officers' good-faith reliance on the invalidated

warrant, in assessing whether the government has carried its burden, courts must be "mindful that in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection." *Clark*, 638 F.3d at 100. "Evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987) (citations omitted).

Here, there is no basis to conclude that the agent who sought and executed the warrant knew or should have known that it contained any defect. Given the facts presented in the affidavit, as discussed at length above, it was manifestly reasonable to seek the warrant and, once obtained, to rely upon it. Indeed, there is no serious allegation—nor could there be here—that the agent acted in bad faith in seeking or relying upon the warrant. The defendant's *pro forma* assertion that "[t]he good faith exception does not apply when the warrant affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" MTS at 37 (quoting *Leon*, 468 U.S. at 923), is a true statement of the law, but that can have no application here in light of the ample probable cause discussed above. For this reason, too, the motion to suppress should be denied

## VI.    The Defendant Validly Waived his *Miranda* Rights

Next the defendant argues that the statements he made to FBI agents in a *Mirandized* and videorecorded post-arrest interview should be suppressed because the agents somehow "undercut" the *Miranda* warnings by their tone or statements (they did not), that he did not knowingly waive his *Miranda* rights (he did), and that he eventually invoked the right to remain silent (he did not). The defendant's arguments are at odds with the videorecorded evidence, the law, and common sense, and they should be rejected.

A.     Applicable Law

"Consistent with *Miranda*, all criminal defendants must be apprised of certain rights before a custodial interrogation may begin, including, of course, the right to remain silent and be afforded the assistance of counsel." *United States v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011). "But once those warnings are properly administered . . . a defendant is left to make his own choice as to how best to proceed." *Id*. "Without question, the most legally remarkable and distinct choices a defendant can make are to (1) unambiguously invoke those rights and thereby cut off further questioning or (2) knowingly and voluntarily waive those rights and cooperate fully." *Id*. As the Supreme Court held in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), a defendant must assert his rights "through a clear, unambiguous affirmative action or statement." *Plugh*, 648 F.3d at 124.

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived *Miranda* rights when making the statement." *Berghuis*, 560 U.S. at 382 (internal quotation marks omitted). The waiver inquiry has two components. *Id*. First, the waiver of rights must be "knowing," *i.e.*, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, the waiver must be "voluntary," *i.e.*, "it [must be] the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis*, 560 U.S. at 382 (quoting *Moran*, 475 U.S. at 421).

"The question of waiver must be determined on the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the

63

accused." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (internal quotation marks and alterations omitted). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver[.]" *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *see also United States v. Chao Xian Yao*, No. 05-CR-1114 (SAS), 2006 WL 1227771, at *5 (S.D.N.Y. May 3, 2006) ruling that "having read and signed this form [advising them of *Miranda* rights in a language they understand], defendants cannot claim that they misunderstood the rights verbally described to them").

> B.    *Miranda* Warnings Were Sufficiently Given, and the Defendant's Waiver Was Knowing and Voluntary

The FBI agents who conducted the post-arrest interview of the defendant presented him (a fluent Russian speaker who acknowledges speaking conversational English, MTS at 12) with a standard FBI *Miranda* form in Russian, gave him a moment to read it silently, then read to him from the standard form in English and explained his *Miranda* rights verbally, and offered to have the Russian-speaking agent address any questions (he had none). The defendant acknowledged that he understood, and he signed the Russian *Miranda* waiver form.[17] This entire interaction was recorded on video, which reflects that it and the whole interview that followed was relaxed and cordial, with no indicia of coercion whatsoever. *See* MTS Ex. C (video attachment to defense motion).[18] And despite a few moments of fairly minor language difficulties over the course of the interview, which were generally addressed satisfactorily by the Russian-speaking

---

[17]    The defendant's motion mistakenly indicates that he signed the English-language form. MTS at 18. The signed form (in Russian) was produced in discovery and is attached hereto as Exhibit 1.

[18]    The entire video was made available under seal as an attachment to the defendant's motion to suppress, so the government does not re-submit it, but in the event of technical difficulties the government can make it available again to the Court upon request.

agent, the defendant appeared to be reasonably proficient in English throughout (which is unsurprising for someone who has lived and worked in the United States since 2016). That should be the end of the analysis. *Cf., e.g.*, *Chao Xian Yao*, 2006 WL 1227771, at *5; *United States v. Matthews*, No. 03-CR-1214 (ERK) (MDG), 2006 WL 8447011, at *9 (E.D.N.Y. Mar. 6, 2006), *report and recommendation adopted*, No. 03-CR-1214 (ERK) (MDG), 2006 WL 8447012 (E.D.N.Y. May 30, 2006) ("Matthews appeared to read the waiver of rights form and signed the form acknowledging that he understood his rights. His express written and oral waiver of the right to remain silent and of the right to counsel are 'strong proof of the validity' of his waiver.") (*citing Butler*, 441 U.S. 369, 373; *United States v. McDuffie*, No. 01-CR-808 (NRB), 2002 WL 654136, at *2 (S.D.N.Y. Apr. 18, 2002); and *United States v. Murphy*, 16 F. Supp. 2d 397, 402 (S.D.N.Y. 1998)).

