NJM:LRO/ADR
F. #2023R00939

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

MANSURI MANUCHEKHRI,
also known as "Mansuri Manchekhri"
and "Manysher,"

Defendant.

Docket No. 25-CR-88 (HG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTIONS *IN LIMINE* TO ADMIT CERTAIN EVIDENCE AND PRECLUDE CERTAIN EVIDENCE AND ARGUMENTS AT TRIAL

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Lindsey R. Oken
Andrew D. Reich
Assistant United States Attorneys
(Of Counsel)

TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES .................... iv

PRELIMINARY STATEMENT .................... 1

RELEVANT BACKGROUND .................... 2

I. Background on ISIS and ISIS-K .................... 2

II. Offense Conduct .................... 5

A. Payments to ISIS Associates Overseas .................... 5

B. Firearms Training and Unlawful Possession .................... 11

C. Immigration Fraud Scheme .................... 13

III. The Defendant's Arrest and Post-Arrest Statements .................... 14

ARGUMENT .................... 17

I. The Court Should Admit the Defendant's Statements Offered by the Government as Party-Opponent Admissions and Preclude the Defendant From Introducing His Own Hearsay Statements .................... 17

A. Legal Framework .................... 17

B. Discussion .................... 21

II. The Court Should Admit Co-Conspirator Statements Made in Furtherance of Certain Charged and Uncharged Conspiracies .................... 24

A. Legal Framework .................... 24

B. Discussion .................... 27

III. The Court Should Admit Evidence of Jihadist Propaganda Possessed and Distributed by the Defendant .................... 35

A. Legal Framework .................... 36

B. Discussion .................... 36

IV. [redacted] ....37

A. Legal Framework .... 39

B. Discussion .... 41

V. [redacted] ....41

A. Legal Framework .... 42

B. Discussion .... 43

VI. The Court Should Admit Certain Court Records and Records of Regularly Conducted Activity ....45

A. Legal Framework .... 45

B. Discussion .... 47

VII. The Court Should Preclude Evidence and Argument Improperly Impugning the Government's Investigative and Prosecutorial Conduct ....47

VIII. The Court Should Preclude Questioning or Argument Regarding the Purported Lawfulness or Reasonableness of Any Government Searches or Other Pretrial Matters ....51

IX. The Court Should Preclude Inquiry and Argument About the Existence or Absence of Classified Information Related to This Matter ....52

X. The Court Should Preclude Evidence and Argument Improperly Appealing to Juror Sympathy or Inviting Jury Nullification ....55

XI. The Court Should Preclude Evidence and Argument About Punishment and Consequences of a Conviction ....56

A. Legal Framework .... 56

B. Discussion .... 56

XII. The Court Should Compel Disclosure of Rule 16(b) Discovery and Defense Trial Exhibits ....58

A. Legal Framework ........ 58

B. Discussion ........ 60

CONCLUSION ........ 61

# TABLE OF AUTHORITIES

Page

## CASES

*Bourjaily v. United States*,
483 U.S. 171 (1987)........................................................................................ 25, 27

*Campinas Found. v. Simoni*,
No. 02-CV-3965 (BSJ) (KNF), 2005 WL 1006511 (S.D.N.Y. Apr. 27, 2005)........................ 40

*Dep't of Navy v. Egan,*
484 U.S. 518 (1988)............................................................................................ 53

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010)................................................................................................ 36

*In re Reserve Fund Sec. and Deriv. Litig.*,
275 F.R.D. 154 (S.D.N.Y. 2011) ........................................................................... 39

*In re United States,*
945 F.3d 616 (2d Cir. 2019) ................................................................................. 55

*In re Witness Before Grand Jury*,
791 F.2d 234 (2d Cir. 1986) ......................................................................... 39, 40, 41

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305 (2009)............................................................................................ 46

*Old Chief v. United States*,
519 U.S. 172 (1997)........................................................................................ 17, 42

*Quartararo v. Hanslmaier*,
186 F.3d 91 (2d Cir. 1999) ..................................................................... 18, 24, 31

*Shannon v. United States,*
512 U.S. 573 (1994)........................................................................................ 56, 57

*Sparf v. United States,*
156 U.S. 51 (1895).............................................................................................. 55

*Trammel v. United States*,
445 U.S. 40 (1980).......................................................................................... 39, 40

*United States v. Aiyaswamy*,
No. 15-CR-568, 2017 WL 1365228 (N.D. Cal. Apr. 14, 2017) .......... 59

*United States v. Alimehmeti*,
284 F. Supp. 3d 477 (S.D.N.Y. 2018) .......... 50

*United States v. Amato*,
15 F.3d 230 (2d Cir. 1994) .......... 27

*United States v. Ashraf*,
320 F. App'x 26 (2d Cir. 2009) .......... 26

*United States v. Badia,*
827 F.2d 1458 (11th Cir. 1987) .......... 52

*United States v. Bakhtiari,*
913 F.2d 1053 (2d Cir. 1990) .......... 55

*United States v. Barone*,
913 F.2d 46 (2d Cir. 1990) .......... 18, 25

*United States v. Bellomo*,
176 F.3d 580 (2d Cir. 1999) .......... 18, 24, 28, 31

*United States v. Blake*,
195 F. Supp. 3d 605 (S.D.N.Y. 2016) .......... 18

*United States v. Blume,*
967 F.2d 45 (2d Cir. 1992) .......... 57

*United States v. Breton*,
740 F.3d 1 (1st Cir. 2014).......... 40

*United States v. Carboni*,
204 F.3d 39 (2d Cir. 2000) .......... 43

*United States v. Cardascia*,
951 F.2d 474 (2d Cir. 1991) .......... 19

*United States v. Coonan*,
938 F.2d 1553 (2d Cir. 1991) .......... 42

*United States v. Cuervelo*,
949 F.2d 559 (2d Cir. 1991) .......... 49

*United States v. Curley*,
639 F.3d 50 (2d Cir.2011) .......... 44

*United States v. Daly*,
842 F.2d 1380 (2d Cir. 1988) .......... 42

*United States v. Davis*,
890 F.2d 1373 (7th Cir. 1989) .......... 18, 46

*United States v. Demosthene*,
334 F. Supp. 2d 378 (S.D.N.Y. 2004) .......... 49

*United States v. Desena*,
260 F.3d 150 (2d Cir. 2001) .......... passim

*United States v. Detrich*,
865 F.2d 17 (2d Cir. 1988) .......... 18, 24, 28, 30

*United States v. DeVillio*,
983 F.2d 1185 (2d Cir. 1993) .......... 25

*United States v. Díaz-Colón,*
651 F. Supp. 3d 468 (D.P.R. 2023) .......... 56

*United States v. DiCarlo*,
131 F. Supp. 2d 537 (S.D.N.Y. 2001) .......... 44

*United States v. DiMarzo,*
80 F.3d 656 (1st Cir. 1996).......... 57

*United States v. Dominguez-Gabriel*,
511 F. App'x 17 (2d Cir. 2013) .......... 18, 24, 28, 31

*United States v. Dunloy*,
584 F.2d 6 (2d Cir. 1978) .......... 18, 24, 28, 30

*United States v. Dupre*,
462 F.3d 131 (2d Cir. 2006) .......... 24, 28, 32

*United States v. Dupree*,
833 F. Supp. 2d 255 (E.D.N.Y. 2011) .......... 49, 50, 51

*United States v. Dupree*,
870 F.3d 62 (2d Cir. 2017) .......... 42

*United States v. Edwards,*
101 F.3d 17 (2d Cir. 1996) .......... 55

*United States v. Ellis*,
460 F.3d 920 (7th Cir. 2006) .......... 46

*United States v. Estes*,
793 F.2d 465 (2d Cir. 1986) .......... 40

*United States v. Estevez*,
No. 16-CR-307 (CM), 2017 WL 700775 (S.D.N.Y. Feb. 16, 2017) .......... 24, 28, 32

*United States v. Farhane*,
634 F.3d 127 (2d Cir. 2011) .......... 37, 48

*United States v. Fawwaz*,
694 F. App'x 847 (2d Cir. 2017) .......... 26

*United States v. Gigante*,
166 F.3d 75 (2d Cir. 1998) .......... 25

*United States v. Gonzalez*,
110 F.3d 936 (2d Cir. 1997) .......... 17, 42

*United States v. Gonzalez*,
399 F. App'x 641 (2d Cir. 2010) .......... 20

*United States v. Gotti*,
457 F. Supp. 2d 395 (S.D.N.Y. 2006) .......... 20

*United States v. Gupta*,
747 F.3d 111 (2d Cir. 2014) .......... passim

*United States v. Guzman-Loera*,
No. 09-CR-466 (BMC), 2018 WL 2744701 (E.D.N.Y. June 7, 2018) .......... 48

*United States v. Haldeman*,
559 F.2d 31 (D.C. Cir. 1976) .......... 35

*United States v. Harper*,
No. 05-CR-6068L, 2009 WL 140125 (W.D.N.Y. Jan. 20, 2009) .......... 20

*United States v. Harwood*,
998 F.2d 91 (2d Cir. 1993) .......... 19

*United States v. Hashimi, et al.*,
No. 22-CR-553 (ENV) (E.D.N.Y.) .......... 37

*United States v. Hilliard*,
19-CR-358 (PKC) (E.D.N.Y.) .......... 50

*United States v. Holden*,
No. 13-CR-444, 2015 WL 1514569 (D. Or. Mar 19, 2015) .......... 59

*United States v. Hsia*,
No. 98-CR-0057 (PLF), 2000 WL 195067 (D.D.C. Jan. 21, 2000) .......... 58

*United States v. Huntress*,
No. 13-CV-199, 2015 WL 631976 (W.D.N.Y. Feb. 13, 2015) .......... 59

*United States v. Inserra*,
34 F.3d 83 (2d Cir. 1994) .......... 42

*United States v. Johnson*,
131 F.3d 132 (2d Cir. 1997) .......... 30, 33

*United States v. Johnson*,
507 F.3d 793 (2d. Cir. 2007) .......... 20, 21

*United States v. Johnson*,
688 F.3d 494 (8th Cir. 2012) .......... 46

*United States v. Kidd*,
No. 20-CR-572 (NSR), 2022 WL 15317483 (S.D.N.Y. Oct. 27, 2022) .......... 35

*United States v. Komasa*,
767 F.3d 151 (2d Cir. 2014) .......... 47

*United States v. Knox*,
687 F. App'x 51 (2d Cir. 2017) .......... 48

*United States v. Kone*,
216 F. App'x 74 (2d Cir. 2007) .......... 22, 28

*United States v. Kurland*,
No. 20-CR-306 (S-1) (NGG), 2022 WL 2669897 (E.D.N.Y. July 11, 2022) .......... 26

*United States v. Kwong,*
69 F.3d 663 (2d Cir. 1995) .......... 55

*United States v. Lewis,*
110 F.3d 417 (7th Cir. 1997) ........................................ 57

*United States v. Lights*,
No. 15-CR-721, 2016 WL 7098633 (S.D.N.Y. Dec. 5, 2016) ........................................ 50, 51

*United States v. Lyles*,
593 F.2d 182 (2d Cir. 1979) ........................................ 25, 33

*United States v. Mahaffy*,
No. 05-CR-613 (ILG), 2007 WL 1094153 (E.D.N.Y. Apr. 10, 2007) ........................................ 19

*United States v. Malka*,
602 F. Supp. 3d 510 (S.D.N.Y. 2022) ........................................ 26, 27, 31, 32

*United States v. Mallay*,
712 F.3d 79 (2d Cir. 2013) ........................................ 26

*United States v. Marcos*,
No. 87-CR-598 (JFK), 1989 WL 135256 (S.D.N.Y. Oct. 31, 1989) ........................................ 39, 40, 41

*United States v. Marin*,
669 F.2d 73 (2d Cir. 1982) ........................................ 18

*United States v. McDaniel*,
398 F.3d 540 (6th Cir. 2005) ........................................ 19

*United States v. Morgan*,
505 F.3d 332 (5th Cir. 2007) ........................................ 46

*United States v. Mostafa*,
16 F. Supp. 3d 236 (S.D.N.Y. 2014) ........................................ 44

United States v. Mulder,
273 F.3d 91 (2d Cir. 2001) ........................................ 27