Moreover, the defendant offers no sworn statement to support any claim about the circumstances of the interview or his waiver or to contest the clear record of events reflected in the video and his signed *Miranda* form. This is especially noteworthy insofar as his motion repeatedly emphasizes that two and a half hours passed between his arrest and his interview and insinuates that something sinister may have happened in the interim—but he submits no factual basis from which the Court could find any such sinister thing, because no such thing occurred, and the length of time during which he was neither *Mirandized* nor interrogated is immaterial.[19]

---

[19]    Relatedly, the government is somewhat puzzled by the defendant's assertion that there is "missing" bodycam video, that the videos "end abruptly" shortly after arrest, and that "[d]espite requests, the government has not explained why." MTS at 14-15. As the government has explained to defense counsel, it is standard FBI procedure to activate bodycams before the start of an arrest operation, but not to keep them running after arrests are made and the location has been secured. It is true that the defendant was not recorded for the entire period of time between his arrest in Brooklyn and his *Mirandized* interview after he was processed at FBI's offices in Manhattan, but that is entirely ordinary and consistent with FBI protocol.

Accordingly, the defendant has failed to present any facts based on personal knowledge in support of his motion, and the motion should be denied on that basis alone. *See, e.g.*, *United States v. Singh*, No. 12-CR-121 (DLI), 2012 WL 2501032, at *2 (E.D.N.Y. June 27, 2012) ("Courts in this Circuit have 'repeatedly' denied motions to suppress without a hearing 'where defendants have failed to provide affidavits alleging facts based on personal knowledge'" (quoting *United States v. Larranga Lopez*, No. 05-CR-655 (SLT), 2006 WL 1307963, at *3 (E.D.N.Y. May 11, 2006) (collecting cases))); *United States v. Aparo*, 221 F. Supp. 2d 359, 369 (E.D.N.Y. 2002) (denying motion to suppress where defendant had "not submitted an affidavit alleging facts which would require the suppression of statements if those facts were proved at a hearing"); *United States v. Simpkins*, No. 96-CR-750 (EHN), 1996 WL 629567, at *1 (E.D.N.Y. Oct. 16, 1996) ("The motion is denied on the ground that defendant has failed to provide an affidavit based on her own personal knowledge."); *United States v. Richardson*, 837 F. Supp. 570, 572 (S.D.N.Y. 1993) (attorney affidavit was not satisfactory substitute because it did not allege facts based on personal knowledge).

Nevertheless, the defendant argues that the *Miranda* warning he clearly received in two languages, verbally (in English) and in writing (in Russian), and which he clearly acknowledged and waived both verbally and in writing, were "undercut" because (1) agents at the time of his arrest (as recorded on bodycam) told him that "people will talk to you" later and "sort it all out" without advising him of his rights then, and in the interim between arrest and interview evidently made some degree of small talk with him, and (2) because the agents who did advise him of his rights at the start of his videorecorded interview did so somewhat casually, saying before they read him his rights that they were "stat[ing] the obvious . . . like they do in the movies," and saying afterward, "you probably knew all that."

The defendant seems to acknowledge, as he must, that *Miranda* warnings are only required before custodial interrogation—that is, before words or actions "reasonably likely to elicit an incriminating response" from a person in custody. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). There is no obligation to provide *Miranda* warnings immediately upon arrest, or before asking the defendant for pedigree information, or what languages he speaks, or engaging in any other conversation not likely to elicit an incriminating response. There is no evidence (and the defendant offers none) to suggest that anyone engaged the defendant in anything like a custodial interrogation prior to the delivery of *Miranda* warnings in the videorecorded interview. Indeed, the defendant's own quotations from the videos suggest precisely the opposite: that agents tried to *stop* the defendant from making any material statements prior to the formal interview. The defendant quotes one agent saying (on bodycam video) at the time of arrest that he would have "plenty of time to talk about this later, believe me," MTS at 13, and another at the time of his formal interview saying, "[a]t your house, I know it sounded like you wanted to talk or to know what is going on. We had to wait until we got here," and "[y]ou started to say things earlier, but we stopped you, so this would be the time to have that conversation." MTS at 16. These statements clearly reflect that the agents pointedly sought (perhaps contrary to the defendant's desire to talk) to *push off* any substantive statements, and avoid any questioning, until they could sit down in the interview room, equipped with audio and video recording equipment. It was only at that time when *Miranda* became necessary, and that is therefore when it was delivered. But far from trying to take advantage of the period before he was advised of his rights, the agents sought to ensure that the defendant said nothing significant until after he was properly advised.