*United States v. Napout*,
No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) ........................................ 59

*United States v. Palmieri*,
No. 97-CR-0356 (JG), 1998 WL 765138 (E.D.N.Y. Apr. 20, 1998) ........................................ 39, 40

*United States v. Paul,*
110 F.3d 869 (2d Cir. 1997) ........................................ 55

*United States v. Preldakaj*,
456 F. App'x 56 (2d Cir. 2012) ........ 48

*United States v. Premises Known as 281 Syosset Woodbury Rd., Woodbury, N.Y.*,
71 F.3d 1067 (2d Cir. 1995) ........ 39

*United States v. Pugh*,
162 F. Supp. 3d 97 (E.D.N.Y. 2016) ........ 37, 39

*United States v. Pugh*,
945 F.3d 9 (2d Cir. 2019) ........ 40, 41

*United States v. Qualls*,
613 F. App'x 25 (2d Cir. 2015) ........ 46

*United States v. Ragano*,
No. 24-CR-50 (HG) (E.D.N.Y. September 9, 2024) ........ 32, 50

*United States v. Rahme*,
813 F.2d 31 (2d Cir. 1987) ........ 27

*United States v. Reese*,
933 F. Supp. 2d 579 (S.D.N.Y. 2013) ........ 49

*United States v. Regan*,
103 F.3d 1072 (2d Cir. 1997) ........ 49

*United States v. Roldan–Zapata*,
916 F.2d 795 (2d Cir.1990) ........ 44

*United States v. Rosado*,
728 F.2d 89 (2d Cir. 1984) ........ 48, 51

*United States v. Russo,*
302 F.3d 37 (2d Cir. 2002) ........ 22, 25

*United States v. Saget*,
377 F.3d 223 (2d Cir.) ........ 27

*United States v. Saldarriaga*,
204 F.3d 50 (2d Cir. 2000) ........ 48

*United States v. Saipov*,
No. 17-CR-722 (S.D.N.Y.) ........ 47

*United States v. Scheibel*,
870 F.2d 818 (2d Cir. 1989) .......... 22

*United States v. Singleton*,
260 F.3d 1295 (11th Cir. 2001) .......... 39

*United States v. SKW Metals & Alloys, Inc.*,
195 F.3d 83 (2d Cir. 1999) .......... 25

*United States v. Smothers*,
No. 20-CR-213 (KAM), 2023 WL 348870 (E.D.N.Y. Jan. 20, 2023) .......... 59

*United States v. Stewart*,
No. 03-CR-717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) .......... 49

*United States v. Stewart,*
590 F.3d 93 (2d Cir. 2009) .......... 54

*United States v. Swenson*,
298 F.R.D. 474 (D. Idaho 2014) .......... 59

*United States v. Taylor*,
92 F.3d 1313 (2d Cir. 1996) .......... 40

*United States v. Thai*,
29 F.3d 785 (2d Cir. 1994) .......... 26, 35

*United States v. Thomas,*
116 F.3d 606 (2d Cir. 1997) .......... 55, 57, 58

*United States v. Trujillo,*
714 F.2d 102 (11th Cir. 1983) .......... 55

*United States v. Ullah*,
173 F.4th 399 (2d Cir. 2026) .......... 51

*United States v. Wagner*,
No. 20-CR-410 (NSR), 2022 WL 19179 (S.D.N.Y. Jan. 3, 2022) .......... 43

*United States v. Warren*,
No. 22-CR-231 (DLI), ECF Order (E.D.N.Y. Sept. 6, 2023) .......... 59

*United States v. Watts,*
934 F. Supp. 2d 451 (E.D.N.Y. 2013) .......... 57

*United States v. Webb, et al.*,
No. 15-CR-252 (PKC) ..... 48

*United States v. Weiland*,
420 F.3d 1062 (9th Cir. 2005) ..... 46

*United States v. Williams*,
205 F.3d 23 (2d Cir. 2000) ..... 42

*United States v. Williams*,
930 F.3d 44 (2d Cir. 2019) ..... 21

*United States v. Yeley-Davis*,
632 F.3d 673 (10th Cir. 2011) ..... 46

*United States v. Young*,
283 F. App'x 858 (2d Cir. 2008) ..... 49

*United States v. Yunis,*
867 F.2d 617 (D.C. Cir. 1989) ..... 54

RULES

Fed. R. Crim. P. 16 ..... 58, 59, 60

Fed. R. Crim. P. 26.2 ..... 60

Fed. R. Evid. 104 ..... 52

Fed. R. Evid. 106 ..... 20, 21

Fed. R. Evid. 104 ..... 25

Fed. R. Evid. 401 ..... 36, 56

Fed. R. Evid. 402 ..... passim

Fed. R. Evid. 403 ..... passim

Fed. R. Evid. 404 ..... 42, 43

Fed. R. Evid. 801 ..... passim

Fed. R. Evid. 802 ..... 24

Fed. R. Evid. 803 .......... 19

Fed. R. Evid. 804 .......... 35

Fed. R. Evid. 902 .......... 45, 46, 47

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motions *in limine* to:

(1) Admit the defendant's statements offered by the government as party-opponent admissions and preclude the defendant from introducing his own hearsay statements;

(2) Admit co-conspirator statements made in furtherance of certain charged and uncharged conspiracies;

(3) Admit evidence of jihadist propaganda possessed and distributed by the defendant;

(4) [redacted]

(5) [redacted]

(6) Admit certain court records and records of regularly conducted activity;

(7) Preclude evidence and argument improperly impugning the government's investigative and prosecutorial conduct;

(8) Preclude questioning or argument regarding the purported lawfulness or reasonableness of any government searches or other pretrial matters;

(9) Preclude inquiry and argument about the existence or absence of classified information related to this matter;

(10) Preclude evidence and argument improperly appealing to juror sympathy or inviting jury nullification;

(11) Preclude evidence and argument about punishment and consequences of a conviction; and

(12) Compel disclosure of Rule 16(b) discovery and defense trial exhibits.

## RELEVANT BACKGROUND

The defendant Mansuri Manuchekhri is charged in a five-count indictment with: (1) conspiring to provide material support to the Islamic State of Iraq and al-Sham ("ISIS") and the Islamic State–Khorasan Province ("ISIS-K"), in violation of 18 U.S.C. § 2339B(a)(1); (2) conspiring to possess firearms and ammunition while unlawfully in the United States, in violation of 18 U.S.C. § 371; (3) possessing firearms and ammunition while unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5)(A); (4) immigration fraud, in violation of 18 U.S.C. § 1546(a); and (5) making false statements to federal agents, in violation of 18 U.S.C. § 1001(a)(2). *See* ECF No. 8 (Indictment); *see also* ECF No. 1 (Complaint).

The government expects to establish the following facts at trial through witness and expert testimony, financial records, electronic communications and other digital, documentary and photographic evidence, and the defendant's own admissions to law enforcement and third parties.

### I. Background on ISIS and ISIS-K

ISIS is a designated foreign terrorist organization that has claimed credit for numerous terrorist activities as part of its broader goal of forming an Islamic state or "caliphate" in Iraq, Syria and beyond.[1] At various times over the past several years, ISIS has controlled territory in Syria, Iraq and Libya, and maintained presences in other countries as well, such as

[1] On or about October 15, 2004, the U.S. Secretary of State ("Secretary") designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist ("SDGT") under Section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary amended the designation of AQI to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the Islamic State of Iraq and al-Sham ("ISIS") and other aliases to the FTO listing. On September 21, 2015, the Secretary added the following aliases to the FTO and SDGT listings: Islamic State, ISIL, and ISIS. On March 22, 2019, the Secretary added additional aliases to the FTO and SDGT listings. To date, ISIS remains a designated FTO.

Yemen, Afghanistan, and elsewhere. ISIS routinely carries out killings and deliberate targeting of civilians; mass executions; persecution of individuals and communities on the basis of their religion, nationality, or ethnicity; kidnapping of civilians; forced displacement of Shia Muslim communities and minorities; killing and maiming of children; rape; and other forms of sexual violence. ISIS has recruited thousands of foreign fighters—*i.e.*, non-Syrians and non-Iraqis—from around the globe to assist with its efforts to expand its caliphate in Iraq and Syria. ISIS has also leveraged technology—including the internet, social media, and encrypted communications platforms—to spread its violent extremist ideology and for the purposes of inciting adherents to commit terrorist acts. Tens of thousands of extremists have traveled to the Middle East to join ISIS.

ISIS has also claimed credit for numerous terrorist activities, including attacks against Americans in the United States and against Westerners abroad. For example, ISIS supporters have claimed responsibility for, among others, the following attacks in the United States: the May 2015 shooting in Garland, Texas at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California at the Inland Regional Center; the June 2016 shooting in Orlando, Florida at the Pulse nightclub; the October 2017 West Side Highway truck attack in Manhattan; the December 2017 attempted bombing of the 42nd Street-Port Authority Bus Terminal in Manhattan; and the January 2025 truck attack in New Orleans. ISIS supporters have continued to publicly express their desire to target and attack the United States and other Western nations. On March 28, 2024, ISIS released a message calling for lone-wolf attacks in, among other places, the United States.

ISIS and its supporters have also claimed responsibility for violent attacks across Europe, South Asia and Oceania, including: the November 2015 shootings and suicide bombings

in Paris, France at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 attack upon the Holey Artisan Bakery in Dhaka, Bangladesh in which more than 25 people were killed, including at least one United States citizen; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; the August 2017 van attack in Barcelona, Spain; an August 2018 suicide bombing in Kabul, Afghanistan; the April 2019 Easter Sunday bombings in Sri Lanka that killed or wounded more than 700 people; the August 2021 suicide bombing attack at the Kabul airport that killed more than 170 people, including thirteen members of the United States military; the September 2021 stabbing attack in New Zealand; the November 2021 shooting and suicide bombing attack at a military hospital in Kabul that killed 25 people; the March 2022 shooting and suicide bombing attack at a mosque in Peshawar, Pakistan, that killed or wounded more than 250 people; and the September 2022 suicide bombing attack at the embassy of the Russian Federation in Kabul, in which approximately ten people were killed. In December 2025, two gunmen determined to have been motivated by ISIS murdered fifteen people (including a ten-year-old child), and injured several dozen others, during a Hanukkah celebration at Bondi Beach in Sydney, Australia.

ISIS-K is a regional branch of ISIS in South and Central Asia.[2] ISIS-K has similarly claimed responsibility for violent and deadly attacks. For example, on March 22, 2024, ISIS-K claimed responsibility for the terrorist attack at the Crocus City Hall concert venue in

[2] On or about January 14, 2016, the Secretary designated ISIL Khorasan as an FTO under Section 219 of the INA and on or about January 21, 2016, as an SDGT under Section 1(b) of Executive Order 13224. The Secretary has also listed additional aliases for ISIL Khorasan, including The Islamic State of Iraq and ash-Sham–Khorasan Province, Islamic State's Khorasan Province, Islamic State Khurasan, and ISIS-K. To date, ISIS-K remains a designated FTO.

Moscow, Russia that killed over 130 people and injured hundreds more. It was the deadliest terrorist attack in Europe since 2004. ISIS and ISIS-K also claimed responsibility for the January 28, 2024 shooting during Sunday Mass at the Santa Maria Church in Istanbul (the "Istanbul Church Attack"), which killed one person and injured another, and publicly asserted on the Telegram social media and messaging platform that the attack was part of the call to kill Christians and Jews everywhere.

II. <u>Offense Conduct</u>

A. <u>Payments to ISIS Associates Overseas</u>

As alleged in the Complaint, the defendant traveled to the United States from Tajikistan in June 2016 on a non-immigrant tourist visa and remained in the country after his visa expired in December 2016. Compl. ¶ 3. While in the United States, the defendant expressed his support for ISIS to others, including by praising past ISIS attacks in the United States (including the October 2017 West Side Highway attack referenced above), *id.* ¶ 6, and by collecting jihadist propaganda videos promoting violence and martyrdom. For example, the defendant's iCloud account contained a video featuring a Hamas spokesman and ending with the message: "It is indeed a jihad of victory or martyrdom." *Id.* ¶ 8. Another video, bearing hallmarks of production by an ISIS media apparatus, featured a lecture by an ISIS leader depicted against a background of battlefield footage and images of dead and wounded fighters. *Id.* The defendant also sent an associate a video entitled "Central Asia: The Call of ISIS," which discussed a Tajik military commander who defected to ISIS in 2015 and encouraged others to do the same. *Id.* ¶ 9. [redacted], referred to in the Complaint as "Individual-1," told law enforcement agents that, on one occasion, the defendant proclaimed that if you kill non-Muslims in the war, you will be rewarded with going to heaven, and that he wanted to get revenge on the "pigs."