Nor is there any impropriety in the agents' saying that *Miranda* rights are now, to most people, fairly obvious, and that the defendant probably already knew them from the movies.

Indeed, it is almost impossible to imagine that any adult today who consumes any American cultural products would not have at least a passing familiarity with *Miranda* warnings. Acknowledging this reality while delivering the warnings in full anyway, as the law requires, does not render the warnings ineffective.

The defendant offers no authority to the contrary. The only binding precedent he cites seemingly in support of his argument is *Missouri v. Seibert*, 542 U.S. 600 (2004), but that case stands for the proposition that police cannot deliberately thwart *Miranda* by coercing an inadmissible confession, then delivering *Miranda* warnings, and then re-eliciting the same confession a second time. Nothing like that happened here, and there is no basis whatsoever to suggest that it did.

The defendant also cites two out-of-circuit district-court cases, but both are wildly inapposite. In *United States v. Brown*, 347 F. Supp. 2d 920 (D. Or. 2004), a district court in Oregon ruled that *Miranda* warnings were ineffective where a defendant who read at a second-grade level was instructed to read a *Miranda* form out loud while heavily under the influence of marijuana (the defendant "testified he informed the agents that he had smoked six marijuana 'blunts,' a fairly large amount of drug, that morning and was still under the influence of the drug" at the time of the interview, *id.* at 921), the agents did not read the warning to the defendant or try to explain it, and the defendant testified that he did not understand. *Id.* at 923. In *United States v. Gonzalez*, 719 F. Supp. 2d 167 (D. Mass. 2010), a district court in Massachusetts ruled that *Miranda* warnings were ineffective where they were "quickly administered" while the defendant "was dazed and bleeding from a struggle with the police," and then when he was handcuffed, and then punched in the stomach by an officer before another officer read the warnings again, and the defendant credibly "fear[ed] that other officers were preparing to beat him and unnecessarily trash his mother's home

in [a] search." *Id.* at 169-70.  Little need be said about these cases: they have nothing to say about the present one.

Nor should the Court credit the defendant's assertion that his waiver was not knowing and voluntary.  In essence, he appears to argue that the supposed "undercutting" of *Miranda* discussed above, and his imperfect comprehension of English, should also be understood with the additional context that he is from Tajikistan, where "theoretical legal protections" akin to *Miranda* evidently do exist but are reportedly not observed, and torture is common.  MTS at 43-45  The government takes no position on the state of the law in Tajikistan, but the defendant has been in the United States since 2016, speaks imperfect but conversational English (which is obvious in the video of his interview, and which he acknowledges in his brief, MTS at 12), is fluent and literate in Russian, and was presented with a Russian-language *Miranda* form, which he read and signed, on video, in addition to receiving them verbally in English.  He was interviewed in the presence of and in part by a Russian-speaking agent, who could address any confusion or questions to the extent the defendant had any, and in fact did so at times.  That is "strong proof of the validity of [the] waiver," *Butler*, 441 U.S. at 373, and there is no evidence in the record or any circumstance arising from the state of the law in Tajikistan that rebuts it.

C.    The Defendant Did Not Invoke the Right to Remain Silent

The defendant now claims that near the end of his videorecorded interview, approximately two hours into the video and only a few minutes before its conclusion, he invoked the right to remain silent, and questioning therefore should have immediately stopped.  He did not. "[T]he relevant inquiry is whether the defendant 'unambiguously' invoked his *Miranda* rights." *Plugh*, 648 F.3d at 124.  If a defendant specifically requests an attorney or specifically states that he does not wish to speak to law enforcement authorities, such an unambiguous and unequivocal

invocation must be honored and questioning must cease. *Id.* But in all of the "significant middle ground" between waiver and full cooperation on the one hand and unambiguous invocation on the other, "*Miranda* and its progeny impose no further burdens on law enforcement officers because once a defendant has been fully apprised of his rights, the law has no preference as between invocation and waiver." *Id.* at 125 (internal quotation marks omitted). An ambiguous statement creates no obligation to stop questioning or to follow up with questions intending to clarify the ambiguity. *Id.* at 127.

Here, near the end of the interview, one of the agents finally told the defendant expressly that the agent believed the defendant was lying, and he asked the defendant whether he had anything to say for himself in response. In response *to that question*, the defendant answered, "No, I don't want to say anything." In other words, the defendant had no response to the accusation that he was lying, and said he did not want to say anything more in response to that accusation. The other agent asked him, "is there anything else you want to say," *i.e.*, whether in response to that accusation or on any of the other issues they had already discussed, and again, the defendant answered, "no, I don't want to say anything"—that is, he *had nothing else to say* and no more information to volunteer about the issues they had already discussed. He did *not* indicate that he wanted to end the conversation altogether, that he did not wish to speak to law enforcement at all, or that he was invoking his *Miranda* rights. If he in fact intended to invoke—and it does not appear at all likely from the video that he did—then he did so at best only ambiguously, which was not sufficient to require the agents to cease all questioning.