The defendant communicated frequently with an ISIS member in Istanbul, Türkiye, who is referred to in the Complaint as "CC-1." CC-1 sent the defendant religious messages, often in the form of links to videos on an Instagram account that CC-1 stated was his account and which contained extremist Islamic videos in Tajik or Russian, or subtitled in Tajik or Russian. For example, on or about September 20, 2022, CC-1 sent the defendant an audio file of an ISIS nasheed, which is a form of vocal music used by ISIS to distribute propaganda. The nasheed, which bore hallmarks of production by ISIS's Turkish media outlet, stated in part: "They have tied my hands and thrown me in prison. The day of revenge is near and we will be glorious against the infidels. To break the chains, we will chant Allahu Akbar." *Id.* ¶ 12.

From approximately December 2021 through June 2023, while residing in Brooklyn, the defendant facilitated payments to ISIS-affiliated individuals in Türkiye and Syria. *Id.* ¶¶ 13-26. On numerous occasions during that timeframe, the defendant and CC-1 discussed the defendant's transmission of money to CC-1 and the defendant's collection of money from other "brothers" to be submitted to CC-1. The defendant regularly sent money to CC-1 through a third-party intermediary, referred to in the Complaint as "Individual-2," and also put Individual-2 in direct contact with CC-1 to facilitate money transfers. *Id.* ¶ 13. The defendant began using Individual-2 as an intermediary to send money to CC-1 on or about December 25, 2021, when the defendant asked CC-1, "Dear brother, can I give them this WhatsApp number?" CC-1 replied: "Give him this WhatsApp." That same day, the defendant sent several text messages in succession to Individual-2—the first with a name provided by CC-1, then the phone number for CC-1, then "$2,000," and finally the message, "Brother, [this is] the WhatsApp number for that brother in Türkiye." On December 28, 2021, Individual-2 texted the defendant an image of a Western Union receipt that displayed an alias of CC-1 as the named recipient. *Id.* ¶ 14.

Subsequent messages confirmed that this money was received. Specifically, on January 18, 2022, CC-1 sent the defendant two photographs, depicted below. The first photograph showed several stacks of Syrian currency, and next to the money was a hand-written sign bearing the date "5.01.22"—an apparent reference to the receipt of the money on January 5, 2022—and another hand-written sign that read, in Russian, "Relief is near, $2,000," and in Arabic, "May God reward you." The second photograph depicted a woman and a girl seated on the floor wearing burqas, with Syrian currency spread out in front of them, and a hand-written sign that read in Russian, "Relief is near," and in Arabic, "May God reward you."







CC-1 further sent the defendant a screenshot of text messages in Russian from another person, which read, "24 = were distributed to families," "24 to sisters and 69 to children," and "$50 for the boy who is in jail." *Id.* ¶¶ 16-17.

CC-1 also sent an audio recording to the defendant in which he stated:

> Brother, this is not photoshop. Just to track down the money. In regard to the money, it was distributed to 24 families and they will receive Syrian currency. For example, for the deceased, their wives receive 30,000 and their children 20,000, depending how many children they have. Praise be upon God; the money has been distributed very well. The money has helped the widows and their children. Just to let you know that this is only half of the money.

In that message, CC-1 referenced battlefield deaths of ISIS members ("the deceased"), consistent with ISIS's practice of soliciting financial support from sympathizers for the families of slain ISIS fighters. CC-1's message further referenced the remaining "half" of the money, intended for individuals whom CC-1 was more circumspect to discuss in writing: specifically, ISIS fighters. *Id.* ¶ 18.[3]

The communications between CC-1 and the defendant reflect numerous other transactions of similar character. In each, the defendant informed CC-1 that he was sending money. The defendant separately directed Individual-2 to send the money, and financial records confirm that Individual-2 did so.

---

[3] During the fighting to recapture territory that was previously controlled by ISIS, thousands of people, including ISIS members and their families, were displaced into Al-Hol and Al-Roj detention camps in northern Syria, near the border with Iraq. These camps were nominally controlled by the Syrian Democratic Forces, and the people in them have received international humanitarian aid, but it has been widely reported that the camps are in substantial part *de facto* governed by ISIS. *Id.* ¶ 19. It has also been publicly reported that ISIS networks, including Tajik-speaking ISIS-K networks, use online and social media platforms to encourage ISIS supporters to transfer money through surreptitious means to support ISIS militants and their families in the camps, and that they send photographs like those described above to support these fundraising efforts. *Id.* ¶ 20. For instance, one article published in June 2022 about fundraising over an ISIS-K–affiliated Telegram channel included images with several overlapping elements of the photographs that CC-1 sent to the defendant, including a hand-written sign and message, the display of Syrian currency on the floor, and even the style of tent wall visible in the background. *See Tajik Islamic State network fundraises in Russia* (Jun. 13, 2022), https://eurasianet.org/tajik-islamic-state-network-fundraises-in-russia.

The messages also reflect that the defendant was raising money from others to send to CC-1. For instance, on January 18, 2022, shortly after receiving the above-described photographs from CC-1, the defendant sent CC-1 a voice message stating that he had "collected the money that was designated for Madrasa." In another sent on April 16, 2022, CC-1 said that he "has a list of 125 individuals who are supposed to pay their alms," and that "each individual should pay $4 as alms and the money will be sent once collected." The defendant responded that he would "count everything" and try to send "by early next week." In another message sent on May 12, 2022, the defendant told CC-1 that he sent $2,100, of which "$1,000 was collected as alms" and the rest of which was collected by the defendant "and other brothers." *Id.* ¶ 22.

After the defendant's message that he sent $2,100, CC-1 responded by asking if he could "put some [of the money] aside for the brothers," some of whom "are traveling," and send the rest for "the sisters." The defendant responded that he approved and added that he was going "to talk to other brothers and once they collect some money," they would send more. The distinction drawn between money designated for "the brothers who are traveling" and "the sisters" reflected a distinction between ISIS or ISIS-K members who were outside of the detention camps, and family members who were inside of them. *Id.* ¶ 23.

In a message sent on February 24, 2023, CC-1 complained to the defendant about "some brothers who promised to send [him] money," who were "now trying to find excuses or not fulfilling their obligation." CC-1 asked the defendant if he had "gathered the money." The defendant answered, "Yes brother, I talked to a few brothers and they told me that they can help." On April 7, 2023, the defendant sent a message to CC-1 that he had just sent $2,300, of which $1,000 was "alms from a brother," $500 was "alms from" a specifically named "brother," and "$300 alms" from another unspecified "brother." CC-1 responded, asking, "Brother, should I use

this money where you told me, can you let me know? Also, I was wondering if you collected alms for the month of Ramadan. You remember as I told you that each brother can pay $3 alms for the month of Ramadan." The defendant answered, "Brother, wherever you want to spend the money it is up to you. If you can spend $1,000 for the brothers and the rest for the sisters, that would be good. In regard to alms for the month of Ramadan, not yet. I will talk to the brothers and let you know." *Id.* ¶¶ 24-25.

Based on the defendant's communications with CC-1 and Individual-2, together with Individual-2's communications and financial records, the government has calculated that between approximately December 2021 and June 2023 the defendant sent or caused to be sent (through Individual-2) approximately $70,000 to CC-1 and to others, including to a second ISIS member in Istanbul referred to in the Complaint as "CC-2." Individual-2's text messages with CC-2, coordinating money transfers that the defendant directed, include an image of CC-2's Turkish identity card showing that CC-2 is a Tajik national residing in Türkiye, and also an image of a receipt with CC-2's name, indicating receipt of a money transfer in Türkiye in April 2023. *Id.* ¶ 26.

In February 2024, CC-2 was arrested by Turkish authorities for terrorism offenses in connection with the January 28, 2024 Istanbul Church Attack, described above, for which ISIS and ISIS-K publicly claimed responsibility. According to public reporting, a vehicle used by CC-2 was used in the attack. *Id.* ¶ 28. CC-1 was similarly arrested by Turkish authorities in the summer of 2023 for affiliation with ISIS-K. As such, CC-1's communications with the defendant, as reflected in the defendant's iCloud account, ended in June of that year. *Id.* ¶ 27.

B. Firearms Training and Unlawful Possession

Within the same time period as the money transfers, the defendant also possessed and used firearms, and made frequent visits to shooting ranges, even though he was prohibited from doing so as an alien unlawfully in the United States (as described below, the defendant twice fraudulently applied for lawful permanent residence status, but that status has never been granted). *Id.* ¶ 29. Photographs and videos in the defendant's iCloud account show him possessing and using firearms at shooting ranges, which he sometimes visited with other foreign nationals residing in Brooklyn. *Id.* ¶ 30. For example, an invoice from a shooting range in New Jersey reflects that, on February 27, 2022, the defendant and a naturalized Tajik native (with whom the defendant lived) rented a rifle port, an AK-47, and a Smith & Wesson M&P 15 tactical rifle, and purchased ammunition and other gear. *Id.* ¶ 32-33.

Additional photographs and communications in the defendant's iCloud account indicate that he was seeking to illegally purchase a firearm. *Id.* ¶ 31. Specifically, on February 8, 2024, a Russian national with whom the defendant lived and with whom he had visited shooting ranges ("Individual-5") sent the defendant a screenshot of a separate text message exchange about the potential purchase of a gun. In that screenshot, a third party ("Individual-6") sent several photographs of a Glock 22 handgun and a text message in Russian stating that the gun or one like it could be purchased for $1,000, which Individual-6 noted in parentheses was a substantial cost markup because it would come "without documents, checks, and other things." *Id.* On August 19, 2024, another individual ("Individual-7") sent the defendant a video displaying a Ruger handgun, holster, and a Ziploc bag filled with ammunition, stating that it cost $250 to buy. The next day, the defendant sent Individual-5 a photograph of what appears to be the same gun and Ziploc bag of ammunition. Several days later, on August 24, 2024, the defendant sent Individual-

5 a video recorded from inside a moving vehicle, which shows an outstretched arm—seemingly the defendant's—firing a handgun out the window toward the side of the highway. (The content of the video and its metadata establish the location where the video was created, and other evidence corroborates that the defendant was in that vicinity in the same timeframe and thus that he was not merely sharing a found video.)

The defendant's interest in and access to firearms and firearms training was directly related to his support for ISIS's violent agenda. In February 2022, the defendant sent CC-1 a recording of himself firing an assault rifle at the shooting range in New Jersey with the message, "Thank God, I am ready, brother." *Id.* ¶ 33. In June 2022, the defendant sent CC-1 another video of himself firing an assault rifle with the message, "Brother, I go for training at least once or twice a week." *Id.* ¶ 34.

These communications are consistent with others found on the defendant's phone in which he relayed his desire to travel overseas to join jihadist causes. For example, in November 2023, the defendant messaged a Türkiye-based individual, "I've been waiting for 5 years, I didn't get married after the divorce, it didn't work out. I thought that if I went to jihad, maybe my family would stop me." // "Brother, for Allah's sake, if there is a way, please tell me. I want to go there." In another instance, the defendant wrote to a separate individual, "Sheikh, is it possible to go to Palestine to fight with Hamas, will it be jihad? For Allah's sake, I ask you to answer, and how to go there?" After receiving a response with instructions for sending cryptocurrency, the defendant responded, "Sheikh, for the sake of Allah, tell me, is it possible to get to Palestine . . . I really want to go there, please, if there is a way, send me there."