D.     The Court Should Deny the Defendant's Request for a Hearing

Finally, the defendant provides no basis for his request for an evidentiary hearing with respect to his motion, and it should be denied. "A defendant who is moving to suppress

evidence is not automatically entitled to an evidentiary hearing." *United States v. Harun*, 232 F. Supp. 3d 282, 285 (E.D.N.Y. 2017) (citing *United States v. Barrios*, 210 F.3d 355, 2000 WL 419940, at *1 (2d Cir. 2000)). In particular, a defendant is not entitled to such a hearing absent "a contested issue of material fact." *Id.* (citing *United States v. Pierce*, No. 06-CR-42 (DLI), 2007 WL 1175071, at *3 (E.D.N.Y. Apr. 19, 2007)). Moreover, as discussed above, "[i]t is well-settled that a hearing is not required if a defendant fails to support his factual allegations with an affidavit from a witness with personal knowledge." *Id.* (citing *United States v. Mottley*, 130 F. App'x 508, 510 (2d Cir. 2005) and *United States v. Walia*, No. 14-CR-213 (MKB), 2014 WL 2533848, at *1-2 (E.D.N.Y. June 5, 2014)). The defendant has provided no such affidavit, and the generalized unsworn assertions and purported factual inferences drawn by counsel in the motion do not cure that defect. *See id.* at 286 (citing *United States v. Perryman*, No. 12-CR-0213 (ADS), 2013 WL 4039374, at *6 (E.D.N.Y. Aug. 7, 2013).

For all of these reasons, the Court should deny the defendant's motion to suppress his statements to the FBI.

## VII.    There Is No Basis to Dismiss Count Five

Lastly, the defendant asserts that Count Five, which charges the defendant with making material false statements to the FBI during the videorecorded interview, should be dismissed because (1) the interview was unconstitutional, and (2) the false statements were not material, since nothing he said "changed the course of the government's prosecution against him: [he] was already on his way to be arraigned for the very same charges that the agents were questioning him about." MTS at 47. In the alternative, the defendant asserts that the false-statements charge should be severed, because "[i]t would be severely prejudicial to allow the

government to put [him] on trial for the substantive offenses and, essentially, for defending himself against the substantive offenses during a post-arrest interrogation at the same time."

First, nothing about the interview was unconstitutional, for the reasons discussed above.

Second, the defendant badly misapprehends the law on materiality. It not necessary that the defendant's false statement *actually* change the course of a prosecution, or that the agents believe his lies; rather, "a statement is material if it has a natural tendency to influence, or be *capable of influencing*, the decision of the decisionmaking body to which it was addressed, or if it is *capable of distracting* government investigators' attention away from a critical matter." *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012) (internal quotation marks and citation omitted, emphasis added). The specific lies charged in the indictment—that the defendant never sent money to CC-1, that his marriage to Individual-3 was genuine and not for immigration benefits, and that the utility bill he submitted to immigration authorities with Individual-3's name on it was genuine and unaltered, Indictment ¶ 6 (ECF No. 8)—are all direct and provably false refutations of facts that satisfy elements of the substantive offenses. Such direct statements about the elements of offense are of course "capable of influencing" a decisionmaking body and "capable of distracting" investigators, because, if they were true, the defendant would not be guilty of the charged offenses. The fact that these lies did not in fact trick the agents does not matter.

Third, and finally, the defendant does not explain his conclusory assertion that a trial of substantive offenses and false statements related to them would be "severely prejudicial" because it would not be, and he cites no authority for the proposition that severance is justified because it is not. To the contrary, evidence of the substantive offense would be admissible to prove the lie, and evidence of the lie would be admissible to prove consciousness of guilt of the

substantive offense, and the two severed trials on the substantive offense and false statements respectively would therefore be virtually identical to each other.  This presents a profound and pointless waste of judicial resources.  *Cf. United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984) ("The law in this circuit clearly supports the joinder of underlying substantive crimes with perjury counts where, as here, the false declarations concern the substantive offenses." (collecting cases)).

        For these reasons, the defendant's motion to dismiss Count Five, or in the alternative, sever it, should be denied.

CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court

deny the defendant's motions in their entirety.

Dated:        Brooklyn, New York
              January 12, 2026

                                        Respectfully submitted,

                                        JOSEPH NOCELLA, JR.
                                        United States Attorney
                                        Eastern District of New York


                              By:        _____/s/_____
                                        Robert M. Pollack
                                        Andrew D. Reich
                                        Assistant U.S. Attorneys


cc:     Clerk of Court (HG) (via ECF and Email)
        Counsel of Record (via ECF and Email)