C. Immigration Fraud Scheme

In March 2017, the defendant paid an American citizen to enter into a sham marriage with him so that he could obtain legal status in the United States. *Id.* ¶¶ 35-38. However, the defendant failed to provide supporting documentation requested by the government, and his petition to become a lawful permanent resident was never granted. *Id.* The defendant thereafter falsely claimed to be a victim of domestic violence in order to obtain legal status and was similarly unsuccessful. *Id.*

Specifically, in March 2017, the defendant married a United States citizen, referred to in the Complaint as "Individual-3." Individual-3 was born in the Bronx, lived in the Bronx at all relevant times, and never lived with the defendant in Brooklyn (or anywhere else). The defendant and Individual-3 together filed a petition for the defendant to become a lawful permanent resident as Individual-3's spouse. Immigration authorities requested additional supporting evidence that the defendant never provided. That original petition was later abandoned in March 2021 when the defendant sought divorce from Individual-3 and filed a petition to become a lawful permanent resident pursuant to the Violence Against Women Act, and claimed to have been abused by Individual-3 and an unspecified male associate of Individual-3's. *Id.* at ¶ 36.

Both of the defendant's petitions were fraudulent. Indeed, in support of his applications, the defendant submitted purported copies of utility bills, altered to appear as if they were addressed to him and Indiviudal-3 at an address in Brooklyn. The actual bills, provided by the utility company, do not include Individual-3's name, and the utility company confirmed that Individual-3's name has never been listed at that address. *Id.* at ¶ 37. Additionally, the defendant's iCloud account contained text messages between the defendant and Individual-3 showing that the defendant paid Individual-3 to marry him and that Individual-3 continually demanded more money

and threatened to report the defendant to immigration authorities for his fraud. *Id.* ¶ 38. For example, Individual-3 made statements such as, "I'm helping you out to get ya papers the least you can do is help me out when I need it," and, "You want papers but don't wanna pay the right price another girl would've got you for more . . . Ima just speak to immigration my sister is married the same way I am she knows the system she's helping me." *Id.* ¶¶ 39-41.

Additionally, the defendant's iCloud account contained text messages with an individual identified in the Complaint as "Individual-4," whom the defendant met through work as a mover and with whom he discussed his sham marriage. On September 6, 2019, Individual-4 asked whether the defendant's friends also found American wives to get green cards, and the defendant said that they did not. Individual-4 asked how the defendant found his American wife, and the defendant said he thought he had already relayed the story. Individual-4 responded, "u didn't tell me the details u just said u got married for green card and that she left." The defendant responded, "Yes." Individual-4 asked, "Why didn't u actually marry her did you not like her[?]" The defendant answered, "No, I don't like her because she drinks a lot and she is a dancer somewhere dancing honestly I don't know, we met twice this affection for the wedding the second time I gave her money." The defendant added that his sham wife "has an unofficial husband." The following day, Individual-4 asked, "These women don't marry more than once right or else the government will know they do it for the money," and the defendant responded: "Yes they do for the money." Individual-4 replied, "No I meant they can't do it more than once? / Bctheyll get caught / It's illegal." The defendant answered: "Yes you right." *Id.* ¶¶ 43-45.

III. The Defendant's Arrest and Post-Arrest Statements

Early on the morning of February 26, 2025, agents from the Federal Bureau of Investigation ("FBI") went to the defendant's home in Brooklyn to execute an arrest warrant.

Subsequent analysis of the defendant's cell phone pursuant to a search warrant revealed that, in the moments after FBI agents began knocking on his door and calling his phone, the defendant deleted the Telegram encrypted messaging application (its contents have not been recovered). The defendant thereafter emerged from his home and was arrested.

Later that morning, the defendant waived his *Miranda* rights and agreed to sit for a consensual interview with FBI agents. When confronted with the WhatsApp communications he had with CC-1, the defendant identified CC-1 by name and repeatedly and unequivocally denied ever having sent him any money, directly or through any intermediary. When confronted with his communications showing that the defendant had sent money, the defendant admitted that CC-1 asked the defendant to send him money, but said (unprompted by the FBI interviewers) that he recognized that he "cannot do this because it's [a] crime." When asked why he thought it would be a crime to send money to CC-1, the defendant said that CC-1 might "do something," that there is "a lot of stuff going on in the world," and that CC-1 might "send money to, like, to do something bad," possibly including a "terrorist group."

The defendant also admitted to agents from the FBI that he had married Individual-3 and claimed that it was a genuine marriage, but he misremembered Individiual-3's first name (giving a name that rhymed with her actual name) and could not remember her surname. When confronted with the altered utility bills that he submitted to immigration authorities, the defendant claimed that they were not altered and that he submitted them just as he received them from the utility company.

On March 11, 2025, a grand jury sitting in the Eastern District of New York returned the indictment described above, charging the defendant with federal crimes for his

material support of ISIS and firearms possession, his immigration fraud scheme and his false statements to federal agents. *See* ECF No. 8.

## ARGUMENT

### I. The Court Should Admit the Defendant's Statements Offered by the Government as Party-Opponent Admissions and Preclude the Defendant From Introducing His Own Hearsay Statements

The Court should admit the defendant's statements when offered by the government, and preclude the defendant from offering his own, self-serving hearsay. The government intends to offer in its case-in-chief various categories of statements by the defendant, including portions of the defendant's post-arrest interview with law enforcement authorities, conversations with co-conspirators (including CC-1), and other statements and admissions made to third-parties, all of which are relevant to the charged crimes.

#### A. Legal Framework

##### 1. Relevance

Under Rule 401, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." "Relevant evidence is admissible" unless specifically excluded by law or the rules. Fed. R. Evid. 402. In analyzing relevancy, the Second Circuit has explained that "evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 183 (1997). In sum, the Federal Rules of Evidence establish a liberal standard of admissibility.

2. Hearsay

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court." *Id.* 802.[4]

a. Defendant's Statements

The government generally may introduce a defendant's statements into evidence because a statement is not hearsay if it is "offered against an opposing party and . . . was made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A).

It is well established that a defendant generally is prohibited from introducing his own out-of-court statements at trial. *See United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); *United States v. Blake*, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) (quoting same). Therefore, a "court may . . . exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible

[4] Statements that are not being offered for their truth are not hearsay. For example, out-of-court statements made by a third party are not hearsay if offered as circumstantial evidence of the defendant's state of mind, rather than for their truth. *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988); *United States v. Dunloy*, 584 F.2d 6, 11 (2d Cir. 1978). Similarly, questions or commands do not generally constitute hearsay. *See United States v. Bellomo*, 176 F.3d 580, 586-87 (2d Cir. 1999); *United States v. Dominguez-Gabriel*, 511 F. App'x 17, 20 (2d Cir. 2013); *Quartararo v. Hanslmaier*, 186 F.3d 91, 98 (2d Cir. 1999). Finally, when a defendant makes statements in the context of a conversation with a third party, the statements of the third party are admissible non-hearsay to the extent that they are necessary to place the defendant's statements in proper context. *See United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990); *United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989).

hearsay." *United States v. Mahaffy*, No. 05-CR-613 (ILG), 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007) (internal quotations omitted); *see also United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (holding that "while the Government was free to introduce the statement as an admission by a party-opponent, [the defendant] had no right to introduce it on his own" (citations omitted)). As the Sixth Circuit has explained, were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005). Indeed, a defendant may not offer his own prior hearsay statements in an "attempt to get [her] side of the . . . story in front of the jury without [herself] testifying and opening [herself] up to cross-examination." *United States v. Davidson*, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004).

Nor, except in extremely limited circumstances, may a defendant introduce her own out-of-court statements as evidence of her state of mind. The state of mind exception to the hearsay rule allows into evidence "[a] statement of the declarant's then-existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3). The state of mind must be relevant, and the statement cannot be offered for any underlying truth. *See United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993) (proposed state-of-mind evidence inadmissible under Rule 803(3) because it was offered not to prove co-defendant's state of mind, but to prove defendant's past conduct). "The exclusion of statement[s] of memory or belief [proffered] to prove the fact remembered or believed is necessary to prevent the exception from swallowing the hearsay rule," and "[t]his would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." *United States v. Cardascia*, 951 F.2d 474,

487 (2d Cir. 1991) (alterations in original; internal quotations omitted). To be admissible, the statement must be forward-looking and not backward-looking. *See id.* (citing *Shephard v. United States*, 290 U.S. 96, 104 (1933), for proposition that the statement, "Dr. Shephard has poisoned me," is not admissible as an existing state of mind because it was backward-looking).

A defendant's own prior hearsay statements are also not admissible pursuant to the rule of completeness. Under Federal Rule of Evidence 106, courts only permit inclusion of otherwise hearsay testimony where it is "essential to explain an already admitted document, to place the admitted document in context, or to avoid misleading the trier of fact." *United States v. Gotti*, 457 F. Supp. 2d 395, 397-98 (S.D.N.Y. 2006). Self-serving exculpatory statements are not admissible by a defendant unless "their exclusion would unfairly distort the meaning of the declarant's non-hearsay statements that are in evidence." *United States v. Harper*, No. 05-CR-6068L, 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009). Accordingly, the Second Circuit has excluded hearsay statements offered by the defendant that, by their omission, do not distort the admitted statements. *See United States v. Gonzalez*, 399 F. App'x 641, 645 (2d Cir. 2010) (affirming district court's decision to exclude portion of defendant's statement where admitted portion did not distort the meaning of the full statement); *United States v. Johnson*, 507 F.3d 793, 796 (2d. Cir. 2007) (affirming district court's decision to exclude portions of confession that did not explain the admitted portion or place the admitted portion in context, noting that while "[t]he admitted portion of the confession related to . . . plans to execute the robbery, . . . the redacted portion related to the execution of the robbery" (emphasis omitted)). As the Second Circuit has explained, a defendant may not introduce other parts of the same statement offered in part by the government unless the defendant makes a proper showing that the statements he seeks to introduce have a separate basis for admission. *See United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999)

(rejecting claim under the completeness doctrine that later portions of conversation provided relevant context and noting that "the portions of the tape proffered by [defendant] consisted largely of [his] own self-serving statements, which, as offered by him, are inadmissible hearsay"). The completeness doctrine does not "require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *Johnson*, 507 F.3d at 796 (citations omitted).[5]

B. Discussion

At trial, the government intends to offer a number of out-of-court statements made by the defendant, which are admissible as statements of a party-opponent. These statements include:

- statements made to the FBI (both inculpatory and false exculpatory statements) during the defendant's post-arrest interview;
- communications about the financial transactions described above, including with CC-1 and Individual-2;
- statements regarding the defendant's fraudulent marriage, including to Individual-3 and Individual-4;
- conversations regarding the defendant's use of, access to, and interest in firearms, including statements made to CC-1, Individual-5, Individual-6 and Individual-7;
- statements made to or heard by Individual-1 regarding the defendant's radicalization and support for ISIS; and

[5] Even after Rule 106 was amended, the Advisory Committee made clear that the rule change "does not give a green light of admissibility to all excised portions of written or oral statements" and "does not change the basic rule" of completeness, which "applies only" to certain "narrow circumstances" set forth in the caselaw. Fed. R. Evid. 106 advisory committee's notes to 2023 amendments. Indeed, the notes cite favorably to Second Circuit precedent. *See id.* (citing *United States v. Williams*, 930 F.3d 44 (2d Cir. 2019)).

- messages, including via Instagram and WhatsApp, relating to the defendant's support for jihadist causes.[6]

The above-described statements of the defendant are well within the purview of Rule 801(d)(2)(A) and thus are admissible. *See* Fed. R. Evid. 801(d)(2)(A); *see United States v. Kone*, 216 F. App'x 74, 76 (2d Cir. 2007) ("'Statements made by the defendant,' where relevant, 'may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party.'" (quoting *United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002)). During his Mirandized interview, the defendant made a number of relevant admissions—and told a number of relevant lies. For example, as discussed above, the defendant identified CC-1 by name; admitted that CC-1 had asked for money; and suggested that it might be a "crime" to "send money to, like, to do something bad." The defendant denied, however, having sent money to CC-1. Similarly, the defendant claimed that his marriage to Individual-3 was genuine, even though the defendant failed to accurately recall Individual-3's name. All of these statements are relevant to the charged conduct; many of them are consistent with the government's theory, and in other instances, they contain demonstrable lies or false exculpatory statements, indicative of the defendant's consciousness of guilt. *See United States v. Scheibel*, 870 F.2d 818, 823 (2d Cir. 1989) (false exculpatory statements may be considered in determining guilt or innocence).

The defendant's various conversations with third parties are similarly relevant and admissible statements of a party-opponent. Among other things, the defendant's communications reveal his radicalization and intent to support ISIS, including in messages in which the defendant

---

[6] The statements outlined herein are representative of those the government intends to introduce at trial as direct evidence; this list is not exhaustive, and the government reserves the right to introduce as evidence statements of a similar nature that are not outlined here.

relayed his desire to travel overseas to join jihadist causes. The defendant's conversations with both Individual-3 and Individual-4 also provide probative evidence of his efforts to fraudulently secure United States citizenship through a sham marriage, for which the defendant compensated Individual-3. The defendant's own statements similarly support the firearms (and material support) charges insofar as they demonstrate, among other things, the defendant's efforts to obtain and use firearms, including to "go for training." These statements would all be "offered against an opposing party" and were "made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A). They should therefore be admitted.

The law is also clear that the defendant may not introduce his own prior statements. The Court should thus preclude the defendant from admitting other portions of his statements, either on cross-examination or in his case-in-chief, because such testimony would constitute hearsay without any exception. This includes precluding the defendant from cross-examining government witnesses about the defendant's prior statements that the government does not seek to admit, including his self-serving statements to the FBI. *See Jackson*, 180 F.3d at 73 (rejecting claim under the completeness doctrine that later portions of conversation provided relevant context and noting that "the portions of the tape proffered by [defendant] consisted largely of [his] own self-serving statements, which, as offered by him, are inadmissible hearsay"). Indeed, if offered at trial, the defendant's false exculpatory statements would be nothing more than an "attempt to get his side of the . . . story in front of the jury without himself testifying and opening himself up to cross-examination." *Davidson*, 308 F. Supp. 2d at 480; *see also Yousef*, 327 F.3d at 153 ("[W]hile the Government was free to introduce the statement as an admission by a party-opponent, [the defendant] had no right to introduce it on his own" (citations omitted)).

## II. The Court Should Admit Co-Conspirator Statements Made in Furtherance of Certain Charged and Uncharged Conspiracies

The government seeks to admit at trial communications made during and in furtherance of various charged and uncharged conspiracies, including statements: (1) by CC-1 to the defendant; (2) by CC-1 on CC-1's Instagram account; (3) by CC-1 and CC-2 to Individual-2; (4) by and among Individual-5, Individual-6, Individual-7 and the defendant; and (5) by Individual-3 to the defendant. These statements are admissible because they are direct evidence of the charged crimes, and they are either not hearsay or they fall within an exception to the hearsay rule under the Federal Rules of Evidence.

### A. Legal Framework

Hearsay is defined above, and as noted above, "[h]earsay is not admissible unless any of the following provides otherwise: a federal statute; [the Federal Rules of Evidence]; or other rules prescribed by the Supreme Court." Fed. R. Evid. 802.

Statements that are not being offered for their truth are not hearsay. For example, out-of-court statements made by a third party are not hearsay if offered as circumstantial evidence of the defendant's state of mind. *See Detrich*, 865 F.2d at 21; *Dunloy*, 584 F.2d at 11. Similarly, questions or commands do not generally constitute hearsay. *See Bellomo*, 176 F.3d at 586-87; *Dominguez-Gabriel*, 511 F. App'x at 20; *Quartararo*, 186 F.3d at 98.

Nor are all out-of-court statements offered for their truth hearsay. *See, e.g.*, Fed. R. Evid. 801(d)(2)(A) (as noted above, characterizing admissions of a party-opponent as non-hearsay). When a defendant makes statements in the context of a conversation with a third party, the statements of the third party can be admissible non-hearsay to the extent that they are necessary to place the defendant's statements in proper context. *See United States v. Estevez*, No. 16-CR-307 (CM), 2017 WL 700775, at *5 (S.D.N.Y. Feb. 16, 2017) (citing *United States v. Dupre*, 462

F.3d 131, 137 (2d Cir. 2006) and *United States v. Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995); *see also Barone*, 913 F.2d at 49.

Additionally, a statement is not hearsay if "the statement is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit such statements, a court must find by a preponderance of the evidence that (i) "there was a conspiracy"; (ii) "its members included the declarant and the party against whom the statement is offered"; and (iii) "the statement was made during the course of and in furtherance of the conspiracy." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). Written as well as oral statements of a co-conspirator, if made in the course of and in furtherance of the conspiracy, are admissible under Rule 801(d)(2)(E). *See, e.g.*, *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 88 (2d Cir. 1999) (citing Fed. R. Evid. 801(a)).

"It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator [under Rule 801(d)(2)(E)] need not be charged in the indictment." *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979); *see also United States v. DeVillio*, 983 F.2d 1185, 1193 (2d Cir. 1993) ("[C]o-conspirator statements can be used against a defendant even though he was not charged with being a member of the conspiracy."); *Russo*, 302 F.3d at 45.

In determining whether a party has established a proper foundation for admission of co-conspirator statements, a court may consider hearsay and other evidence not admissible at trial, including the proffered statements themselves. *See* Fed. R. Evid. 104(a), 1101(d)(1); *Bourjaily v. United States*, 483 U.S. 171, 178-81 (1987); *United States v. Gigante*, 166 F.3d 75 (2d Cir. 1998). However, the Court must consider independent corroborating evidence of the defendant's participation in the conspiracy beyond the statements themselves, *see United States v.*

*Desena*, 260 F.3d 150, 158 (2d Cir. 2001); Fed. R. Evid. 801(d)(2)(E) (noting that the statement "does not by itself establish . . . the existence of the conspiracy or participation in it").

The requirement "that the challenged statement be 'in furtherance of' the conspiracy is satisfied if the statement's objective is 'designed to promote or facilitate achievement of the goals of the conspiracy.'" *United States v. Malka*, 602 F. Supp. 3d 510, 535 (S.D.N.Y. 2022) (quoting *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994)). This standard "is not very restrictive." *United States v. Kurland*, No. 20-CR-306 (S-1) (NGG), 2022 WL 2669897, at *3 (E.D.N.Y. July 11, 2022) (citing *Malka*, 602 F. Supp. 3d at 535)). "It permits, for example, introduction of any co-conspirator statement that 'reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy.'" *Malka*, 2022 WL 1488568, at *13 (citing *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988)). Even "statements relating [to] past events meet the in-furtherance test if they serve some current purpose in the conspiracy." *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994); *see also United States v. Mallay*, 712 F.3d 79, 106 (2d Cir. 2013). "[S]o long as a co-conspirator statement was in furtherance of the conspiracy, there is no requirement that it have been in furtherance of the interests of the defendant himself or of any particular co-conspirator." *Gupta*, 747 F.3d at 124.

Nothing in the text of Rule 801(d)(2)(E) or in caselaw interpreting the Rule's scope requires that a statement be communicated to any other member of the conspiracy to qualify as a co-conspirator statement, so long as it was made during and in furtherance of the conspiracy and is admitted against a member of the conspiracy. *See, e.g.*, *United States v. Fawwaz*, 694 F. App'x 847, 851 (2d Cir. 2017) (holding that list containing "information regarding the current status of the conspiracy and its membership [was] sufficiently in furtherance of a conspiracy"); *United*

*States v. Ashraf*, 320 F. App'x 26, 29 (2d Cir. 2009) (affirming admission of drug ledgers pursuant to Rule 801(d)(2)(E)); *Malka*, 2022 WL 1488568, at *12 ("A statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy.").

Co-conspirator statements that "provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness or inform each other as to the progress or status of the conspiracy" further the ends of a conspiracy, *Desena*, 260 F.3d at 159, as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987); *see also United States v. Amato*, 15 F.3d 230, 234 (2d Cir. 1994), or that "prompt the listener to respond in a way that facilitates the carrying out of criminal activity," *Gupta*, 747 F.3d at 125. In *United States v. Mulder*, for example, the Second Circuit upheld the admission of a co-conspirator's statements even though they appeared to merely narrate conversations between members of the conspiracy because it kept fellow co-conspirators apprised of the arrangements for their extortion scheme. 273 F.3d 91, 103 (2d Cir. 2001).

Where co-conspirator statements are non-testimonial, there is no Confrontation Clause concern in the admission of co-conspirator statements. *See United States v. Saget*, 377 F.3d 223, 228-30 (2d Cir.), *supplemented*, 108 F. App'x 667 (2d Cir. 2004) (analyzing *Bourjaily*, 483 U.S. 171, and identifying as testimonial "a declarant's knowing responses to structured questioning in an investigative environment or in a courtroom setting where the declarant would reasonably expect that his or her responses might be used in later judicial proceedings.").

B. Discussion

1. Statements by CC-1 to the Defendant

The government intends to introduce into evidence various statements by CC-1 to the defendant. *First*, on numerous occasions during the charged conspiracy, the defendant and

CC-1 discussed the defendant's transmission of money to CC-1, including through Individual-2. Those communications are described in detail above and include, for example, a discussion about passing CC-1's contact information to Individual-2, communications about where donated funds were sent or would be sent and in what amounts, communications about collecting and transmitting additional funds, logistical instructions, and other similar communications. *See supra* at Section II.A.

All of these communications are admissible for multiple reasons. Communications by the defendant to CC-1 are admissible as party admissions under Fed. R. Evid. 801(d)(2)(A), as described above. *See* Fed. R. Evid. 801(d)(2)(A); *Kone*, 216 F. App'x at 76. Communications by CC-1 to the defendant during those conversations are admissible to give context to the defendant's statements. *See Estevez*, 2017 WL 700775, at *5; *Dupre*, 462 F.3d at 137; *Sorrentino*, 72 F.3d at 298. They are also admissible because they are not being offered for their truth but rather as non-hearsay requests, questions and commands being posed to the defendant regarding the money transfers, *see Bellomo*, 176 F.3d at 586-87; *Dominguez-Gabriel*, 511 F. App'x at 20, and to otherwise demonstrate the defendant's state of mind while he was facilitating these transfers, *see Detrich*, 865 F.2d at 21; *Dunloy*, 584 F.2d at 11.

Even if none of those principles applied (and they do), these statements by CC-1 would also be admissible as statements of a co-conspirator made during and in furtherance of the charged material support conspiracy. The statements were all made between December 2021 and June 2023, which is during the alleged timeframe of the conspiracy, and all pertain to the defendant's and CC-1's efforts to provide funds to ISIS. *See Gupta*, 747 F.3d at 123. The conspiracy by CC-1, the defendant and others to provide material support to ISIS will be further

demonstrated through independent evidence including financial records and the defendant's own statements. *Desena*, 260 F.3d at 158.

*Second*, as described above, the defendant also communicated with CC-1 about his firearms training in support of his desire to fight for ISIS, and CC-1 provided encouragement in response. For example, on February 27, 2022, the defendant sent CC-1 a 17-second video of himself firing an assault rifle at a shooting range in New Jersey. The defendant included with the video a message to CC-1 stating, "Thank God, I am ready, brother." CC-1 responded, "Wow, praise be upon God, brother. This is perfect, brother . . . . It has been transferred to the [online] account on the other side." In June 2022, the defendant sent CC-1 another video of himself firing an assault rifle with the message, "Brother, I go for training at least once or twice a week." CC-1 also sent the defendant religious messages and extremist content. As one example, on or about September 20, 2022, CC-1 sent the defendant an audio file of an ISIS nasheed, a form of vocal music used by ISIS to distribute propaganda. The lyrics of the nasheed are, in part, "The day of revenge is near and we will be glorious against the infidels. To break the chains, we will chant Allahu Akbar."

Such communications are directly relevant to proving the charged conspiracy between the defendant, CC-1 and others to provide material support to ISIS. The defendant's statements are admissible for the reasons discussed above. The communications by CC-1 are admissible because they provide necessary context to the defendant's own statements and reactions, and because they are in any event not admitted for their truth (*e.g.*, that ISIS "will be glorious against the infidels"), but rather to demonstrate CC-1's and the defendant's states of mind, including their intention to knowingly support ISIS. Such evidence is particularly important because the defendant has suggested that he intends to argue that he only intended to support

families in need, not ISIS fighters, and that his motivation was humanitarian, not terroristic. They are alternatively admissible as co-conspirator statements because they were made during and in furtherance of the conspiracy among CC-1, the defendant and others to provide material support to ISIS, including both by fighting for ISIS and by providing funding to ISIS. *See Gupta*, 747 F.3d at 123.

2. Statements by CC-1 on CC-1's Instagram Account

Next, the government intends to introduce into evidence posts by CC-1 on CC-1's Instagram account. CC-1 occasionally directed the defendant to the account, as discussed above. The account, which had over 22,000 followers, displayed a user bio that translates to "Madrasa for youth," and contained content supporting jihad and ISIS. For example, the government intends to introduce posts by CC-1 during the charged material support conspiracy that include a video of ISIS leader Abu Bakr al-Baghdadi firing a machine gun with other ISIS fighters, a video of ISIS commander Omar al-Shishani meeting with ISIS fighters with machine guns and an ISIS flag, and a video discussing jihad and depicting an ISIS emblem.

These posts on CC-1's Instagram are directly relevant to proving CC-1's ISIS affiliation and his and the defendant's participation in a conspiracy to provide material support to ISIS. They are admissible as non-hearsay because they will not be admitted for their truth, but rather to demonstrate CC-1's attempts to promote ISIS and his state of mind as a member and supporter of ISIS. *See United States v. Johnson*, 131 F.3d 132 (2d Cir. 1997) (statements of co-conspirator, not offered for their truth, demonstrated co-conspirator's "awareness of guilt" and "knowledge or intent"). They are also admissible for the effect on the listener—that is, they inform the defendant's understanding of CC-1, whom he clearly understood to be a member and supporter of ISIS. *See Detrich*, 865 F.2d at 21; *Dunloy*, 584 F.2d at 11. Even if they were not, they would

be admissible as statements of a co-conspirator made during and in furtherance of the charged material support conspiracy for all the same reasons discussed above. *See Malka*, 2022 WL 1488568, at *12 ("A statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy."); *see also infra* at Section III (discussing admissibility of jihadist propaganda in a material support case).

3. Statements by CC-1 and CC-2 to Individual-2

The government further intends to offer into evidence statements by CC-1 and CC-2 to Individual-2. These largely consist of instructions to Individual-2 as to where to send funds and Individual-2's confirmations that he had done so. For example, on or about April 7, 2023, Individual-2 told CC-1 that the defendant had instructed Individual-2 to make a transfer of $2,300. Individual-2 asked CC-1 to whom he should send the funds and asked for their passport information so that he could execute a money transfer through Western Union. On or about that same day, CC-1 replied to Individual-2 instructing him to send the funds (which he referred to as a "donation") to CC-2 and another individual. CC-1 indicated that Individual-2 needed to send the funds by the following Saturday. Similarly, CC-2 messaged Individual-2 to coordinate money transfers, and sent Individual-2 an image of his Turkish identity card and an image of a receipt for a money transfer he successfully received in Türkiye in April 2023. Such instructions and confirmations by CC-1 and CC-2 are directly relevant to the charged conspiracy to provide funds to ISIS and admissible as non-hearsay because questions and commands are not statements admitted for their truth. *See Bellomo*, 176 F.3d at 586-87; *Dominguez-Gabriel*, 511 F. App'x at 20; *Quartararo*, 186 F.3d at 98.

Alternatively, CC-1's and CC-2's statements to Individual-2 are statements of co-conspirators made during and in furtherance of the material support conspiracy for all the same

reasons that CC-1's statements to the defendant about money transfers are. *See supra* at Section II.A; *Gupta*, 747 F.3d at 123. As described above, such statements need not be made to another co-conspirator to qualify under this non-hearsay rule. *Malka*, 2022 WL 1488568, at *12; *see also United States v. Ragano*, No. 24-CR-50 (HG) (E.D.N.Y.), ECF No. 58, September 9, 2024 Pretrial Conference Tr. at 8-9 (provisionally admitting statements made by co-conspirator to non-member of conspiracy during and in furtherance of conspiracy with defendant).

4. <u>Statements by and Among Individual-5, Individual-6, Individual-7 and the Defendant</u>

The government also intends to introduce into evidence statements by Individual-5 to the defendant (including statements in which Individual-5 sent the defendant statements of Individual-6), as well as statements by Individual-7 to the defendant, about the illegal purchase of firearms. As described above, on February 8, 2024, Individual-5 sent the defendant a screenshot of messages from Individual-6 about the potential purchase of a gun "without documents, checks, and other things." On August 19, 2024, Individual-7 sent the defendant a video displaying a handgun and ammunition, stating that it cost $250 to buy. The next day, the defendant sent a photograph of what appears to be the same gun and ammunition to Individual-5. Several days later, the defendant sent Individual-5 a video depicting the firing of a handgun out the window of a moving car.

These communications by Individuals -5, -6 and -7 to the defendant are directly relevant to the charged conspiracy to possess firearms as an alien unlawfully in the country, and are admissible on several bases. Among other things, they provide crucial context to the defendant's own admissible communications to these individuals about illegal firearms. *See Estevez*, 2017 WL 700775, at *5; *Dupre*, 462 F.3d at 137; *Sorrentino*, 72 F.3d at 298. They are also non-hearsay statements offered not for their truth (the government has no interest in proving,

for example, the actual cost of an illicit firearm for the jury in this case), but rather to demonstrate the conspirators' intent to engage in illegal firearms transactions. *Johnson*, 131 F.3d at 132. Alternatively, they are statements of co-conspirators made during and in furtherance of the firearms conspiracy. *Gupta*, 747 F.3d at 123. The communications plainly advance the defendant's efforts to possess a firearm and the co-conspirators' efforts to help him obtain one. Moreover, the description of the firearm as coming "without documents, checks, and other things" shows the awareness of the co-conspirators of the defendant's inability to purchase a gun legally. That some of these communications occurred after the period of the firearms conspiracy charged in the indictment does not change the analysis. As described above, "the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator [under Rule 801(d)(2)(E)] need not be charged in the indictment" at all. *Lyles*, 593 F.2d at 194.[7] Importantly, the conspiracy and the defendant's participation in it will also be demonstrated by other admissible evidence, including testimony, immigration records, records and photographic evidence

---

[7] Nor does that timing make these communications (including both Individual-7's August 2024 messages to the defendant and the defendant's August 2024 video message to Individual-5) any less relevant and admissible to proving the charged conspiracy, separate and apart from any hearsay concerns. *See, e.g., United States v. Serrano*, 640 F. App'x 94, 98-99 & n.2 (2d Cir. 2016) (affirming district court decision to admit communications between defendant and witness that postdated the charged conspiracy because they "bore directly on . . . the criminal conduct at issue"); *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010) (conversations that "took place more than four years after [the] charged crime" were nonetheless "undoubtedly relevant to a jury's assessment of [the defendant's] guilt"); *United States v. Bimbow*, No. 21-CR-48 (JPO), 2022 WL 1617490, at *2 (S.D.N.Y. May 23, 2022) ("[I]t is of no consequence that . . . communications that the government introduced to establish the existence of a narcotics conspiracy occurred a month or a couple months before the time period alleged in the indictment."), *aff'd*, No. 24-21, 2025 WL 1416591 (2d Cir. May 16, 2025); *United States v. Bennett*, 74 F. App'x 201, 207 (3d Cir. 2003) (evidence of defendants' efforts to acquire narcotics ingredients several months after charged narcotics conspiracy was relevant to proving the conspiracy).

illustrating the defendant's trips to shooting ranges, and the defendant's own statements about his use of firearms. *Desena*, 260 F.3d at 158.

5. Statements by Individual-3 to the Defendant

Finally, the government intends to offer into evidence statements by Individual-3 to the defendant in furtherance of the uncharged conspiracy between them to commit visa fraud, the substantive crime with which the defendant is charged in Count Four of the indictment. In particular, the government expects to introduce at trial text messages between Individual-3 and the defendant showing that the defendant paid Individual-3 to marry him and that Individual-3 continually demanded more money and threatened to report the defendant to immigration authorities. As noted above, Individual-3 made statements such as, "I'm helping you out to get ya papers the least you can do is help me out when I need it," and, "You want papers but don't wanna pay the right price another girl would've got you for more . . . Ima just speak to immigration my sister is married the same way I am she knows the system she's helping me." The defendant texted Individual-3 that he would send her money, noting that, "you must not break the contract but every time you break."

Individual-3's messages are admissible because they lend context to the defendant's own statements to Individual-3 about their agreement, which are admissible as opposing party statements as discussed above. Individual-3's messages are also admissible as co-conspirator statements because they were made during and in furtherance of the uncharged conspiracy between Individual-3 and the defendant to make false statements in a visa application about their sham marriage. *Gupta*, 747 F.3d at 123. Though some of these statements were made following the defendant's submission of the application, they were crucial to the ongoing agreement between the defendant and Individual-3 to violate immigration laws, including by

hiding the sham nature of their marriage from authorities, in exchange for money. *See Thai*, 29 F.3d at 813 ("[S]tatements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy."); *United States v. Haldeman*, 559 F.2d 31, 111 (D.C. Cir. 1976) (co-conspirator statements admissible where they were "integral parts of the continual strategy sessions that took place . . . concerning what to do in the future about [the past conduct]"); *United States v. Kidd*, No. 20-CR-572 (NSR), 2022 WL 15317483, at *3 (S.D.N.Y. Oct. 27, 2022) ("[S]tatements designed to 'cover up' are in furtherance of the conspiracy.") (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989)). That conspiracy will be further demonstrated through independent evidence including witness testimony and the defendant's fraudulent submissions and own statements. *Desena*, 260 F.3d at 158.[8]

## III. The Court Should Admit Evidence of Jihadist Propaganda Possessed and Distributed by the Defendant

In connection with his efforts to support ISIS, the defendant possessed jihadist propaganda on his mobile device and iCloud, including videos promoting violence and martyrdom (together, the "Propaganda Evidence"). For example, one video featured a Hamas spokesman and ended with the message, "It is indeed a jihad of victory or martyrdom." Another video, produced by an ISIS media apparatus, featured a lecture by an ISIS leader depicted against a background of

[8] Alternatively, should Individual-3 invoke her Fifth Amendment rights and refuse to testify, these statements would be admissible as statements against penal interest pursuant to Fed. R. Evid. 804(b)(3). *See United States v. Miller*, 954 F.3d 551, 560–61 (2d Cir. 2020) ("Rule 804(b)(3) allows for a hearsay statement to be admitted 'if the declarant is unavailable as a witness,' the statement is 'so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability' that 'a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true,' and the statement 'is supported by corroborating circumstances that clearly indicate its trustworthiness' . . . . When a witness properly invokes his Fifth Amendment right against self-incrimination, he is unavailable for the purposes of [the rule].").

battlefield footage and images of dead and wounded fighters. The defendant also sent an associate a video entitled "Central Asia: The Call of ISIS," which discussed a Tajik military commander who defected to ISIS in 2015 and encouraged others to do the same. Lastly, as discussed above, the defendant received an ISIS nasheed from CC-1. The lyrics of the nasheed were, in part, "The day of revenge is near and we will be glorious against the infidels. To break the chains, we will chant Allahu Akbar." The Court should admit the Propaganda Evidence as direct evidence of the defendant's intent to engage in a conspiracy to provide material support to ISIS and ISIS-K.

A. Legal Framework

Title 18, United States Code, Section 2339B criminalizes "knowingly provid[ing] material support or resources to a foreign terrorist organization, or attempt[ing] or conspir[ing] to do so." Among the elements that the government must prove beyond a reasonable doubt is the defendant's knowledge of the foreign group's designation as a foreign terrorist organization or its commission of terrorist acts. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 130 (2010).

In assessing whether evidence is admissible at trial, courts must consider if the evidence is relevant, meaning that it has a tendency to make a fact more or less probable, and that that fact is of consequence to the action. *See* Fed. R. Evid. 401, 402. The court may exclude relevant and otherwise admissible evidence only where its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or because it is cumulative. Fed R. Evid. 403.

B. Discussion

In determining whether the defendant conspired to provide support to ISIS and ISIS-K, the jury must be able to see the propaganda maintained and disseminated by the defendant. These exhibits are not prejudicial because they are not more inflammatory than the charged

conduct (and indeed they are less inflammatory than many ISIS propaganda videos that arise in material support cases, which often depict brutal murders and beheadings). Meanwhile, they are directly probative of the defendant's embrace of a violent terrorist organization. As described above, such knowing and intentional support of a terrorist group, including familiarity with its acts of terror, is an essential element of the offense that the government must prove beyond a reasonable doubt. The materials are thus direct evidence of the crimes charged and should be admitted. *See United States v. Hashimi, et al.*, 22-CR-553 (ENV) (E.D.N.Y.), ECF No. 144, September 30, 2025 Short-Form Memorandum and Order (finding ISIS propaganda stored on defendant's electronic devices and social media "relevant to defendant's intent and [] neither inflammatory nor unduly prejudicial") (citing *United States v. Farhane*, 634 F.3d 127, 159 (2d Cir. 2011) and *United States v. Pugh*, 162 F. Supp. 3d 97, 118 (E.D.N.Y. 2016) (violent ISIS propaganda in defendant's possession spoke "strongly to his state of mind" and "directly to the charged conduct")).[9]

IV. [redacted]

[redacted]

[9] The defendant distributed the "Central Asia: The Call of ISIS" video to an associate in or about November 2023, shortly after the charged material support conspiracy. But that timing does not alter its relevance and admissibility to prove that conspiracy. *See supra* at n.7 (citing *Serrano*, 640 F. App'x at 98-99 & n.2 (affirming district court decision to admit communications between defendant and witness that postdated the charged conspiracy because they "bore directly on . . . the criminal conduct at issue") and *Abu-Jihaad*, 630 F.3d at 132 (defendant's conversations about jihad that "took place more than four years after [the] charged crime" were nonetheless "undoubtedly relevant to a jury's assessment of [his] guilt")).

[redacted]

[redacted]

[redacted]

[redacted]

V. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

VI. The Court Should Admit Certain Court Records and Records of Regularly Conducted Activity

The government also expects to offer evidence pursuant to various certifications, including business record certifications, in accordance with Federal Rule of Evidence 902. Over the course of this investigation, the government has obtained records from electronic communications service providers, government agencies, and other businesses, including through subpoenas and search warrants. In doing so, the government has obtained (or expects to obtain), among other things, certified records from various electronic communications services providers (such as Meta and Apple), certified forensic extractions of multiple cell phones, and certified court records, all of which is evidence relevant to and probative of the crimes charged in the indictment. Offering these categories of proof pursuant to their respective certifications will enable the government to streamline trial in this matter by obviating the need for testimony from multiple records custodians.

A. Legal Framework

The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In discussing the contours of this right, the Supreme Court has held that admitting business records that have been authenticated by affidavit or certificate does not

---

Individual-1's testimony regarding the threats establishes a bias against the defendant—which the government would contest—such argument is of course permissible.

violate a defendant's right to confrontation. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). The Supreme Court explained: "Business and public records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." Id. at 324.

Relying on *Melendez-Diaz*, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and therefore are permissible. *See, e.g.*, *United States v. Qualls*, 613 F. App'x 25, 28 (2d Cir. 2015); *United States v. Johnson*, 688 F.3d 494, 504-05 (8th Cir. 2012); *United States v. Yeley-Davis*, 632 F.3d 673, 680-81 (10th Cir. 2011); *United States v. Morgan*, 505 F.3d 332, 339 (5th Cir. 2007); *United States v. Ellis*, 460 F.3d 920 (7th Cir. 2006); *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005). As the Seventh Circuit explained in *United States v. Ellis*, an authenticating certification under Rule 902(11) is "nothing more than the custodian of records . . . attesting that the submitted documents are actually records kept in the ordinary course of business" and "merely establish the existence of the procedures necessary to create a business record." *Ellis*, 460 F.3d at 927. It is the underlying records, not the certification, that are introduced to establish the facts at trial.

Consistent with this understanding of the confrontation right, federal law permits the authentication of business records by certification and sets forth specific requirements for their admission. Federal Rule of Evidence 902(11) expressly permits the authentication of domestic business records by certification.[11] Title 18, United States Code, Section 3505 expressly permits

[11] Other provisions of Rule 902 provide for self-authentication of other categories of evidence—for instance, domestic public documents that are sealed and signed, certified records generated by an electronic process or system, and certified data copied from an electronic device, storage medium, or file.

the authentication of foreign business records by certification. And courts in the Second Circuit have routinely applied these provisions to admit certified business records at trial. *See, e.g.*, *United States v. Komasa*, 767 F.3d 151 (2d Cir. 2014).

B. Discussion

The government should be permitted to authenticate various records using business record or other applicable certifications pursuant to Rule 902 because it is proper under the law and because doing so would eliminate unnecessary witnesses, shorten the amount of time that jurors will need to sit for trial, and obviate the need for unnecessary witnesses to travel to New York to appear at trial. Among other things, the government intends to offer the following self-authenticating records: (i) certified records from Apple relating to the defendant's Apple iCloud account; (ii) certified records from Meta relating to multiple Instagram accounts (including the defendant's and CC-1's); (iii) certified digital forensic extractions of multiple cell phones (including the defendant's and Individual-2's); and (iv) certified court records, including relating to *United States v. Sayfullo Habibullaevic Saipov*, 17-CR-722 (S.D.N.Y.). The government has provided business records certifications to the defense on a rolling basis, and will continue to produce any additional certifications as they are received.

## VII. The Court Should Preclude Evidence and Argument Improperly Impugning the Government's Investigative and Prosecutorial Conduct

The defendant should be precluded from introducing evidence or making arguments that seek to impugn or otherwise put at issue the government's conduct or motives in prosecuting this matter. Such evidence is irrelevant to the defendant's guilt or innocence and presents a substantial risk of misleading the jury or inviting jury nullification.

Courts have consistently held—and often give jury instructions reflecting—that arguments regarding the government's decisions during an investigation and its motives and

timing in bringing charges are irrelevant, unduly prejudicial, and improperly invite jury nullification. *See, e.g.*, *United States v. Saldarriaga*, 204 F.3d 50, 52 (2d Cir. 2000) (affirming jury charge stating that "[t]he government's function is to give enough evidence to satisfy you beyond a reasonable doubt that the charges are true, and the fact that there are a thousand other things they could have done is wholly irrelevant" (internal quotations and alterations omitted)); *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"); *United States v. Preldakaj*, 456 F. App'x 56, 60 (2d Cir. 2012) (affirming instruction that "[y]ou have heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were not used by law enforcement authorities[, but t]he government is not on trial, and law enforcement techniques are not your concern"); *United States v. Knox*, 687 F. App'x 51, 54-55 (2d Cir. 2017) (instructing jury that "government is not on trial" was "appropriate" (internal quotations omitted)).

Courts also consistently preclude defendants' attacks on the prosecution's motivation or methods in initiating its prosecution, including arguments that a defendant was improperly targeted. *See, e.g.*, *Farhane*, 634 F.3d at 167 (affirming district court's ruling precluding defendant from arguing in summation that government had improperly targeted him for prosecution); *United States v. Guzman-Loera*, No. 09-CR-466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) ("[S]elective-prosecution argument by defendant to the jury would . . . be improper"). The Court should do the same here. *See United States v. Webb, et al.*, No. 15-CR-252 (PKC) (E.D.N.Y), ECF No. 1275, Trial Transcript at 3630:09-3632:12 ("[M]aking argument

in the vein of selective prosecution or the government's motive in conducting its investigation; for example, not getting certain evidence or pursuing certain leads and potentially focusing on certain defendants is . . . inappropriate" at trial.); *United States v. Stewart*, No. 03-CR-717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); *United States v. Reese*, 933 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2013) ("[A] defendant 'may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case.'") (quoting *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004)).

The same applies to claims of prosecutorial misconduct. It has long been held that such allegations must be directed to the court, not the jury. *See United States v. Dupree*, 833 F. Supp. 2d 255, 270 (E.D.N.Y. 2011), *vacated and remanded on other grounds*, 706 F.3d 131 (2d Cir. 2013) ("It is established Second Circuit law that allegations of prosecutorial misconduct are properly directed to the judge, not the jury."); *see also United States v. Young*, 283 F. App'x 858, 860 (2d Cir. 2008) (defendant's argument regarding alleged misconduct by the government was more appropriately directed to the court rather than to a jury); *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997) ("[W]e agree with the district court's decision to resolve for itself whether the government's conduct was lawful and to prevent Regan from presenting evidence [that the grand jury investigation was illegitimate]."); *see also United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991) ("A motion to dismiss an indictment alleging outrageous governmental conduct is a question of law directed to the trial judge.").

Here, the defendant has already made a number of allegations of government misconduct to the Court, and the Court has ruled on those allegations. Such pretrial issues already

decided by the Court are not proper argument at trial. *See Dupree*, 833 F. Supp. 2d at 272 ("The court cannot and will not permit this case to become a referendum before the jury on the appropriateness or legality of government conduct that has already been found appropriate and lawful and which has no bearing on the reliability of evidence offered against defendants. Therefore, the court grants the government's motion to preclude defendants from presenting evidence or eliciting testimony during direct or cross-examination regarding their allegations of prosecutorial misconduct."); *United States v. Lights*, No. 15-CR-721, 2016 WL 7098633, at *1-2 (S.D.N.Y. Dec. 5, 2016) ("This issue has been litigated and decided. No reference to the illegality of the stop or subsequent searches will be permitted at trial . . ."); *see also Ragano*, ECF No. 58, September 9, 2024 Pretrial Conference Tr. at 45:5-13 ("[T]here doesn't seem to be a dispute that July 5th was a coordinated investigative technique to send in John Doe to elicit, if possible, incriminating statements from your client. I expect the government to do that in an investigation. And you can -- if your argument is that somehow that's improper, that I won't allow because there's nothing improper about that."); *United States v. Hilliard*, 19-CR-358 (PKC) (E.D.N.Y.), Trial Tr. at 1270 ("Sustained. Ladies and gentlemen, it's not for you to decide if the prosecution is just. . . . Again, the Government is not on trial[,] ladies and gentlemen.").

To be clear, a defendant is entitled to argue before the jury that the absence of certain types of evidence presented to the jurors may give rise to reasonable doubt. But the Court should preclude the defendant from presenting any argument or evidence about the entirely different—and inappropriate—topics of the government's pretrial investigative motives, "enforcement initiatives" and "investigative steps." *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 492 (S.D.N.Y. 2018). Those latter topics are "irrelevant to the defendant's innocence or guilt" under Rule 402, and inquiry into those topics invites "confusion, delay, and distraction"

and enhances "the risk of unfairly prejudicing the Government at trial" under Rule 403, "with no offsetting probative value." *Id.*; *see also, e.g.*, *Rosado*, 728 F.2d at 93.

## VIII. The Court Should Preclude Questioning or Argument Regarding the Purported Lawfulness or Reasonableness of Any Government Searches or Other Pretrial Matters

The government anticipates that it will call one or more FBI agents at trial to testify regarding evidence recovered pursuant to judicially authorized searches, including of the defendant's premises and certain electronic devices and accounts. The defendant should be precluded from any questioning or argument suggesting that such searches were unlawful or unreasonable, or from otherwise advancing legal arguments relating to the subjects of pretrial motions that are properly directed to the Court. *See* ECF No. 35 (defendant's motion to suppress and dismiss); ECF No. 60 (motion for reconsideration, invoking *United States v. Ullah*, 173 F.4th 399 (2d Cir. 2026)).

Any attempt, subtle or otherwise, by the defendant to suggest at trial that the government's searches were somehow improper or that law enforcement acted unreasonably would have no bearing on his guilt or innocence. *See Lights*, 2016 WL 7098633, at *1-2 ("The stop and subsequent searches were all based on valid probable cause. This issue has been litigated and decided. No reference to the illegality of the stop or subsequent searches will be permitted at trial . . .") (citation omitted). Similarly, legal arguments invoked by the defendant in seeking dismissal of certain counts of the indictment are properly directed to the Court—not the jury—and should therefore be precluded at trial. *See Dupree*, 833 F. Supp. 2d at 272 ("The court cannot and will not permit this case to become a referendum before the jury on the appropriateness or legality of government conduct that has already been found appropriate and lawful and which has no bearing on the reliability of evidence offered against defendants. Therefore, the court grants the government's motion to preclude defendants from presenting evidence or eliciting testimony

during direct or cross-examination regarding their allegations of prosecutorial misconduct.") (citations omitted).

While the defendant may (and here, did) move to suppress the fruits of searches prior to trial, and to dismiss certain counts of the indictment, Rule 104 makes clear that the Court decides "preliminary questions" outside the presence of the jury, including whether evidence is admissible. Any purported probative value of this line of argument or questioning would be substantially outweighed by all of the risks enumerated in Rule 403, including unfair prejudice, confusion of the issues and misleading the jury, as well as undue delay and waste of time.

IX. The Court Should Preclude Inquiry and Argument About the Existence or Absence of Classified Information Related to This Matter

On April 13, 2026, the Court granted the government's motion for a protective order pursuant to Section 4 of the Classified Information Procedures Act ("CIPA"), which provides the procedural framework for handling classified information in criminal cases.[12] *See* ECF No. 57. To the extent the defendant seeks to elicit classified information at trial, he was required to do so in accordance with CIPA, which requires a defendant who reasonably expects to disclose or to cause the disclosure of classified information to notify the United States "within the time specified by the court, or, where no time is specified, within thirty days prior to trial." 18 U.S.C. app. 3 § 5. Accordingly, and out of an abundance of caution, the government moves to preclude any inquiry or argument about classified information during trial outside the scope of CIPA. *See, e.g., United States v. Badia*, 827 F.2d 1458, 1464-66 (11th Cir. 1987) (precluding inquiry for failure to provide notice under CIPA Section 5). Publicly disclosing the existence or absence of particular classified

[12] The government's CIPA Section 2 filing contains a more comprehensive discussion of the statute. *See* ECF No. 18.

information, even in general terms, would tend to reveal classified facts and thus risk damage to national security. Additionally, any testimony or argument about the general absence or existence of classified information would be irrelevant and inadmissible.

As background, CIPA Section 5 requires a defendant to provide notice of his intent to seek to disclose classified information at trial. 18 U.S.C. app. 3 § 5. CIPA Section 6 prescribes a hearing for the Court to make pretrial determinations about the use, relevance, and admissibility of that classified information at trial. 18 U.S.C. app. 3 § 6. Finally, CIPA Section 8 addresses limited circumstances not covered by Sections 5 and 6, like when defense counsel inadvertently asks a question calling for classified information, and permits the government to object to any inquiries that might require a witness to disclose classified information not previously held to be admissible.[13] 18 U.S.C. app. 3 § 8(c).

The Supreme Court has "recognized the Government's 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business" and described the reasons underlying that interest as "too obvious to call for enlarged discussion." *Dep't of Navy v. Egan*, 484 U.S. 518, 527, 529 (1988) (citations omitted). This interest applies both to disclosing information as well as to confirming or denying the existence of such information, which could harm intelligence sources, methods, and operations by revealing the scope of the government's ability to collect information on foreign governments (or lack thereof). As the D.C. Circuit has explained, "much of the government's security interest in the

---

[13] CIPA Section 7 permits the government to take an expedited interlocutory appeal if the district court: (1) authorizes the disclosure of classified information; (2) imposes sanctions for nondisclosure of classified information; or (3) refuses to issue a protective order sought by the government to prevent the disclosure of classified information. 18 U.S.C. app. 3 § 7.

conversation lies not so much in the contents of the conversations, as in the time, place, and nature of the government's ability to intercept the conversations at all." *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989). The Second Circuit has adopted *Yunis*'s reasoning and made clear that disclosing whether the U.S. intelligence community obtained information about any particular person would reveal national security and classified information. *See United States v. Stewart*, 590 F.3d 93, 131-32 (2d Cir. 2009) (holding that the details of the NSA's operations, including "the surveillance vel non of any particular group," implicate national security). Thus, any witness examination about the existence, scope, or content of intelligence collection related to this case in violation of CIPA would reveal classified information and should be precluded.

Likewise, general questions or arguments about the existence or non-existence of intelligence information about the defendant are irrelevant and inadmissible and should also be precluded. Testimony confirming the existence of classified documents (if any did exist), after the Court ordered that any such documents could be withheld under CIPA Section 4, could cause the jury to speculate about the nature of any such document and could damage national security by revealing intelligence sources and methods. *See Yunis*, 867 F.2d at 623. Testimony confirming that no such documents exist (if that were so) is likewise inadmissible. A lack of records held by U.S. intelligence agencies could mean, for example, that inculpatory communications were not intercepted, not that they did not occur. As a result, all that would be revealed would be a potential gap in intelligence collection, which would not be relevant, could cause the jury to draw unsupported inferences, and would cause significant damage to national security. And any claims about the lack of a particular type of evidence or records, like the absence of classified intercepts, would be an argument about law enforcement techniques—an area far outside the jury's concern. Any inquiry or argument about classified information at trial should thus be precluded.

## X. The Court Should Preclude Evidence and Argument Improperly Appealing to Juror Sympathy or Inviting Jury Nullification

The Court should also preclude any argument or elicitation of testimony that have no bearing on the defendant's guilt or innocence and serve only to garner juror sympathy or otherwise invite jury nullification.

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667 (2d Cir. 1995), and so long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the defense does not have a basis in fact or law, a court should not allow the defendant to present the evidence or advance the argument to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997); *United States v. Edwards*, 101 F.3d 17, 20 (2d Cir. 1996) (holding that a "[d]efendant is not entitled to a jury charge based on a theory that the court properly found to be invalid and irrelevant and hence without foundation") (citation omitted).

Relatedly, a defendant is not entitled to advance an argument or introduce evidence to obtain an acquittal or mistrial through jury nullification. A defendant's attempt to focus the jury on sympathy, prejudice or public opinion in coming to a verdict, rather than on the evidence and facts before it, "subverts the jury's solemn duty to 'take the law from the court, and apply that law to the facts of the case as they find them to be from the evidence.'" *In re United States*, 945 F.3d 616, 627 (2d Cir. 2019) (quoting *Sparf v. United States*, 156 U.S. 51, 102 (1895)). Trial courts have a duty to forestall or prevent such conduct. *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent"); *see also United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983) ("We therefore join with those courts which hold that defense counsel may not argue jury nullification during

closing argument"); *United States v. Díaz-Colón*, 651 F. Supp. 3d 468, 480 (D.P.R. 2023) ("This Court possesses the discretion to block defense attorney's attempts to serenade a jury with the siren song of nullification, and may instruct the jury on the dimensions of their duty to the exclusion of jury nullification") (citation omitted).

## XI. The Court Should Preclude Evidence and Argument About Punishment and Consequences of a Conviction

The Court should similarly preclude the defendant from offering evidence or argument at trial regarding the punishment that the defendant may face if convicted on one or more counts at trial, along with any collateral consequences of conviction, including but not limited to deportation.

### A. Legal Framework

As noted above, evidence is relevant only where it pertains to a fact that "is of consequence in determining the action." Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Courts may exclude even relevant evidence where its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. Fed. R. Evid. 403.

### B. Discussion

Evidence and argument regarding the possible punishment the defendant may face if convicted should be precluded because it is irrelevant. *See Shannon v. United States*, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task."). As noted above, evidence is relevant only where it pertains to a fact that "is of consequence in determining the action," Fed. R. Evid. 401, and "[i]rrelevant evidence is not admissible," Fed. R. Evid. 402. Courts may exclude even relevant evidence where its probative

value is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. Fed. R. Evid. 403.

Moreover, such evidence and argument improperly "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a defendant's guilt. *See generally Sand et al., Modern Federal Jury Instructions*, Instruction 9-1 (2017 ed.); *see also Shannon*, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might be imposed [and] not to consider the consequences of their verdicts . . . ." (internal citation omitted)); *United States v. Watts*, 934 F. Supp. 2d 451, 464-65 (E.D.N.Y. 201) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion that would result.").

For these reasons, courts have repeatedly precluded evidence and argument regarding the potential sentence or other consequences a defendant may face on the grounds that such evidence is irrelevant, unfairly prejudicial, and outside the province of the jury. *See, e.g.*, *United States v. Blume*, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences"); *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997) *United States v. DiMarzo*, 80 F.3d 656, 660 (1st Cir. 1996).[14] In short, guilt should determine punishment, not the other way around. *See Thomas*, 116 F.3d at 614 ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court . . . . We categorically reject the idea that, in a society committed to the rule of law, jury nullification is

---

[14] The government reserves the right to revisit this issue should the defendant exercise his right to testify at trial and thereby put his credibility at issue.

desirable or that the courts may permit it to occur when it is within their authority to prevent."). Courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct." *Id.* at 616. Therefore, the Court should preclude the defendant from referencing potential punishment and collateral consequences at trial.

## XII. The Court Should Compel Disclosure of Rule 16(b) Discovery and Defense Trial Exhibits

### A. Legal Framework

Rule 16(b) of the Federal Rules of Criminal Procedure governs a defendant's disclosures in a criminal case. In relevant part, it requires the defendant to provide to the government documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A). Rule 16 does not require a defendant to disclose documents he intends to use for purposes of cross-examining a government witness to impeach their credibility. However, to the extent that a defendant seeks to admit into evidence a document while cross-examining a witness during the government's case-in-chief to affirmatively support the defendant's theory of the case, such a document falls within the ambit of Rule 16. As explained in *United States v. Hsia*:

> A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Black[']s Law Dictionary 207 (7th ed. 1999). Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense . . . . The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case.

No. 98-CR-0057 (PLF), 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000). The *Hsia* court distinguished documents introduced by a defendant via a government witness—which do fall within Rule 16 and should be disclosed—from documents used by a defendant "merely to impeach

a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, [which are] not part of [the defendant's] case-in-chief." *Id.* at *2 n.1. Numerous other district courts have recognized this same distinction. *See United States v. Aiyaswamy*, No. 15-CR-568, 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017) (production requirement); *United States v. Holden*, No. 13-CR-444, 2015 WL 1514569, at *4 (D. Or. Mar 19, 2015) (holding that a defendant must disclose non-impeachment substantive evidence that the defendant seeks to use in examination of government or defense witnesses); *United States v. Huntress*, No. 13-CV-199, 2015 WL 631976, at *33 (W.D.N.Y. Feb. 13, 2015) (observing that "it is not clear that defendants' case-in-chief would be limited to any case they may present after the government rests"); *United States v. Swenson*, 298 F.R.D. 474, 477 (D. Idaho 2014) ("Defendants have a duty to produce any exhibits they intend to use at trial during cross examination of a government witness other than for impeachment purposes.").

Courts in this district have repeatedly held that the defense must produce in advance any "exhibit that will not be used solely for impeachment purposes," even if the defense intends to introduce such exhibit during cross-examination of a government witness. *United States v. Smothers*, No. 20-CR-213 (KAM), 2023 WL 348870, at *22 (E.D.N.Y. Jan. 20, 2023); *see also United States v. Napout*, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) ("Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant."); *United States v. Warren*, No. 22-CR-231 (DLI), ECF Order (E.D.N.Y. Sept. 6, 2023). That obligation extends to material produced by the government in discovery that the defense intends to use as an exhibit. *See Smothers*, 2023 WL 348870, at *22

(requiring advance production of defense exhibits "regardless of whether such an exhibit is in the defense's sole custody").

B. Discussion

Here, the government has repeatedly requested reciprocal discovery from the defendant pursuant to Federal Rule of Criminal Procedure 16(b). To date, the defense has not disclosed any document that it intends to introduce at trial. Accordingly, to avoid gamesmanship and unfair surprise, the government respectfully requests that the Court order the defendants to provide a list of exhibits they intend to introduce during the government's case (*i.e.*, not those documents to be used for impeachment purposes only) or any defense case no later than October 23, 2026.

Finally, the government respectfully submits that, to avoid delay at trial, the Court should set a recommended schedule for disclosure of the statements of any defense witnesses. *See* Fed. R. Crim. P. 26.2. The government proposes that Rule 26.2 material should be provided no later than five days before a witness testifies.

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court grant the government's motions *in limine*.

Dated: Brooklyn, New York
September 7, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

By: /s/
Lindsey R. Oken
Andrew D. Reich
Assistant U.S. Attorneys

cc: Clerk of Court (HG) (via ECF and Email)
Counsel of Record (via ECF and Email)